3:14-CV-1200-J-32PDB

| UNITED STATES DISTRICT COURT MIDDLE | DIVISION OF: JACKSONVILLE | |
|---|---|---|
| Name (under which you are convicted) TONEY D. DAVIS | Docket or Case Number: 3:14-MC-23-J-34JRK | |
| Place of Confinement: UNION CORRECTIONAL INSTITUTION | Prisoner Number: 300807 | |
| Petitioner | | Respondent |
| V. | | |
| TONEY D. DAVIS | MICHAEL D. CREWS Department Of Corrections Secretary | |
| The Attorney General of the State of Florida: PAMELA JO BONDI | | |

## 28 U.S.C. § 2254

## PETITION FOR WRIT OF HABEAS CORPUS

1.  (a)  Name and **location of the circuit court** that entered the judgment of conviction you are challenging: _____**Judicial Circuit**_____

    (b) Criminal docket or case number (if you know): _____92-13193-CF_____

2.  (a) Date of the judgment of conviction (if you know): ___May 11, 1995___

    (b) Date of sentencing: _____July 18, 1995_____

3.  Length of sentence: ___Death, Life, 10 years___

4   In this case, were you convicted on more than one count or of more than one crime? **Yes**.

5.  Identify all crimes of which you were convicted and sentenced in this case: First-degree Felony murder, Sexual Battery, Aggravated Child Abuse

6.    (a)    What was your plea? **Not guilty**

      (b)    If you entered a guilty plea to one count and a not guilty plea to another count, what did you plead guilty to and what did you plead not guilty to?

      (c)    If you went to trial, what kind of trial did you have? **Jury Trial.**

7.    Did you testify at a pretrial hearing, trial, or a post-trial hearing? **Yes.**

8.    Did you file a **direct appeal** from the judgment of conviction? **Yes.**

      (a)    Name of court: ___Florida Supreme Court_____
      (b)    Docket or case number (if you know): _____86, 363_____
      (c)    Result: _____Denied_____
      (d)    Date of result (if you know): __November 6, 1997_____
      (e)    Rehearing Denied: _____January 9, 1998_____
      (f)    Mandate Issued:_____
      (g)    Citation to the case: ____703 So.2d 1055 (Fla. 1997)_____
      (h)    Grounds raised:
      **Trial court erred in not following the dictates of <u>Nelson</u> and <u>Faretta</u> when Davis moved to discharge court appointed counsel ; Trial court erred in denying Davis' motion for judgment of acquittal; Evidence failed to prove victim was alive when vaginal penetration occurred; Court erred in admitting victim impact evidence; Court erred in considering and finding HAC aggravator in which jury was not instructed and state presented no evidence or argument to jury; Court erred in finding statutory aggravator of HAC was proven beyond reasonable doubt; Court erred in finding the statutory aggravator of murder committed during commission of a sexual battery was proven beyond reasonable doubt; Court erred in finding that aggravator outweighed mitigation and therefore improperly sentenced Davis to death.**

            (i) Did you seek further discretionary review in the **Florida Supreme Court** for the **direct appeal**? Yes [ ] No [x] If yes, answer the following:

                  (1)    Docket or case number (if you know): _____
                  (2)    Result: _____
                  (3)    Date of result (if you know): _____
                  (4)    Rehearing Denied: _____

(5)   Citation to the case (if you know): _____

(6)   Grounds raised: _____

(j)   Did you file a petition for **certiorari in the United States Supreme Court** concerning your **direct appeal**? **Yes** If yes, answer the following:

    (1)   Docket or case number:  97-8683 _____

    (2)   Result: _____ Denied _____

    (3)   Date of result:____ June 15, 1998 _____

    (4)   Rehearing Date:_____

    (5)   Citation to the case: ____ 524 U.S. 930 (1998) _____

    (6)   Grounds raised: __ N/A/ _____

9.   Did you file a Fla. R. Crim. P. **3.851 motion (Capital Cases Only)**? If so please give the following information:

    (1)   Name of court: ____ **4th  Judicial Circuit** _____

    (2)   Docket or case number: 16-1992-CF-13193-AXXX-MA-DIV: CR-E

    (3)   Date Mailed:_____

(4)   Date of filing: _____ May 3, 1999 _____

(5)   Nature of the proceeding: Motion to vacate judgment and sentence with special request for leave to amend

    (6) Grounds raised: **Claim I** - Appointed trial and appellate counsel were ineffective for failing to insure that an accurate and completed record on appeal was prepared so as to include Mr. Davis' unequivocal request to discharge appointed trial counsel for being ineffective and not competent for failing to include Mr. Davis written request to present evidence of his musical talents in mitigation during the penalty phase failure to hold a Nelson hearing requires a new trial;

    **Claim II** - Mr Davis was deprived o f his rights to due process under the fourteenth amendment, as well, as his rights under the Fifth, Sixth, an eighth amendments of the United States Constitution and those corresponding provisions of the constitution of the State of Florida, because the State withheld evidence that was material and exculpatory in nature and/or presented misleading or false evidence such omissions went unfounded due to trial counsel's ineffective representation and prevented a full adversarial test.

**Claim III** – Trial counsel was deficient and ineffective for failing to investigate and discover that Gwen Cunningham was being medical treated for a condition that would indicate that she might have been the course of blood found on Mr. Davis' under wear and elsewhere.

**Claim IV** – It was fundamental error to conduct a coir dire examination of the jury panel without an oath being administered.

**Claim V** – It was fundamental error to conduct a pretrial conference between judge Haddock and trial counsel concerning Mr. Davis' complaint about trial counsel without Mr. Davis being present.

**Claim VI** – Mr. Davis was denied a full adversarial testing at the penalty phase of his capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Critical material and exculpatory evidence was not presented. Counsel  failed to adequately investigate and prepared Mr. Davis' case.

**Claim VII** – Mr. Davis received ineffective representation during jury selection as evidenced by trial counsel's inadequate vior dire and failure to exercise meaningful strikes.

**Claim VIII** – (Amended) – Mr. Davis received ineffective representation during his jury trial as evidenced by trial counsel's failure to object to evidence, failure to present evidence or rebutting testimony, failure to object to improper argument and failure to object to improper jury instructions.

**Claim IX** – Mr. Davis was denied a fair trial due to prosecutorial misconduct in that the State improperly questioned and argued that his testimony at trial was new and that he did not tell the police the full story after his arrest.

**Claim X** – Mr. Davis was denied a fair trial due to prosecutorial misconduct in that the State improperly stated the prosecutor's opinion to the jury and made reference to the thoughts of t he victim's surviving siblings.

**Claim XI** – (Abandoned) – The trial court  committed fundamental error by instructing the jury regarding the aggravating factor of heinous atrocious, and cruel.

**Claim XII** – Mr. Davis was denied a reliable sentence and verdict in violation of the eighth and fourteenth amendments to the United States Constitution and the corresponding provisions of the Florida Constitution when the jury's role was diminished, in violation of Caldwell v. Mississippi.

**Claim XIII** – Mr. Davis was denied a reliable sentence and verdict in violation of the eighth and Fourteenth Amendments to the Untied *States*

Constitution when the jury's role was diminished in violation of <u>Ring v. Arizona</u>.

**Claim XIV** – The trial was fraught with procedural and substantive errors which cannot be harmless when viewed as a whole since the combination of errors deprived Mr. Davis of a Fundamentally fair trial guaranteed under the Sixth, Eighth, and Fourteenth Amendments.

(7)  Did you receive an evidentiary hearing where evidence was given on your petition, application, or motion? Yes [x] No [ ]

(8)  Result: ____ Denied _____

(9)  Date of result (if you know)___ December 19, 2011 _____

(10)  Date Rehearing Mailed:_____

(11)  Date Rehearing Denied:_____

(12)  **Appeal from Fla. R. Crim. P. 3.851** Yes [ x] No [ ]

    (a) Name of Court:_____**Florida Supreme Court** _____

    (b) Date Mailed Notice of Appeal"_____

    (c) Result:_____ Denied _____

    (d) Date of Result: _____ April 10, 2014 _____

    (e) Date Rehearing Mailed:_____

    (f) Date Rehearing Denied: August 28, 2014_____

    (g) Mandate Issued:_____

    (h) Case Number:_____ SC12-115 _____

    (i) Citation: 136-So. 3D 1169 (Fla. 2014)_____

    (j) **Discretionary Review to Florida Supreme Court:**

        (1) Date Mailed:_____

(2) Date Filed:_____

(3) Result:_____

(4) Date of Result: _____

(5) Rehearing Mailed:_____

(6) Rehearing Denied:_____

(7) Case Number:_____

(8) Citation:_____

    (k) **Certiorari to the United States Supreme Court:**

(1) Date Mailed:_____

(2) Date Filed:_____

(3) Result:_____

(4) Date of Result: _____

(5) Rehearing Mailed:_____

(6) Rehearing Denied:_____

(7) Case Number:_____

(8) Citation:_____

(10)   Did you file a Fla. R. App. P. 9.141 (d), **State Habeas Corpus motion** challenging effectiveness of appellate counsel? If so please give the following information:

      (1)    Name of court: ___ Florida Supreme Court _____

      (2)    Docket or case number: _SC12-115 _____

      (3)    Date of filing: _____ March 14, 2013 _____

      (4)    Nature of the proceeding: _____

      (5)    Grounds raised: __ IAC of Appellate counsel for failing to present direct appeal claim of fundamental error based on numerous instances of prosecutorial misconduct in violation of Mr. Davis' 5th, 6th, 8th, and 14th Amendment rights under the U. S. Constitution and provisions of Florida Constitution; due process violation because appellate counsel failed on direct appeal to supplement two handwritten letters from Mr. Davis unequivocally requesting discharge of then counsel because of in competence, leaving Florida Supreme Court with an inadequate record on appeal when reviewing claim that trial court failed to conduct a hearing after Mr. Davis requested dismissal of trial counsel in violation of Mr. Davis' 5th, 6th, 8th, and 14th amendment rights under this U. S. Constitution and previsions of Florida Constitution.

      (6)    Did you receive an evidentiary hearing where evidence was given on your petition, application, or motion? Yes [ ] No [ x ]

      (7)    Result: _____ Denied _____

      (8)    Date of result:_____

    (9)    Rehearing Mailed: _____

    (10)  Rehearing Denied: _____

(11)   **Appeal from Fla. R. App. P. 9.141(d) motion**: Yes [ ] No [ x ]

      (a) Discretionary Review to Florida Supreme Court:

(1) Date Mailed:_____

(2) Date Filed:_____

(3) Result:_____

(4) Date of Result: _____

(5) Rehearing Mailed:_____

(6) Rehearing Denied:_____

(4) Case Number:_____

(5) Citation:_____

     (b) **Certiorari to the United States Supreme Court:**

(1) Date Mailed:_____

(2) Date Filed:_____

(3) Result:_____

(4) Date of Result: _____

(5) Rehearing Mailed:_____

(6) Rehearing Filed:_____

(4) Case Number:_____

(5) Citation:_____

(f)    If you did not appeal to the highest state court having jurisdiction, explain why you did not:  Filed in the Florida Supreme Court._____

_____

12.    For this petition, **STATE EVERY GROUND ON WHICH YOU CLAIM THAT YOU ARE BEING HELD IN VIOLATION OF THE CONSTITUTION, LAWS, OR TREATIES OF THE UNITED STATES.** Attach additional pages if you have more than four grounds. State the facts supporting each ground.

## GROUND ONE:

The State violated *Brady* and it's progeny by failing to disclose exculpatory an/or impeachment evidence received to the victim's prior head inquires and vaginal bleeding which violated Mr. Davis Fifth, Sixth, Eighth, and Fourteenth Amendments of the U. S. Constitution and denied that a fair trial. The Florida Supreme Court's holding denying this claim was contrary to or is unreasonable application of clearly established federal law, and/or was based on an unreasonable determination of the facts in light of the State Court record.

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Gwen Cunningham, who was being investigated by HRS for child abuse at the time of her daughter's death, testified that she fed her children cereal shortly after 8 AM; at 9 AM she drove her older daughter to daycare leaving her and the victim alone until Mr. Davis returned to the apartment at approximately 10:30. Shortly after that around noon she left her happy, healthy child – who had never bled vaginally (Tr.490) – in the care of Mr. Davis. She testified that Mr. Davis had never before been  alone with the child and that he had never been abusive toward her children (Tr. 505)

However, in 2006 the State Attorney and Jacksonville Sheriff's office turned over  sealed  boxed  that  contained  exculpatory  and/or  impeachment  evidence, undisclosed evidence found in JSO boxes contradict Ms. Cunningham's testimony. Specifically, detective Mike Hallam interviewed Melissa Taylor, a patient relations employee at Baptist Hospital, who was on duty when the child was admitted for treatment. Ms. Taylor informed Det. Hallam that when she interviewed Ms. Cunningham, she stated that the child had visited her father a few days ago and returned with a "bump on her heard and vaginal bleeding"(1 SR. 93- Postconviction Supplement Record), and that the father admitted beating the child. Also, that he had been abusive to her and their children throughout the marriage. (1 SR 93).

During a May 28, 2008, evidentiary hearing, Detective Mike Hallam testified that he intentionally excluded the Melissa Taylor interview from his report and did not turn it over to the State (Evid. Vol. II pg. 320) He also admitted  he did not follow-up on the information concerning Ms. Cunningham's statement which would have been critical to the defense. (Evi. II pg. 319).

Furthermore, statements by Happyland Daycare employes, Valarie Daddy and Betty Green, indicate Ms. Cunningham told them that her daughter was not in daycare due

to "diarrhea, vomiting and asthma." Also, they noted a "vaginal odor" and "discharge" the last time the child had attended. (Post-Conviction Supplement Record SR. 94-95).

The final withheld Cunningham statement concerning the child's health in December was made to Carmen Richter of Family builders. Ms. Richter stated that Ms. Cunningham explained her daughter was not in daycare due to Asthma. (SR. 98).

The withheld material prejudiced Mr. Davis because Cunningham's credibility was central to the State's case, and the withheld evidence could have contradicted her testimony that the child was healthy and had never bled vaginally prior to that days. **Trial counsel could have used the evidence to destroy her credibility and placed potential exculpatory evidence before the jury; then counsel could have questioned her veracity concerning blood she claimed was not in the apartment when she left-post conviction DNA tests show a match for the child's blood on a pink blanket in the non-crime scene bedroom,** the children's room. Also, crime scene photos show blood on bedding and a pillow on the bed — fact the State has yet to mention. **Once her credibility was destroyed, counsel could have questioned her concerning pending child abuse investigations against her, and most importantly, her culpability in connection with the injuries found during autopsy — Since she alone with the child prior to leaving her with MR. Davis considering expert testimony that the injuries were as much 24 to 48 hours old, the important issue the jury had to decide was whether or not the injuries and the alleged sexual battery occurred during the half hour period Mr. Davis was with her, and any evidence tending to prove or disprove it is paramount to the jury reaching a confident verdict.**

Dr. Whitworth testified the injuries could have been as much as 48 hours old. (Tr. 642 ) medical examiner, Floro Testified the injuries were "consistent" with

being inflicted on Dec. 9, 1992. However, in his Nov. 9, 1993 deposition, he stated some of the injuries were "old" and some "recent, fresh." when asked how recent, he stated, "a few days." (Depo. pg. 11-12;14) also, he found scarring on the face and body related to impetigo, a condition resulting from bad hygiene – which is consistent with the withheld daycare statements and with evidentiary  hearing testimony by Dr. Randall Alexander. (Evh. Vol. III 101-102).

M.E. Floro found 3 skull/scalp impacts. He ruled one was too old and not consistent with the 9th of December and testified as to the other two impacts, facial injuries and buttocks bruises he deemed "recent" - keeping in mind his definition of recent is a "few days."

Mr. Davis testified he accidentally dropped her once during attempts to revive her. Obviously, one of the two impacts resulted from that drop, leaving one skull/scalp impact.

**Dr. Floro found no brain bruising (concussion) related to any of the impacts and could not determine which of the two occurred first.**

M.E. Floro also testified in contradiction to his autopsy report when he testified the degree of force was so "severe" it lacerated bridging veins connected to the brain. He stated, "if you hit it hard enough to lacerate the bridging veins, then you will kill the child." (Tr. 841) However, he did not document it in his report, nor did he mention this as cause of death during deposition. His contradicting testimony does not reconcile how it is possible to have impacts so severe they tear veins and cause death, but they do not cause the less severe concussion injuries.

**Most importantly, his testimony does not foreclose the possibility that the injuries to the left cheek, left ear, buttocks and one of the two skull/scalp bruises did not occur prior to the half hour period in which Mr. Davis was with the child.**

**Dr. Edward Willey, a forensic pathologist, testified during evidentiary hearing that the "vaginal injuries" could not have healed "right away" and disappeared prior to Dr. Floro's autopsy and that unconscious would have not been "immediate".** He testified that it could have been a "few hours..." before any physical mark – festations because brain swelling "begins immediately and progresses" to the point of unconsciousness. (Evh. Vol. II pg. 267)

The Florida Supreme Court  erroneously held:

> In light of this evidence of recent severe injury, any doubt about the veracity of Cunningham's testimony about the victim's health and the state of the apartment on the morning of December 9, 1992, does not undermine confidence in the jury's verdict.

Davis v. State, 136 So.3d at 1186

Had defense counsel been in possession of the withheld evidence, he could have impeached Ms. Cunningham's testimony which would have informed the jury of prior abuse that caused head trauma and vaginal bleeding, then counsel could have created further reasonable doubt as to Mr. Davis' culpability by placing evidence – once she was impeached – before jury that Ms. Cunningham was in fact being investigated for abusing the child.

Mr. Davis was deprived of reliable adversarial testing, undermining confidence in the verdict and denying him due process.

For the reasons expressed above, the Florida Supreme Court's holding is contrary to or an unreasonable application of clearly established Federal law and based on an unreasonable determination of the facts in light of the State Court record.

Mr. Davis humbly request this honorable Court to reverse his convictions.

(b)     Did you file a **direct appeal** on this Ground: Yes_____ (See Above)
No__x__ .

(c)     Did you file a Post-Conviction Proceedings on this ground: Yes x (See above), No_____ .

(d)     Did you receive an evidentiary hearing on this ground? Yes [x] No [ ]

(e)     If you did not exhaust your state remedies on this ground, explain why:

## GROUND TWO:

The State violated Giglio and its progeny when it failed to correct eyewitness testimony that it knew or should have known was false and they capitalizing on that false testimony during closing arguments, which violated Mr. Davis' Fifth, Sixth, Eighth, and Fourteenth amendment rights under the U. S. Constitution and denied him a fair trial. The Florida Supreme Court's holding denying this claim was contrary to or an unreasonable application of clearly established Federal law, and / or was based on an unreasonable determination of the facts in light of the State Court record.

(a)     Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.).:

Janet Cotton testified as an eyewitness for the State. She testified that on December 9th, she and Celeste Wiley heard – through the common apartment walls – a lot of crying and thumping sounds, like something hitting the walls and Mr. Davis' voice yell 'sit down'. She stated the commotion lasted from noon until 12:30. (Tr. 51). She also admitted she had never had a conversation with Mr. Davis, she'd only spoken to him "Just through passing." (Tr. 521).

However, after rescue had taken the child away, Ms. Cotton – before meeting with the state – provided to Detective C. L. Conn a far less specific, far less prosecution theory friendly statement. During Det. Conn's deposition, referencing investigative notes, she stated that when she interviewed Ms. Cotton she stated,

"between 11 a.m. and noon she heard a child crying and a male voice say "Sit down." She didn't think anything of it ..." (Depo. pg. 51-52) This was the statement Ms. Cotton made moments after witnessing rescue take the child away.

At evidentiary hearing, Det. Hallam, testified that later that day when he interviewed Ms. Cotton and Ms. Wiley together, **they agreed that on Monday they heard a commotion around 12:00 or 1:00 (Evh. Vol II pg. 345) and again "yesterday [Tuesday Dec. 8] they heard a child crying and a male voice say "Sit down..." (Evh. Vol. II pg. 346) while in Ms. Wiley's presence, Ms. Cotton never mentions hearing banging and a child crying and Mr. Davis yelling 'sit down' just hours prior to the interview.** The day before and Monday were the only days in which the women observed commotions. Furthermore, neither woman mentioned hearing anything coming from Gwen Cunningham's apartment. Ms. Wiley stated during her deposition that they discussed the origin of the commotion, but they couldn't locate it. (Depo. pg. 25-28). She stated that Ms. Cotton said, "Periodically the girl upstairs and her old man fights." [sic] (Dep. pg. 26)

**Ms. Wiley's deposition testimony is identical to what Det. Hallam testified at evidentiary hearing, as far as what Wiley and Cotton told him on the evening of Dec. 9, 1992. neither woman mentioned an incident on that day – only Monday and Tuesday incidents**. Also, a number of State attorney memos from sealed boxes detail only Monday and Tuesday events. One undisclosed document reveals that Ms. Cotton was not visited by Ms. Wiley on Dec. 9 "until after rescue and police had arrived." (Tr 92).
**Ms. Cotton – after meting with prosecutors – obviously incorporated the Monday and Tuesday events and switched it to Wednesday in order to  fit the State's theory.**

Her pretrial statements to both Det. Conn and Hallam – which are far more favorable to Mr. Davis – materially differ from her eyewitness trial account in which

she identified Mr. Davis as the perpetrator. Neither her individual statement to Det. Conn nor the collective statement with Wiley to Det. Hallam is consistent with her noon to 12:30 timing trial testimony; neither statement identifies Mr. Davis as the perpetrator; neither statement mentions Ms. Wiley as a Corroborating witness. Most importantly, the statements – specifically the timing and days do not fit the State's theory of the case.

Mr. Davis was prejudiced because his credibility was unfairly diminished when Ms. Cotton was allowed to give false eyewitness testimony and asserted that another eyewitness could corroborate her testimony. Then after the State failed to correct her, they capitalized on it by arguing it in summation and as proof of HAC aggravator (Tr. 970, 1013, and 1019).

Without Cotton's Testimony identifying Mr. Davis as the perpetrator, the jury would be left with only Mr. Davis' testimony – which is corroborated by physical evidence – that he was in the kitchen cooking during that half hour period. He stated he threw the first batch of french fries he cooked into the trash can and put another batch on the stove. (Tr. 911)

Officer Phillips testified he found fries in the trash can (Tr. 577), and Det. Hicks testified he saw fries in a pot on the stove. (Tr. 770).

The Florida Supreme Court Failed to rule on the crux of Mr. Davis claim when it erroneous held:

> This record does not establish that Cotton's trial testimony was false. Willey did not comment on December 9, 1992, in her deposition, and her statement that she was at Cotton's apartment on December8, 1992, does not conflict with Cotton's testimony that Wiley was present on December 9, 1992 ...
> And even if Cotton's testimony that Wiley was in her apartment on December 9, 1992, was false, the State's failure to correct the testimony was harmless ...

Davis v. State, 136 So.3d at 1189

The paramount issue does not rest solely on the question of whether Cotton's testimony concerning Wiley's presence is true or false; **it's that Cotton was allowed to give for the very first time a false eyewitness account identifying Mr. Davis the murderer**. The State deliberating capitalized on it after failing to correct it, creating a harmful and reversible error. Mr. Davis respectfully requests a new trial.

The Florida Supreme Court's holding concerning this issue is contrary to clearly established federal law or an unreasonable application, and was based on an unreasonable determination of the facts in light of the State Court record.

(b)     Did you file a **direct appeal** on this Ground: Yes_____ (See Above) No_x_.

(c)     Did you file a Post-Conviction Proceedings on this ground: Yes_x_ (See above), No_____.

(d)     Did you receive an evidentiary hearing on this ground? Yes [x] No [ ]

(e)     If you did not exhaust your state remedies on this ground, explain why:

## GROUND THREE:

The State violated Giglio and its progeny when it failed to correct testimony it knew or should have known was false and then capitalizing on the false testimony during closing arguments, which violated Mr. Davis' Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the U. S. Constitutions and denied him a fair trial. The Florida Supreme Court's holding denying this claim was contrary to or an unreasonable application of clearly established Federal laws, and/or was based on an unreasonable determination of the facts in light of the State Court record.

(a)     Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Olivia Williams testified that she spoke to Mr. Davis on the phone at around 10:30 in the morning of the 9th·· he emphasized that she had no further contact with him again after that. (Tr. 881) However, in her April 23, 1993, deposition and suppressed documents found in the sealed State Attorney boxes, she states that she talked to Mr. Davis twice shortly after his arrest. She stated that she went to the hospital for a while and returned home, **"it wasn't too late because Toney called me at my apartment from jail. He called me twice, I think ..."** (Depo. 22) He also stated that Mr. Davis denied harming the child. **"He said somebody else did it there was somebody else at that apartment, another guy."** "He [Davis] left, I guess while he called me or something, **the first call**." (Depo. pg. 23).

The State was aware that Ms. Williams had stated that Mr. Davis denied harming the child and that someone else – Thomas Moore – had harmed the child, but the State chose to allow her false testimony because it omitted an exculpatory statement by Mr. Davis. Thus, the State deliberately and impermissibly impeached Mr. Davis when he testified he told Ms. Williams about Moore. The prosecutor commented, "You mean that lady that came in here and testified... that lady that said you called her between 10 and 10:30 the morning of the murder." (Tr. 947) The State was present during Williams' deposition and possessed withheld material that confirms they were on notice that Mr. Davis had made statements to Williams professing his innocence. (Postconviction Supp. Record, SR 99-102; 107).

Whether they spoke during the day, evening, or night of the 9th is purely semantical. The paramount issue is that the State allowed its witness – one of several – to withhold an exculpatory statement by omitting the conversation in which Mr. Davis named a possible perpetrator, and then capitalized on the omitted evidence by first bolstering Ms. Williams' false testimony when Mr. Davis testified he told Williams about Moore, and during summation argued Mr. Davis concocted the

Moore  story during trial – after hearing the evidence presented against him. (Tr. 946, 971, 983, 989, and 1018).

The Florida Supreme Court erroneously held:

> in addition, any failure to clarify Williams' testimony was harmless. Testimony about Williams' second phone conversation with Davis – even if it did occur on December 9, 1992, would not have bolster Davis credibility. The jury would still be left with the impression – as explained below – that 'Davis' defense evolved after he had time to contemplate the situation.

Davis v. State, 136 So.3d at 1182

The pertinent issue is not when Mr. Davis defense evolved; it's that he stated to Ms. Williams on the day of his arrest that someone else harmed the child – not him. The State was well aware but still chose to deliberately place false evidence before the jury by failing to correct Williams' testimony and then arguing it was a "new version" defense developed during trial. (Tr 989) Ms. Williams' omission of the exculpatory statement is what renders her testimony false and prejudicial – as it aided the State in yet again presenting another witness who unfairly diminished Mr. Davis credibility with untruthful testimony that the State capitalized on to secure a conviction.

Contrary to the facts and irrelevant to the claim, the Court erroneously ruled that:

> The timing of Davis' accusation that Moore harmed the child also does not explain Davis' testimony that when he returned to the apartment after leaving victim with Moore, "physically [the victim] didn't look like anything was wrong with her .... Medical personal who treated the victim render Davis' claim that the child appeared uninjured patently implausible.
> ... Davis implausibly testified that he promised not inform law enforcement about Moore's presence – and thus risked implicating himself in the murder ...

Id. at 1188

First, when the State asked Mr. Davis if the child had the injury to her head before or after he dropped her. Mr. Davis replied, "After." (Tr. 920) So she didn't have the injury when the returned to find her, so "physically" there was noting to draw suspicion to foul-play by Moore.

Furthermore, first responder, Lt. Wade and Dr. Denicola testified to a seeing a single prominent "bump" on her head. (Tr. 590, 612).

The State obfuscates the truth and perpetuates the falsehood that this child suffered an isolated incident of abuse, knowing that the mother was under investigation for abusing the child and the child had a plethora of injuries in various stages of healing – evidence that it asked the Court to excludes. (Evh. Vol. I at 150 – 51).

So even if Mr. Davis had returned and noticed something different about the child does not mean he would've instantaneous suspected Moore; he may have naturally assumed it was something from when Ms. Cunningham was alone with the child a couple of hours prior.

Lastly, Mr. Davis "risking implicating himself in the murder" does not render his testimony implausible for the simple fact that a murder had not occurred. The child didn't die until the next day. Mr. Davis didn't even know a crime had been committing.

He testified that he asked the police to take him back to the hospital, "If you want to know what really happened." (TR. 918) **"I told them I would tell them the complete story"** (Tr. 919) Mr. Davis just wanted to talk to someone he trusted about the child's condition.

Shortly after that interview, Mr. Davis spoke to Williams who told him what was going on with the child; he in turned told her about Moore.

The Florida Supreme Court's holding is contrary to or an unreasonable application of clearly established Federal laws and based on an unreasonable determination of the facts in light of the State Court record. Mr. Davis humble requests reversal of his conviction.

(b)   Did you file a **direct appeal** on this Ground: Yes____ (See Above) No_x_.

(c)   Did you file a Post-Conviction Proceedings on this ground: Yes_x_ (See above), No____.

(d)   Did you receive an evidentiary hearing on this ground? Yes [x] No [ ]

(e)   If you did not exhaust your state remedies on this ground, explain why:

## GROUND FOUR:

Trial counsel rendered, inter alia, ineffective assistance of counsel when he failed to adversarially test the State's case by presenting a viable defense, depriving Mr. Davis of his Sixth, Eighth, and Fourteenth Amendment rights under the U. S. Constitution. The Florida Supreme Court's holding denying this claim was contrary to or an unreasonable application of clearly established Federal law, and/or was based on an unreasonable determination of the facts in light of the State Court record. Mr. Davis was denied a fair trial.

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Mr. Davis testified he was in the kitchen cooking during the half hour period he was alone with the victim. He stated she dropped the first batch of french fries he cook, so he threw them into the trash can and put another batch on the stove (Tr. 911) This was corroborated by officer Phillips who testified he saw french fries in the trash (Tr. 577) and by detective Hicks who testified that a pot on the stove had fries I it. (Tr. 770) Mr. Davis stated that he left around 12:30, and before leaving the child in Moore's care, he instructed Moore to give her some fries once they cooled

down, then he went to Gordon's apartment to call Olivia Williams. (Tr. 911) Gordon corroborated the 12:30 arrival (Tr. 868). After spending 20 to 25 minutes at Gordon's, Mr. Davis returned to the apartment to find the child in distress and Moore gone. (Tr. 912) While administering CPR, Moore returned and Mr. Davis told him to go call 911, which he did from a pay phone within the complex. Mr. Davis stated that upon Moore's return from the 911 call, Moore stated that the child had choked while eating fries and he left the apartment to look for Mr. Davis. (Tr. 914) He testified he didn't suspect anything foul because physically she looked the same when he found her as she did when he left to go to Gordon's (Tr. 914) also, that he'd taken her into the bathroom to hold her under the shower spray a few times in an attempt to revive her and that on one of those times, she accidentally slipped out of his arms and fell to the floor. (TR. 913). He stated that it was after that when she had the bump on her head (Tr. 920) that EMT, medic Lt. Wade (Tr. 590) and Baptist Hospital physician Dr. Denicola (Tr. 612) both testified to. Doctors Denicola and Whitworth testified to aspects consist with shaken baby (Tr. 611, 645) medical examiner Dr. Floro testified that there were multiple impacts and cause of death was blunt force trauma (Tr. 842) M. E. Floro and Dr. Whitworth were adamant that one drop from a short distance could not cause the separate impacts to the skull (Tr. 652, 658-59).

Trial counsel's entire defense hinged on hypothetical questions he posed to state witnesses, Dr. Whiworth and M. E. Floro. These hypotheticals served only to diminish counsel's one accidental drop death defense argument and to reiterate damaging testimony.

During direct examination Dr. Whitworth testified he had seen similar injuries in children in "car accidents" and who had "fallen from 2 or 3 story windows." (Tr. 651) The State asked if a fall from the height of an adult make would "account for the injuries." He replied, "No." (Tr. 652).

On cross defense counsel asks, "You keep saying a 2 or 3 story building?" Reply: "That's correct." Then he asks if he has ever seen those injuries from a shorter distance fall. Reply: "No." (Tr. 658-659).

During direct M. E. Floro was asked if "a single fall" would account for the head and brain injuries. Reply: "No" (Tr. 841) On cross counsel asked if the forehead injury could have resulted from a drop. Reply, "yes" (Tr. 845) Then he posed a shaken baby hypothetical to which M. E. Floro answers, "No". The next hypothetical was very critical because it contradicted his one drop theory and he had no basis for asking it. He asked, "Could the injuries come from being dropped more than once?" Reply: "Yes". (Tr. 846). Next, he inquired as to the buttocks injuries. M. E. Floro replied that they could've come from a fall of "no less than 5 feet" (Tr. 847) Counsel failed to place before the jury – through cross – examination or otherwise – evidence supporting his defense that the multiple injuries could have resulted from Mr. Davis accidentally dropping the child once.

As further evidence of Mr. Adams' deficient performance, at a 2008 evidentiary hearing, Mr. Adams testified he enlisted the serves of Dr. Edward Willey, a forensic pathologist, who reviewed the medical evidence and informed him that he could not assist with the one drop accidental death defense. But that he would testify that evidence reveals that no sexual battery occurred on Dec. 9th.

Mr. Adams consulted with Dr. Willey for his expertise in a field in which Mr. Adams was not qualified and to aide Mr. Adams in making a coherent connection between the medical evidence and his defense. When Dr. Willey concluded he could not reconcile how the injuries to different planes of the body all occurred during one drop, Mr. Adams – as should any reasonably competent attorney - should have realized he did not have a sound trial strategy, one worthy of adversarially testing the State's case. At the very least, Mr. Adams should have attempted to locate an expert who agreed with his defense or found a plausible

defense. He instead chose to present a totally incredible defense based on nothing – as he failed to present even an iota of evidence to support it.

Mr. Adams made numerous admission during the evidentiary hearing that leave no doubt as to his Constitutional deficiency. **He admitted multiple time that he himself believed blunt trauma from multiple impacts to the head was the cause of death (Evh. Vol. I 98, 171, 236, and 248) and that he knew his accidental drop defense was contrary to medical evidence (Evh. Vol. # 98,121, 123) and that he did even bother to investigate whether someone else could have inflicted the injuries**. (Eh. Vol. I 124).

Post-conviction counsel asked Mr. Adams what he did, he "do to prove the injuries were caused by a single fall" from Mr. Davis arms. He replied: " went to trial" (Evh Vol. I 126)

Mr. Adams was completely incompetent for presenting a totally incredible defense and for expecting the jury to accept it without presenting evidence to support it; this was akin to no defense at all.

The Florida Supreme Court failed to rule on Mr. Davis' claim and erroneously held that the claim was untimely:

> ... His claim that trial counsel was ineffective for tailing to present – as Davis' primary defense – the theory that Moore was responsible for the victim's death. The postconviction Court correctly concluded that this claim was untimely and without merit.

Davis v. State, 136 S.3d at 1192-93

Mr. Davis' claim is not that counsel failed to present as a primary defense that Moore was the perpetrator. The claim is that counsel failed to present a viable defense, one that subjected the State's case to meaningful adversarial testing. The Moore defense was offered as an alternative to the implausible one drop defense

that medical science disproved. Counsel would not have needed medical science on this side to argue Moore was the perpetrator.

If Mr. Adams had investigate and prepared for the case, he would have been able to present plausible evidence that called into question the culpability of Moore and Gwen Cunningham. What counsel didn't do is present a singles shred of evidence to support accidental death. What he may have believed about Mr. Davis credibility as a witness played no part in his decision to pursue a defense he had no evidence to support and knew was contrary to evidence.

The Florida Supreme Court erroneously held that:

> Because attorney Adams made a reasonable strategic decision not to present the Moore defense, the post-Conviction Court did not err in denying Davis' claim.

Davis v. State, 136 So.3d 1193

Even though that was not Mr. Davis' claim, the record refutes that holding.

In fact, Mr. Adam failed to articulate – though post-Conviction counsel attempted over and over again – any strategic decision for his deficient representation. He admitted that he didn't bother to investigate whether someone else could have inflicted the injuries (Evh. Vol. I 124), so he could not have without investigating made a reasonable decision not to pursue Moore defense.

Furthermore, contrary to the Court's claim that Mr. Adams articulated during evidentiary hearing that "He thought it would be a "problem" for Davis to testify and assert Moore harmed the victim... would "create[] inconsistencies..."(Id. At 1192), the record reflects that.

The prosecutor under the guise of questioning impermissibly testified and offered his strategic reasoning to Adams to which Adams merely repeated certain words in acquiescence.

And in the colloquy between Davis, Adams and the trial Judge, the issue of the Moore defense was never even mentioned. (Tr 886-895).

Since the Court cited, "This Court has held that trial counsel acts reasonably by deciding not to raise an incredible defense" (36 F.3d 1538); it should have held that Adam's admission that he knowingly proceed to trial with a defense that was contrary to medical evidence wholly incredible and unreasonable.

The State had to prove beyond a reasonable doubt that Mr. Davis – who had never before been alone with the child – in a half an hour period inflicted deadly harm. The only evidence to dispute Mr. Davis' corroborated testimony that he was in the kitchen cooking was Cotton's new eyewitness account.

The State's theory was that Mr. Davis beat and raped her, leaving her to go to Gordon's apartment to establish an "alibi." As evidence of the sexual battery, they used a bloodstain on the outside crotch area of Mr. Davis' underwear. The bloodstain matched the child, the mother and large percentage of the population. **But the State cannot reconcile how she was left injured and bleeding – But no blood was found in the diaper she had been wearing.**

Mr. Davis testified it fell off and into the bathtub when he was holding her under the shower, attempting to revive her. Evidence technician Richard Coffee testified he found the bloodless diaper in the tub (Tr. 685).

The fact that the "went to trial" is not sufficient enough to establish Mr. Adams presented competent evidence to support has defense, and, most importantly, because he "went to trial" did not satisfy his constitutional obligation to effectively represent Mr. Davis.

The only evidence he could not contradict - the medical evidence – is what he chose to base his defense on. Furthermore, he failed to investigate or challenge the lack of sexual battery evidence.

By his lack of investigation he limited himself to the incredible defense theory, depriving Mr. Davis of his constitutional right to effective representation.

It's apparent from the time Mr. Adams was appointed that he was not concerned about effectively representing Mr. Davis; he failed to attend Court on January1, 1993, for appointment to the case (R. At 17), and he missed numerous appearances thereafter – including Mr. Davis arraignment on the October 14, 1994, amended indictment. The Court even vowed on April 4, 1994, to "send an investigator to find" Mr. Adams if he failed to appear on the next day.

The most felling evidence of Mr. Adams' lack of preparation or efforts to effectively represent Mr. Davis is the fact that he was home asleep at 11:00 O'clock whole everyone, including perspective jurors, was in Court waiting to start the trial. The prosecutor had to call Mr. Adams and rouse him. The prosecutor indicated he spoke to Adams who indicated he'd be there soon. (Tr. 213) Adams finally appeared at 12:40 at which time a meeting was held in chambers. (Tr. 214).

It's obvious, not just from his prevalent pretrial no shows but also from his testimony that he "went to trial" in response to the question of what he did "to prove his single drop fatal injury defense theory is enough to show that Mr. Adams did not prepare for the case; thus, the reason he presented a wholly incredible defense theory after trial Adams did not even bother to file notice of appeal or associated appellate pleadings. The public defender – despite conflict – filed notice (R. 438 – 44).

Mr. Davis avers that this claim is timely for two reasons: (1) in his initial 1999 brief/motion, the State was put on notice as to this specific claim by specific case law cited therein; (2) the Florida Rules of Court allowed for Amendments in 1999 for claims raised in initial motions at anytime prior to evidentiary hearing.

Moreover, Mr. Davis asserts that the Federal Court has "cause" to excuse a State prisoner's procedural default in failing to raise an ineffective assistance of trial counsel claim in initial State post-conviction proceeding when the claim is

substantial, post-conviction is the first proceeding in which the claim can be raised and counsel in that proceeding was ineffective.

Mr. Davis humbly request this Honorable Court to reverse his convictions. Mr. Adams' failure to present evidence to support his defense rendered it incredible and prejudiced Mr. Davis because his jury had no evidence to consider during its deliberation, so it had no other recourse than to vote for guilt.

The Florida Supreme Court's holding denying this claim is contrary to or an unreasonable application of clearly established Federal law and is based on an unreasonable determination of the facts in light of the State Court record.

(b)   Did you file a **direct appeal** on this Ground: Yes____ (See Above) No _x_ .

(c)   Did you file a Post-Conviction Proceedings on this ground: Yes _x_ (See above), No____.

(d)   Did you receive an evidentiary hearing on this ground? Yes [X] No [ ]

(e)   If you did not exhaust your state remedies on this ground, explain why:

## **GROUND FIVE:**

Trial counsel rendered, inter alia, ineffective assistance of counsel when he failed to investigate or to call an expert to challenge the lack of sexual battery evidence found during the autopsy, depriving Mr. Davis of his Sixth, Eighth, and Fourteenth Amendment rights under the U. S. Constitution. The Florida Supreme Court's holding denying this claim was contrary to or an unreasonable application contrary to or an unreasonable application of clearly established Federal law, and/or was based on an unreasonable determination of the facts in light of the State Court record Mr. Davis was denied a fair trial.

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Medical examiner Floro testified he found no evidence of genital injury at autopsy, but that because of rich blood supply, Genital wounds heal "Right away" and disappear. (Tr. 835).

Dr. Whitworth testified he examined the child approximately three (3) hours after she was admitted to the hospital and found injuries on both sides of the hymen that were 12-18 hours old. (Tr. 639

However, in a June 23, 1993, deposition, Dr. Whitworth was specific when asked to explain this definition of "recent" vaginal injury. He stated, "Again, the color of the bruise... if it appears like this, it's occurred within 72 – hours prior to the time we had seen the <u>bruise</u>." Depo. pg. 9) He never mentioned 72 hours as a time-line for lacerations because according to him, he never saw lacerations.

Dr. Randall Alexander, who testified for the State at evidentiary hearing, though aspects of his testimony does not make sense and he contradicts himself on multiple occasions, **conceded the fact that the injury "it is not going to go away within 24 hours or it might last a little longer... you are right."** (Evh. Vol. III 118) He also conceded the redness seen at the "nine O'clock and three O'clock positions" of the child's vaginal area could **be a chemical reaction to "bubble bath soap. When we see kids that have genital redness, abuse is real unlikely to be what we're looking at."** (Evh. Vol. III 101) He further testifies"<u>we very commonly see this in pediatrics</u>." Furthermore, he states that a "<u>bacterial infection sometimes that will do that</u>." (Evh. Vol. III 102) Finally, he conceded that it probably started as a superficial laceration, "but healed enough" by the time Dr. Whitworth did his examination and no active bleeding source was there (Evh. Vol. III 120) but that the injury was probably in the last of four healing stages that started prior to December 9th, <u>Conceeding injury started to heal days prior to Whitworth's examination (Evh. Vol. III pg. 124)</u>

Dr. Edward Willey, a forensic pathologist, testified to his area of expertise, post mortem wound diagnostic and examination. Dr. Willey testified that not only would the injury not disappear in 24 hours but that it would have been more pronounced after death due to a well-known pathological condition known as "hypothesis." Dr. Willey stated that "blood outside the vessel, it will not migrate ... and it will keep the actual bruises or hemorrhage outside vessels much more prominent." (Evh. Vol. III 138).

The Florida Supreme Court contrary to the record erroneously held:

> Here, competent substantial evidence supports the post conviction Court's determination that Dr. Willey was not credible. Dr. Willey based his conclusion on photographs rather than in – person examination and admitted he had no clinical experience in pediatrics, gynecology or obstetrics. Additionally, the articles cited by Dr. Willey to argue that the victims injuries could not have healed in twenty-six hours pertained to severe genital lacerations rather than superficial hemorrhages. The postconviction court did not err in denying relief.

Davis v. State, 136 So.3d at 1192

Dr. Willey also presented several medical treatises to support his position in particular a 2007 published study by Dr. John McCann titled, Healing of Hymenal Injuries in Prepubertal and Adolescent Girls: A Descriptive Study, A documented study of 239 girls age 4 - 18 evidences the healing of vaginal abrasions, blood blisters, hemotomas, petechire, sumucosal hemorrhages (mild, moderate and marked) – which is the diagnosis in the present case – and laceration (superficial, intermediate, and deep).

Though Dr. Whitworth – who contributed to this study – did not diagnosis. The hemorrhages as mild, moderate or marked, looking at the results of the least (mild) of hemorrhages to the prepubertal girls, the earliest disappearance of any of the 118 hemorrhages was 3 days. The earliest for both moderate and marked was 5

days. (Table 1 pg. E1097). The three day disappearance of the least severe supports Dr. Willey's testimony, contrary to the State Court's holding. Furthermore, Dr. Alexander used the same photos and agreed with Dr. Willey on every aspect. (EvH. Vol. III 101-102, 118, 120).

Attorney Adams testified he made a strategic decision not to call Dr. Willey because agreed with the State experts concerning the head injuries – that death did not result from an accidental drop. But that he was aware he could have called him to testify for limited purposes, but that "He still bothered me" as a strategic reason for not calling him for limited purpose pertaining to the lack of vaginal injury (Evh. Vol. I 101) **Then Mr. Adams was asked if he consulted another expert in regards to the lack of injury, and he replied, "No, I didn't."** (Evh. Vol. I 101) But he conceded that it was important to get an expert to rebut the claim of sexual battery. (Evh. Vol. I 102), yet he didn't bother to even investigate need for such an expert.

Had Mr. Adams investigated the case and presented Dr. Willey or another expert, he would have been able to create serious doubt as to the sexual battery charge and thus, the State's entire case. By failing to present an expert, he failed to defend the charge.

The State argued Mr. Davis committed the crime before going to Gordon's place, yet cannot reconcile why no blood was found in the diaper the child was wearing.

Having an expert explain that the absence of blood in the diaper and the lack of vaginal injury at autopsy is evidence that no sexual battery occurred on December 9th.

Furthermore, wholly contrary to the facts was the Court's ruling that: "At trial, the State presented four witnesses whose testimony tends to establish that the victim had been sexually battered." Id. At 1190.

First, only one of the first responders, Lt. Wade, testified at trial, and his claiming to have seen blood coming from the vaginal canal is not proof that a sexual battery took place on that day or at all; Forty-eight hours prior she had vaginal bleeding. Lastly, Dr. Floro never testified to finding or seeing any evidence that even remotely suggest sexual battery. Dr. Whitworth was the <u>sole witness who suggested evidence of sexual battery.</u>

Mr. Davis avers that on page 46-47 of his initial brief to the Florida Supreme Court is claim that trial counsel did fail to "properly investigate the case" and "had[he] presented the testimony of Dr. Willey or another medical professional, there is a reasonable probability that the result..." (Brief pg 46, 47).

Moreover, Mr. Davis asserts that Mr. Adams' failure to investigate the lack of sexual battery evidence or to call another expert in place of Dr. Willey who "bothered" him was ineffective, and the Federal Court has "cause" to excuse a State prisoner's procedural default in failing to raise an ineffective assistance of trial counsel claim in his initial brief in a post conviction proceeding when the claim is substantial, and post-conviction is the first proceeding in which this claim can be raised, and counsel in that proceeding was ineffective.

Mr. Davis humbly request this Honorable Court to reverse his convictions due to counsel's constitutional ineffectiveness in failing to adversarially test the State's case.

The Florida Supreme Court's holding denying this claim is contrary to or an unreasonable determination of the facts in light of the State Court record.

    (b)    Did you file a **direct appeal** on this Ground: Yes____ (See Above) No__X__.

    (c)    Did you file a Post-Conviction Proceedings on this ground: Yes__X__ (See above), No____.

(d)    Did you receive an evidentiary hearing on this ground? Yes [x] No [ ]

(e)    If you did not exhaust your state remedies on this ground, explain why:

## GROUND SIX:

Trial counsel rendered, inter alia, ineffective assistance of counsel when he failed to  object to and move for mistrial after several instances of prosecutorial misconduct which resulted in violations to Mr. Davis rights under the Fourth, Sixth, Eighth, and Fourteenth Amendments of the U. S. Constitution. The Florida Supreme Court's holding denying this claim was contrary to or an unreasonable application of clearly established Federal law, and/or was based on  an unreasonable determination of the facts in light of the State Court record Mr. Davis was denied a fair trial.

(a)    Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

During trial the prosecutor improperly presented false evidence to the jury and capitalized on that evidence which it knew was false during closing argument. First, during cross-examination of Mr. Davis, the State opened the door when it asked why Mr. Davis has not, before taking the witness stand, told anyone about leaving the child in Mr. Moore's care. Mr. Davis replied he had told Olivia Williams (Tr. 946-47) **and the State was on notice that he had informed Gwen Cunningham as evidenced by a 1993 response to discovery notice file by the State (Tr. 32)**. After Mr. Davis response, the prosecutor implied that his testimony was not true by commenting, "... **That lady that said you called her between 10:00 and 10:30 the morning of the murder. That lady that came in here and testified...** (Tr. 947)

"The State was present along with counsel at Williams deposition, So both were on notice that Mr. Davis in 1992 had told Williams and Cunningham exactly what he testified to. Then during summation the State argued that Mr. Davis invented his testimony during trial. "**Mr. Moore, who has now become our suspect after two and a half years.**" (Tr. 971); "**Next, we know his [Davis]**

response two and a half years later. He [Moore] was there earlier." (Tr. 983); "Well, he's going to change it today ... His new version is Thomas Moore did it." (Tr. 989); "Especially consider Moore, because two and a half years later he's become the murderer." (Tr. 1018) in fact, competent counsel would have been on their feet objecting and calling for a mistrial when the prosecutor initialed her colloquy in which she improperly  suggested that Mr. Davis presence at his trial afforded him an opportunity to here all witness testimony and tailor his testimony accordingly (Tr. 945-946) Trial counsel failure to object to the improper impeachment when Mr. Davis corrected Olivia Williams omission testimony that contradicted her prior pretrial sworn statements and failure to object when the State capitalized on the false testimony, rendering the trial fundamentally unfair counsel had ample opportunity to object and move for mistrial as the prosecutor deliberately persisted in a designed attempt to destroy Mr. Davis' credibility at all cost by arguing falsities as evidence for the jury to consider.

Post-conviction counsel asked  Mr. Adams if he would object to the State's accusation that his client was making up his story at trial, and he replied, "yeah, usually."(Evh. Vol. I 115) Also, he agreed it would be important to know the statements attributed to his client, yet he allowed Mr. Davis' statements to Mrs. Williams and Ms. Cunningham concerning Moore at a detriment to his client's credibility.

When asked if he had a "tactical or strategic reason" for not apprising the jury that Mr. Davis had told people about Moore years prior to trial, proving that it wasn't a trial concoction, Mr. Adams replied, "I can't." (Evh. Vol. I 119)

As egregious and prejudicial as the prosecutors repeated misrepresentation were, Mr. Adams' failure to effectively right a fundamental wrong caused even more harm to Mr. Davis; he had only his credibility to place before the jury.

Mr. Davis concedes that if the State had argued Mr. Davis never told police about Thomas Moore, it would have been withing permissible bounds. But not once did the prosecutor ever mention Mr. Davis' statement to police concerning Moore during summation Its argument – contrary to evidence in State possession – was that it was a "new", never before uttered, trial fabrication.

The Florida Supreme Court erroneously held:

> Davis misreads <u>Zant</u> and <u>Jackson</u> in this claim. Next, Mr. Davis claims was not that the State may never comment on the timing of a defendant's asserted defense; **it was that the State intentionally misled the jury by misrepresenting the facts when they knew about Williams' and Cunningham's statement concerning Thomas Moore being with the child.** Despite having abundant evidence that Mr. Davis informed the witnesses of such, the State still chose to improperly impeach Mr. Davis – misrepresenting the facts and misleading the jury – when he testified he told Williams. The prosecutor – in a calculated effort to discredit Mr. Davis – commented "...That lady that said, you called her between 10:00 and 10:30... (Tr. 947), imply that Mr. Davis was lying, knowing that Williams testified falsely when omitting that evidence. And then arguing that Mr. Davis made it all up at trial.
>
> The Court in denying this claim cited:
>
> In Zant, the prosecutor responded to the defendant's statement the co-defendant Underwood had confessed by announcing to the jury that the defendant's statement was "not true" - when it was – and argued that defendant's testimony that Underwood was guilty was the "First time in living memory" that defendant told that defense to anyone. (36 F.3d at 1546-47) The prosecution also described the defendant's defense as "Last minute stuff" and a "First time defense." And...

Davis v. State 136 So.3d at 195

The circumstances in the instant case are indistinguishable: The State responded to Mr. Davis' statement concerning this conversation with Williams by announcing the

"That Lady" comments, implying his testimony was not true, and then arguing this defense was "a new version," that Mr. Davis waited two-and-a-half years to mention who the real perpetrator was. (Tr. 971, 982, 983, 989, 1018) – even though the State possessed Cunningham's discovery statement (R. 32, 1Sr. 52-56) and Williams' deposition testimony and numerous memorandums (3.850 App. 181; Sr 107)

Again, the Court failed to rule on Mr. Davis' claim that the State intentionally misrepresented the facts and then argued those facts in summary, misleading the jury.

The Court erroneously held:

.... as a result, Davis has not established that trial counsel erred by not objecting to the prosecution's arguments based on Williams' testimony.

*Id*. at 1195

This claim does not hinge on arguments based on Williams' testimony, but on arguments made due to what Cunningham and Williams did not testify to: **Statements identifying Moore as the perpetrator to which both trial counsel and State were privy**. Had either or both statements been introduced, the state could not and would not have been able to misrepresent facts that unfairly destroyed Mr. Davis credibility and claim of innocence by falsely arguing that Mr. Davis waited two-and-a-half years – after he heard all the evidence and realized his story would not fly today" (Tr. 988) – To implicate Moore as " the murderer (Tr. 1018)

The State's deliberate placement of false evidence in a win at all cost attempt and defense counsel's failure to  object and move for mistrial has absolutely no bearing on what the jury may or may not have concluded about Mr. Davis' defense. On speculation, it can be argued that had counsel objected and made the truth known that the jury could have concluded that, for the State to so boldly lie and

deceive them, the State could not be reliable in presentation of the evidence, or the Judge could have granted the mistrial , eliminating an kind of credibility issues.

Mr. Davis was denied a fair trial and requests this humble court to reverse his convictions.

The Florida Supreme Court's holding denying this claim is contrary to or an unreasonable application of clearly established Federal law and based on an unreasonable determination of the facts in light of the State Court record.

(b)     Did you file a **direct appeal** on this Ground: Yes__ (See Above) No_x_.

(c)     Did you file a Post-Conviction Proceedings on this ground: Yes_x_ (See above), No____.

(d)     Did you receive an evidentiary hearing on this ground? Yes [x] No [ ]

(e)     If you did not exhaust your state remedies on this ground, explain why:

## GROUND SEVEN

Trial counsel rendered, inter alia, ineffective assistance of counsel when he failed to impeach ___ Janet Cotton's testimony by calling Celeste Wiley or Detective C. L. Conn in violation of Mr. Davis' rights under the Fourth, Sixth, Eighth, and Fourteenth Amendments of the U. S. Constitution. The Florida Supreme Court's holding denying this issue was contrary to or an unreasonable application of clearly established Federal law, and or was based on an unreasonable determination of the facts in light of the State Court record.

(a)     Supporting facts (Do not argue or cite law. Just state the specific facts that            support your claim.):

Janet Cotton, the next door neighbor, testified as a ~~Easy~~ State eyewitness. She testified that she and Celeste Wiley heard "banging and thumping" sounds like "Something hitting the wall" and a child crying, which lasted for 30 minutes, between noon and 12:30, on December 9, 1992, She identified Mr. Davis' voice as

deceive them, the State could not be reliable in presentation of the evidence, or the Judge could have granted the mistrial , eliminating an kind of credibility issues.

Mr. Davis was denied a fair trial and requests this humble court to reverse his convictions.

The Florida Supreme Court's holding denying this claim is contrary to or an unreasonable application of clearly established Federal law and based on an unreasonable determination of the facts in light of the State Court record.

(b) Did you file a **direct appeal** on this Ground: Yes__ (See Above) No_x_.

(c) Did you file a Post-Conviction Proceedings on this ground: Yes_x_ (See above), No____.

(d) Did you receive an evidentiary hearing on this ground? Yes [x] No [ ]

(e) If you did not exhaust your state remedies on this ground, explain why:

### GROUND SEVEN

Trial counsel rendered, inter alia, ineffective assistance of counsel when he failed to impeach/rebut Janet Cotton's testimony by calling Celeste Wiley or Detective C. L. Conn in violation of Mr. Davis' rights under the Fourth, Sixth, Eighth, and Fourteenth Amendments of the U. S. Constitution. The Florida Supreme Court's holding denying this issue was contrary to or an unreasonable application of clearly established Federal law, and or was based on an unreasonable determination of the facts in light of the State Court record.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Janet Cotton, the next door neighbor, testified as a day State eyewitness. The testified that she and Celeste Wiley heard "banging and thumping" sounds like "Something hitting the wall" and a child crying, which lasted for 30 minutes, between noon and 12:30, on December 9, 1992, She identified Mr. Davis' voice as

the voice she heard yell "sit down" during that period (Tr. 517 – 19) – Though she had never had a conversation with Mr. Davis. (Tr. 521)

However, Ms. Cotton's pretrial statements were significantly different – as were Ms. Wiley's in comparison to to Ms. Cotton's

Detective C. L. Conn, referencing field notes of statements taken at the scene, testified in deposition that Ms. Cotton stated that she heard crying between 11:00 and noon and a male voice say "sit down". (Depo. Pg 51-52)

Ms Wiley testified during her deposition that on the day before when she was at Cotton's they heard some crying, but they could not determine it's origin. Cotton stated that noise from the apartment above her was a common occurrence (Depo pg 26) Ms. Cunningham lived in the adjacent downstairs apartment. Ms. Wiley never testified to any events concerning Dec. 9th.

Ms. Cotton's statement prior to meeting with prosecutors that she "didn't think much of it" in reference to the noise is much more favorable to Mr. Davis because it does not identify him as the perpetrator of an alleges rape and murder.

Defense counsel should have impeached Cotton with prior inconsistent testimony by presenting her prior statements to Det. Conn, Calling Det. Conn and Celeste Wiley to testify.

Furthermore, Det. Hallan testified during evidentiary hearing that he interviewed both Cotton and Wiley later on Dec. 9th at Cotton's apartment. He testified that both made statements concerning Monday and Tuesday incidents of hearing crying. neither of the women mentioned anything unusual just a few hours prior to the interview. Nor did either mention Mr. Davis or the Cunningham apartment as the source of the previous disturbances.

Counsel's failure to impeach Cotton prejudiced Mr. Davis be – the favorable pretrial statements does not identity Mr. Davis as the perpetrator and it does not unfairly diminish his credibility regarding his testimony that he was in the kitchen

cooking from noon to 12:30. Also, the statements eliminate Cotton's self-made corroboration witness, and the time and day difference weakens the States theory of the case. Had counsel impeached her and apprised the jury of the material difference in the statements, it would have likely concluded that Cotton was untrustworthy, leaving them with only Mr. Davis testimony as to what he did between noon and 12:30, which is supported by evidence found by police.

The State knew Cotton's trial testimony was false, but also that it was essential to their theory and to prove the HAC aggravator, so in an attempt to win at all cost approach, they failed to correct her testimony and even argued it in summation.

Attorney Adams was given ample opportunity at evidentiary hearing to articulate his strategy for not impeaching Ms. Cotton. Mr. Adams states, "if I had known about the inconsistencies I guess I would have tried to impeach her with it." (Evh. Vol. 106) Also, he conceded that the inconsistencies. "sound like something an attorney would use." (Evh. Vol. I. 107) Given yet another opportunity to explain his strategy in failing to impeach Cotton, Adams States, "At this point and time I can't think of any." (Evh. Vol. I 109).

Trial counsel's ineffectiveness denied Mr. Davis a fair trial . He humbly requests this Honorable court to reverse his convictions.

The Florida Supreme Court's holding denying this claim is contrary to or an unreasonable application of clearly established Federal law and was based on an unreasonable determination of the facts in light of the State Court record.

(b)  Did you file a **direct appeal** on this Ground: Yes____ (See Above) No  X .

(c)  Did you file a Post-Conviction Proceedings on this ground: Yes  X  (See above), No____.

(d)  Did you receive an evidentiary hearing on this ground? Yes [X] No [ ]

(e)     If you did not exhaust your state remedies on this ground, explain why:

## **GROUND EIGHT:**

Trial counsel rendered, inter alia, ineffective assistance of counsel when he failed to impeach Olivia Williams with prior inconsistent testimony and failed to illicit testimony form given Cunningham concerning Mr. Davis' statements that he left Thomas Moore with the victim, depriving Mr. Davis of his Sixth, Eighth, and Fourteenth Amendment rights under the U. S. Constitution. The Florida Supreme Court's holding denying this claim was contrary to or an unreasonable application of clearly establish Federal law, and was an unreasonable determination of the facts in light of the State Court record.

(a)     Supporting facts (Do not argue or cite law. Just state the specific facts that             support your claim.):

Olivia Williams testified she perceived a call from Mr. Davis at around 10:30 on December 9th. She emphasized that she had no further contact with him again after that (Tr. 881), omitting a critical statement made to h er in a conversation from jail by Mr. Davis, shortly after his arrest.

In her 1993 deposition and in suppressed documents found in seal boxes, Ms. Williams states that after she returned home from visiting the victim an the hospital, Mr. Davis called her. She stated, "It wasn't too late because Toney called me at my apartment from jail. He called me twice, I think..." (Depo. 22) Also, "He said somebody else did it, there was somebody else at that apartment, another guy. He [Davis] left, I guess while he called me or something, the first call." (Depo. 23).

This deposition testimony is the complete opposite of her trial testimony and much more favorable to Mr. Davis in  that it supports his claim of innocence, at the very least it provides evidence with which the jury could have used to reach a conclusion of reasonable doubt had trial counsel not failed to put the evidence before them.

Trail attorney Charles Adams testified at evidentiary hearing he could not recall Williams' testimony, but conceded that if she had testified during deposition differently than at trial, she should have been impeached. When asked if he had "any reason, tactical or strategic, why you would not have impeached her with that?" He replied, "I can't think of any." (Evh. Vol. I at 113).

The Florida Supreme Court in denying this claim did not even bother to address the crux of Mr. Davis claim that counsel was ineffective for failing to impeach Williams concerning her conversation with Mr. Davis in which he told her that someone else did it, that he left the child with someone [Moore]. It ruled that the claim was without merit because, "as discussed above, Williams' deposition does not establish that she and Davis spoke twice on December 9, 1992..." Davis v. State,

In denying the Williams <u>Giglio</u> claim, the Court in hindsight went inside the mind of Ms. Williams and learned that she "assumed that "day" referred to the daylight hours of December 9, 1992, rather than the entire twenty-four hour period ..." (Id at 1187).

Not only is the Court's denial based on semantics but also it's based on pure conjecture that is contrary to the facts.

Ms. Williams' testimony during deposition that "it wasn't too late because Toney called me... he called me twice, I think ..." (Depo. pg. 22) is evidence that Mr. Davis called her 3 times on the 9th.

Whether it was day of night is irrelevant as to the f act that in her deposition she admitted Mr. Davis denied harming the child, stating that someone else did it, and then omitted it at trial – which is what makes the trial and deposition testimony inconsistent.

Trial counsel also failed to elicit testimony from Gwen Cunningham concerning Mr. Davis statement that Moore was left alone with the child, as evidenced by a 1992 response to discovery (Tr 32), which allowed the State to place

known false evidence before the jury when it argued that Mr. Davis failed to tell Cunningham. It stated, "Any reason why you neglected to tell Gwen Cunningham." (Tr. 923)

In denying this claim the Court held that, "again, this claim is without merit because defense counsel made a reasonable strategic decision not to raise the Moore defense. " Id. At 1194.

First, concluding that Adams made a reasonable strategic decision not to present the Moore defense is wholly contrary to the record. Post conviction counsel asked Mr. Adams specifically if at any time did he ever "consider the option that the injuries were inflicted by someone else at a time when Mr. Davis was not with the child?" Adams replied, "I don't think so." (Evh. Vol. I at 124). Counsel asked if he inquired as to a time frame in which the injuries could have occurred. He replied, "I don't think so." (Evh. Vol. I at 124) it is clear from Mr. Adams' testimony that he did not even consider investigating whether Moore or anyone could have caused the injuries.

Furthermore, what defense Mr. Adams did or did not choose has no bearing on his failure impeach Williams, damaging her credibility and weakening the State's case, and introducing exculpatory evidence that supported Mr. Davis assertion of innocence, or his failure to elicit testimony from Ms. Cunningham that corroborated Mr. Davis' statements against Moore. Moreover, Mr. Davis suffered dual prejudice because had counsel not failed in presenting their evidence to the jury, the State would not have been able to suggest Mr. Davis was testifying falsely when the prosecutor impermissible bolstered testimony they knew was false . She stated, "You mean that lady that said you called her between 10 and 10:30 the morning of the murder." (Tr. 947); and the comment that he failed to tell Cunningham about Moore, "any reason you would keep from Gwen Cunning ham the fact that maybe Moore did something..." (Tr. 928), the State would not have been able to unfairly

destroy Mr. Davis credibility by arguing that he never told anyone about Moore and made it up during trial.

It was defense counsel's failure to make known the statements concerning Moore that allowed the State to perpetuate the scheme to discredit Mr. Davis' assertion of innocence, intentionally misleading the jury.

Because of this it cannot – even in the most infinitesimal interest of justice – be said that Mr. Davis received a fair trial,and he humbly requests this Honorable Court to reverse his convection.

For the reasons expressed above, the Florida Supreme Court's holding in denying this claim is contrary to or an unreasonable application of clearly established Federal law, and an unreasonable determination of the facts in light of the State Court record.

Filed in POST-CONVICTION PROCEEDING. EVIDENTIARY HEARING HELD.

## GROUND NINE

Trial counsel rendered, inter alia, ineffective assistance of counsel when he failed to effectively cross examine and impeach Thomas Moore's prior inconsistent testimony depriving Mr. Davis of his Sixth. Eighth and Fourteenth Amendment rights under the United States Constitution . The Florida Supreme Court's holding denying this claim was contrary to or an unreasonable application of clearly established Federal law, and was an unreasonable determination of the facts in light of the State Court record.

(a)    Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Thomas Moore, a convicted felon and suspect in the instant case, presented more conflicting evidence than anyone involved in this case .

Trial counsel ineffectively failed to impeach Moore with his prior inconsistent statements.

Moore consistently testified that he arrived at the apartment at between 12:30 and 12:45 which is consistent with Mr. Davis' testimony that he left Moore and the child in the apartment at around 12:30 to go to Gordon's apartment and Gordon's testimony corroborates these facts. (TR-865).  However, Moore's 911 call was not made until 1:02 (TR-564).  But he testified that Mr. Davis answered the door with the child in his arms and when Moore asked what happened?  Davis stated, "he choked on french fries and had an asthma attack and, 'go dial 911.'"  At which time he rushed around the corner to the payphone. (TR-536-38).  However, in his pretrial deposition, he stated that when he asked what happened?  Mr. Davis replied, "man, just go dial 911." (depo. At 54).  The statement appears verbatim in a withheld document found in sealed boxes from the Sheriff's Office.  The handwritten note was an interview conducted in a Colorado prison by Jacksonville detectives.  When asked in two separate interviews, what did Mr. Davis say?  Moore replied, "he said, 'man, just go dial 911.'"  But at jury trial when confronted with contradicting 911 statements, he he changes his testimony.  He also told the 911 operator that he, "saw Mr. Davis blowing in her mouth." (TR-562)  But on cross-examination counsel failed to question Moore concerning this and many other inconsistencies.  Mr. Davis complained to the court.  The judge allowed Mr. Davis to write a list of questions he wanted posed to Moore and put Moore back on the witness stand.  When Counsel asked Moore about witnessing CPR, he stated that after I asked his to dial 911, he stood there for "15, 20 minutes" and watched Mr. Davis lay the child on the floor and blow in her mouth, that "the way the kitchen was built, there was a shelf about yea tall that I could see over and I could see him, you know." (TR-897).

Trial counsel failed to use crime scene photos to show that there were no shelves anywhere in the apartment to impeach him and he failed to use Gordon's testimony as impeachment.  Gordon testified that when Moore ran away from the

door opening, he could see Mr. Davis "standing in the back of the apartment with the child in his arms." (TR-871).

This proves that Moore could not have witnessed CPR from that doorway and supports Mr. Davis's testimony that the only other opportunity Moore had to witness CPR was through the back sliding glass patio door, prior to going around to the front door. Mr. Davis testified that Moore exited the patio door in an attempt to locate Mr. Davis after the child became distressed. And in the interim, Mr. Davis returned, closed the door and found the child in distress. He then placed her on the floor in between the bathroom and living room and administered CPR. While doing so, he heard Moore's footsteps running onto the patio, then shortly thereafter, Moore rang the front doorbell. The patio door was the only vantage point from which Moore could have witnessed CPR, which proves he was in the apartment that day, as well as the fact that Moore cannot account for his whereabouts during the 20 – 30 minute period before he made the 1:02 911 call.

Attorney Adams has ample opportunity to destroy Moore's credibility. From the start Moore tried to use lies to distance himself. In his deposition he stated he had never been to the apartment prior December 9th but he knew the location because Mr. Davis told him where it was (Depo. at 52). Then once he realized that the lie would not hold up, he remembers visiting "once or twice." However, during trial he testified that Gwen Cunningham told him the location and that he had spent Thanksgiving there. (TR-533) Mr. Adams failed to impeach Moore.

After Moore testified he believed he was a suspect (Tr. 553). Adams failed to place further suspicion on him and further destroy his credibility by introducing evidence that he fled the State and nationwide APB was issued for him.

Because the jury had to decide between Moore's and Mr. Davis' credibility, trial counsel should have used every piece of evidence available to discredit Moore

and strengthen Mr. Davis' account. Had counsel done that, he could have made the logical argument that had Moore been just an innocent bystander, He would not have initially lied about never visiting the apartment, made contradictory statements about who informed him of the apartment's location and about what was said when Mr. Davis asked him to go dial 911 and that the 1:02 – 911 call proves he did not immediately call upon arrival at 12:30 – 12:45; that he lied about when he witnessed CPR by Mr. Davis; that he fled after learning he was a suspect.

The florida Supreme Court's ruling is contrary to clearly established law and the facts at held:

> This claim is conclusively refuted by the record after initially rested, attorney Adams – at Mr. Davis' request – reopen the defense's case and called Moore... Davis offers no reason why it was essential for trial counsel to raise this issue during cross-examination rather than later in the trial when Moore was called as a defense witness.

Id. At 1194-95

First, Adams rested his case, so he obviously did not plan to c all Moore as a witness. Mr. Davis complained to the court that Adams failed to properly cross-examine Moore and refused to bring him back to impeach him. Davis stated, "Mr. Adams indicated he couldn't get Moore back." (Tr. 888) Adams was against it and stated, "If the Court wants me to bring him back … (Tr. 890)

The Court ordered Moore brought back and the defense reopened – which perturbed Adams as the record evidences.

When Moore took the stand, Adams asked him about witnessing CPR (Tr.897) but never used crime scene photo or Gordon's testimony to show that his testimony could not be true, so it's impossible for the record to refute this claim.

Mr. Davis humbly requests that the Court reverse his convection.

(b)   Did you file a **direct appeal** on this Ground: Yes_____ (See Above) No__χ__.

(c)   Did you file a Post-Conviction Proceedings on this ground: Yes__×__ (See above), No_____.

(d)   Did you receive an evidentiary hearing on this ground? Yes [χ] No [ ]

(e)   If you did not exhaust your state remedies on this ground, explain why:
      _____

## GROUND TEN

Trial counsel rendered, inter alia, ineffective assistance of counsel when he failed to investigate the gastric evidence; and the timing of the head injuries or prepare for the medical examiner's testimony concerning the evidence, which violated Mr. Davis' Sixth, Eighth and Fourteenth Amendment rights under the U. S. Constitution, and postconviction counsel rendered ineffective when he railed to raise this claim in initial postconviction proceedings, pursuant to Martinez and its progeny.

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Given Cunningham testified that she fed her daughter cereal shortly after 8:00 a.m. On the morning of December9. 1992. (Tr. 486).

Mr. Davis testified that he cooked one batch of french fries that were dropped on the floor and thrown in the trash, after which, he put a new batch on the stove to cook. He stated that Thomas Moore arrived shortly thereafter and he instructed Moore to give the child some fries once they cooled down some. (Tr. 911).

Mr. Davis never testified to seeing the child eat fries at anytime. But he did testify that when he returned from Gordon's to find the child in distress and upon Moore's return it was Moore who informed him that she choked on a french fry. (Tr. 914)

To prove Mr. Davis' french fry statement was inconsistent with stomach contents evidence, the State relied on testimony from medical examiner Floro.

Dr. Floro testified that he found stomach contents that were not consistent with french fries. The State asked him would the contents be consistent **with the child having consumed some cereal a few hours prior to suffering the injury**? He replied, "It could be. Yes, sir." (Tr. 848) When asked if he was making a distinction between cereal contents and french fries, he replied, "That's correct. French Fries you will see in the stomach, sir (Tr. 848) "They would have been there if the child had taken french fries. (Tr. 849).

With what is known about digestion and digestive times, had attorney Adams made even the slightest effort to prepare for trial, he wold have easily discovered a litany of information that would have  allowed him to use Dr. Floro's testimony as exculpatory evidence. Mr. Adams would have discovered that in order for cereal to still be in her stomach, over 3 hours later when she was left in Mr. Davis' care, her digestion must have suspended or retarded not long after eating the cereal – when she was with Gwen Cunningham. Counsel would have learned that head Trauma and stress from trauma are two of many commonly known causes of suspend/retarded digestion and that under normal circumstances, her stomach would have completely emptied within one-and-a-half to two hours at most.

During a brief period, while Mr. Davis was unrepresented by counsel, he took the initiative to contact a forensic pathologist, Dr. R. K. Wright, and request a sworn affidavit based on proposed medical questions. Mr. Davis asked if a child ate cereal at 9 O'clock and sustained head injuries after 12:00 would autopsy discover the cereal? Dr. Wright replied, "No. The finding of identifiable cereal suggests an interval of less than 3 hours." *See* Exhibit 1

Counsel's failure to investigate deprived Mr. Davis of reliable adversarial testing. Had Mr. Adams effectively introduced through Dr. Floro, or called an

expert, the significance of food in the stomach for over 3 hours, he could have argued that the child suffered a traumatic event while in Cunningham's care, creating reasonable doubt as to Mr. Davis culpability. Moreover, counsel failed to investigate the timing of the head injuries and to call an expert to introduce exculpatory evidence

Attorney Adams testified during evidentiary hearing that he did not call Dr. Willey to testify concerning the lack of sexual battery evidence found during autopsy because – due to this misunderstanding of the law – he believed the State would question Dr. Willey, who disagreed with the accidental one drop defense, concerning the head injuries. However, had counsel investigated Dr. Willey's finding – though he agreed with State expert's as to causation – he would have discovered that the timing of the injuries was prior to the half an hour period Mr. Davis was alone with the child.

**Dr. Willey's testified during evidentiary hearing that – contrary to State experts – unconsciousness would not have been "immediate" because the brain swelling that led to unconsciousness and ultimately death progressed over a period of time and it could have been a "few hours" before any "physical manifestations" appeared**. (Evh. Vol. II at 267), corroborating the suspended digestion evidence and Dr. Wright's testimony that French fries in the stomach "suggests an interval of less than three hours." (Exh. 1) All of which places the timing of the injuries at the time when Gwen Cunningham was with the child – exculpating Mr. Davis. By neglecting to investigate and prepare for the case, Mr. Adams' deficient representation denied Mr. Davis a fair trial.

Mr. Davis avers that postconviction counsel was ineffective for failing to raise this claim in initial postconviction proceedings and that failure gives the Federal Court "cause" to excuse a procedural default and rule on this meritorious claim Mr.

Davis respectfully requests and evidentiary hearing and leave to amend/supplement this claim and humbly requests reversal of his convictions.

b)   Did you file a **direct appeal** on this Ground: Yes_____ (See Above) No_✗_ .

(c)   Did you file a Post-Conviction Proceedings on this ground: Yes_____ (See above), No_✗_ .

(d)   Did you receive an evidentiary hearing on this ground? Yes [ ] No [✗]

(e)   If you did not exhaust your state remedies on this ground, explain why: <u>Post conviction counsel failed to file in initial proceedings</u>

## **GROUND ELEVEN**

Trial counsel rendered, inter alia, ineffective assistance of counsel when he failed to prepare for trial by failing to investigate the crime scene and evidence from the crime scene, including statements by witnesses, depriving Mr. Davis of his Sixth, Eighth and Fourteenth rights under the U. S. Constitution, and postconviction counsel was ineffective for failing to raise this claim in initial postconviction proceedings, pursuant to <u>Martinez</u> and its progeny

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Gwen Cunningham testified that when she left home the only blood in the apartment was on the kid's bedroom wall. (Tr. 507)

The State's theory is that Mr. Davis beat and raped the child in the adult bedroom, then left her there to die while he went to Gordon's to establish an "alibi." (Tr. 1021)

Had attorney Adams bothered to view the crime scene photos and the evidence collected, he would have discovered that blood was pictured on a sheet and a pillow on the kid's bed, and police collected a pink blanket that was not on the bed – which postconviction DNA tests would confirm contained the victim's blood. By

failing to impeach Cunningham with this evidence, he missed an opportunity to weaken the State's argument that the child's blood could have only been spilled in an attack by Mr. Davis – being that it was also found in the "noncrime scene" bedroom and to further discredit Cunningham's truthfulness, which would aid in helping to lay the foundation of question her culpability.

Janet Cotton testified that she heard Mr. Davis' voice yell "sit down" through her apartment wall. (Tr. 519) but that she'd never had a conversation with him (Tr. 521)

Had Mr. Adams investigated the apartment, he would have learned that Ms. Cotton would have had to recognize Mr. Davis' voice through two walls, minimum. Mr. Davis' voice would have to travel through the "crime scene" bedroom wall, across the approximate nine foot span of the living-room and through the wall that abuts her apartment.

Mr. Adams failed to visit the scene and ascertain whether it's possible to positively identify even a familiar voice through those walls.

By destroying Cotton's eyewitness account – which mutated into the perfect mold of the State's theory after she met with the State – it would left only Mr. Davis account with corroborating evidence of what happened between noon and 12:30.

Janet Cotton testified that she and Celeste Wiley were witness to the 30 minute episode of murder, but because counsel failed to investigate, he failed to discover statements made on December9, 1992, to Detective Hallam by Cotton's trial testimony.

Detective Hallam testified that he interviewed both women at Cotton's apartment. They informed him that on Monday they heard a commotion around noon or 1:00 p.m. (Evh. Vol. II at 345) and again on Tuesday "yesterday they heard a child crying and a male voice say sit down..." (Evh. Vol. II at 346) neither of them mentioned hearing anything a few hours prior tot he interview Wiley's deposition

mentions only Monday and Tuesday. Nor do either State that the commotion was coming from Cunningham's apartment They could not pinpoint it (Wiley depo. At 25-28).

Counsel was ineffective for failing to ascertain the information, elicit testimony from Detective Hallam and use it to impeach Cotton's eyewitness account

When counsel failed to discover impeachment evidence that would have destroy key witnesses' credibility, severely undermining the State's case, He deprived Mr. Davis of a fair trial

Mr. Davis avers that postconviction counsel was ineffective for failing to raise this claim in initial postconviction proceedings and that failure gives the Federal Court "cause" to excuse a procedural default and rule on this meritorious claim Mr. Davis respectfully requests and evidentiary hearing and leave to amend/supplement this claim and humbly requests reversal of his convictions.

(b)    Did you file a **direct appeal** on this Ground: Yes____ (See Above) No_x_.

(c)    Did you file a Post-Conviction Proceedings on this ground: Yes____ (See above), No_x_.

(d)    Did you receive an evidentiary hearing on this ground? Yes [ ] No [x]

(e)    If you did not exhaust your state remedies on this ground, explain why: Post conviction counsel failed to file in initial proceedings_____

## GROUND  TWELVE

Trial counsel rendered, inter alia, ineffective assistance of counsel when he stipulated to exclude evidence that would have been used as impeachment and when he failed to impeach Gwen Cunningham and elicit testimony from her, which violated Mr. Davis' Sixth, Eighth and Fourteenth of the U. S. Constitution, and

postconviction counsel rendered  ineffective when he failed to raise the claim in initial postconviction proceedings, pursuant to <u>Martinez</u> and its progeny.

    (a)    Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Attorney Adams proved deficient when, without investigation, he stipulated to the exclusion of evidence that would have established a pattern of abuse for which Gwen Cunningham was being investigated and when, on May 3, 1995, he withdrew motions requesting HRS records, days prior to Mr. Davis' trial.

Not only did Mr. Adams' deficiency deprive the jury of valuable impeachment evidence but also, and most importantly, of critical evidence that would have pointed to Ms. Cunningham's culpability, creating reasonable doubt as to Mr. Davis' guilt.

Ms. Cunningham testified that Mr. Davis had never been alone with the child and was not abusive towards her children. (Tr. 505).

In addition to the latter testimony, had the jury been privy to he allegations that Ms. Cunningham was abusing the child and was alone with her for almost two hours prior to leaving her in Mr. Davis' care, they would have concluded that it was more likely that Mr. Davis decided – his very first time alone with the child–to abuse her.

Due to counsel's deficiency, the jury was instead left with the false impression that the child suffered an isolated incident of abuse and that Cunningham was a loving, caring mother grieving the loss of her child.

Had counsel not failed to investigate, he would have discovered the investigation report with which he could have used to elicit information from Cunningham concerning the allegations. Also, he would have discovered a statement by Cunningham to Carmen Richter stating that her daughter was  absent

from daycare on the 9th due to asthma, impeaching her trial testimony that the child was "happy and healthy."

Furthermore, counsel failed to impeach Cunningham with a April 27, 1993, arrested and conviction to filing a false police report, which counsel  probably was unaware ofbecause he failed to discover it.

Defense counsel's action – or, inaction's deprived Mr. Davis of a fair trial it is his ineffectiveness in failing to adversarially test the state's case that renders unworthy confidence in the verdict and Mr. Davis humbly requests that his Court reverse his convictions.

Mr. Davis asserts that the Federal Court has "cause" to excuse a State prisoner's procedural default in failing to raise an ineffective assistance of trial counsel claim in initial State postconviction proceeding when the claim is substantial, and postconviction proceeding when the claim is the first proceeding in which the claim can be raised, and counsel in that proceeding was ineffective.

(b)  Did you file a **direct appeal** on this Ground: Yes____ (See Above) No‾⨯‾ .

(c)  Did you file a Post-Conviction Proceedings on this ground: Yes____ (See above), No‾⨯‾ .

(d)  Did you receive an evidentiary hearing on this ground? Yes [ ] No [⨯]

(e)  If you did not exhaust your state remedies on this ground, explain why: <u>Post conviction counsel failed to file in initial proceedings</u>

## GROUND THIRTEEN

Trial counsel rendered, inter alia, ineffective assistance of counsel when he failed to object and move for mistrial due to numerous instances of prosecutorial misconduct, which violated Mr. Davis Sixth, Eighth and Fourteenth Amendments

rights under the U. S. Constitution, and postconviction counsel was ineffective for failing to raise the claim in initial postconviction proceedings, pursuant to <u>Martinez</u> and its progeny.

      (a)    Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

This state habeas corpus petition and accompanying appeal of the trial court's order denying 3.851 relief follows:

During the prosecutor's closing argument in the guilt phase, he improperly shifted the burden of proof to Mr. Davis; argued that state's witnesses thought Davis' story was untrue and that he was guilty' offered personal opinion as to Davis' credibility; called Davis' testimony at trial "lies"; and denigrated Mr. Davis and his defense theory.

In the penalty phase, the prosecutor continued its impermissible arguments arguing that because the victim died so should Davis; arguing non-statutory aggravation that Davis; "lies" show his true character; opining the jury should recommend death based on prsecutorial expertise; alleging that justice demands that Davis be held fully accountable and "fully accountable" means a death sentence; and inflamed the passions and minds of the jury by stating that the victim's siblings will one day want to know justice was done and that Mr. Davis received the death penalty.

These comments, un-objected to at trial, constitute prosecutorial misconduct resulting in fundamental error. Appellate counsel was ineffective for failing to raise these clearly improper comments on direct appeal. Davis was prejudiced by appellate counsel's failure because this Court would have reversed had the issues been raised on appeal.

In Mr. Davis' case, the multiple instances of prosecutorial conduct against Mr. Davis constitute fundamental error because they were so prejudicial that they tainted the jury's verdict.

During the cross-examination of Mr. Davis, the prosecutor made an improper comment by saying "This sounds like a great big conspiracy." (31 Tr. 942)

> STATE: **This sounds like a great big conspiracy. Do you any idea where those detectives got that information?**

(31 Tr. 942) The prosecutor also asked Mr. Davis to comment on the testimony of Detective Hickson (31 Tr.936) Hallum (31 Tr. 941). In making these statements, the prosecutor construed Mr. Davis' previous statement as an affirmative comment that the officers lied. The prosecutor cross-examination invaded the province of the jury by making the statement "this sounds like a great big conspiracy," which informed the jury that Mr. Davis was accusing the officers of lying.

The prosecutor shifted the burden of proof to Mr. Davis by commenting on his decision to raise a new defense for the first time at trial. Because a defendant is not required to divulge the substance of his or her testimony to the state before trial, a prosecutor improperly shifts the burden of proof on to a defendant by informing the jury that a defendant presented a new defense theory for the first time at trial.

Here, the prosecutor explicitly commented on Mr. Davis' decision to raise a new defense theory at trial, the prosecutor made the following comments during cross-examination of Mr. Davis:

> STATE: You failed to tell the police that Thomas Moore spent one-half hour with the child.

(31 Tr. 921)

> STATE: [Y]ou neglected to mention . . . that you had left that child alone, in truth with Mr. Moore

(31 Tr. 923)

> STATE;  [A]nd now you come into this courtroom and you tell the members of this jury **for the very first time that Thomas Moore must have committed this . . . crime?'**
> **"You never called either detective in this case to explain to them that the true culprit was Thomas Moore**

(31 Tr. 946 – 47)  The prosecutor also improperly asked Davis whether he knew that **"the old French fry astham thing**[Davis' theory of defense'" was not going **"to cut it"** (31 Tr. 945)

Subsequently, the prosecutor infringed on the state's burden of proof during closing arguments:

> STATE:  **So what's the next story? The next** story  that the Defendant provides us with is the head injury and the vaginal injury explanation. **He's got to give us one, so he gives us one.**

(32 Tr. 988.)    This comment shifted the burden to Mr. Davis to provide an explanation as to why the victim died. Of course, it is the state's burden to prove beyond a reasonable doubt that Davis killed the victim. Davis did not have to prove anything. The prosecutor continued with his improper burden shifting argument:

> STATE:  Well, he's going to change it today, because he's locked himself in. **He's going to  have to give you some explanation for that, because he's got to  have hat child unconscious when he comes back from he phone call, or else he did it. So he gives you an explanation that makes no sense.**

(32 Tr. 989)    Comments made by the prosecutor here led the jury to believe that Mr. Davis carried the burden of proof to both raise a defense theory before trial and explain any new theory he raised at trial. Mr. Davis was not obligated to disclose to the state his theory that Mr. Moore was responsible for the victim;s death; yet, the

prosecutor informed the jury during Mr. Davis' cross-examination and closing argument that Mr. Davis cheated or otherwise did something wrong in failing to make his defense known.

The prosecutor's comment tainted the jury's verdict because the jury was informed that, in reaching a verdict, it should consider the fact that Mr. Davis raised a new defense theory at trial. The prosecutor improperly led the jury to believe that Mr. Davis was obligated to raise any exculpatory defense before trial or, at least, explain his rationale for not disclosing it during direct examination. In inferring to the jury that the defense had a duty to come forth with information, the prosecutor shifted the burden because a defendant never has a duty to prove anything.

The prosecutor in the instant case denigrated Davis' theory of defense, interjected her person opinion of Davis' credibility, and belittled Davis and his counsel for presenting its chosen defense. During the state's closing argument, the prosecutor belittled the defense's argument by stating all of Mr. Davis' defenses were "not true." are "out the window," "would not fly today," and "makes no sense." (32 Tr. 988, 990).

The prosecutor continued to demean Mr. Davis' defense during the state's rebuttal closing argument. The Prosecutor sarcastically stated that, according to Mr. Davis, the jury was "support to believe" the defendant's theory contending the blood found in the house resulted from an injury to Ms. Cunningham or her son. (32 Tr. 1010). The prosecutor concluded that statement by calling the defense's theory "**silly**" (32 Tr. 1012).

The prosecutor also inappropriately belittled Mr. Davis in asking the jury to compare Mr. Davis' testimony with the testimony of other witnesses.

> STATE: You're all here to determine whether or not he committed first-degree murder. Do you think, perhaps, that may have shaded the accuracy of his testimony?

> Does the witness' testimony agree with the other
> testimony in the case? **He's in la-la land.**

(32 Tr. 1018) (emphasis added).

The prosecutor also demeaned Mr. Davis by stating that he "probably doesn't have the same wisdom as counsel does," (32 Tr. 11008), and further trampled Mr.. Davis' defense by referring to his theories as "lies," (32 Tr. 1009), thereby calling Mr. Davis a liar. The prosecutor also invited the jury to accept its proposition that Davis' made up a new story on the witness stand to get out of trouble:

STATE:  We have heard a lot about what Toney Davis told you happened today. We heard it all. Toney Davis told us what happened.

But what has he said seven times to seven different people on December 9, 1992, two-and-a-half years ago? What did he say?

Well, I'd like to go through them quickly with you. With respect to Toney Davis' prior testimony to Thomas Moore, who arrived at the scene moments before calling 911, what happened? She choked on a French fry, she had an asthma attack, call 911.

**We new know that's not true, and so does Toney Davis.** She did not choke on a French fry and have an asthma attack. **That has changed.**

Lieutenant Wade, what happened? The paramedic. I'm her stepfather. She is choking on a French fry:

Question:  Did this child drown?
Answer:    "I never had her in the water. We put her in the shower when she has asthma attacks."

**We now know that this is a lie.**

(32 Tr. 981 – 982) (emphasis added). In fact, the prosecutor argued that *every* version of events given to the jury by Mr. Davis is a lie:

> STATE:  Well, if you believe what the Defendant is telling you, one of his stories is a lie. I submit to you they're both lies.

(32 Tr. 1009)

The most troubling fact is that although Mr. Davis took the stand in his own defense, the prosecutor here referred to his story and version of events as "lies."

The comments of the prosecutor in Davis mirror those previously condemned by Florida Courts because they are overzealous and invade the province of the jury in improperly weighing the credibility of the witnesses.

Where this case boiled down to a swearing match between Mr. Davis and the state's witnesses, the "undeniably crucial issue was the juror's perception of the Defendant's credibility.

The prosecutor improperly urged the jury to determine Davis' guilt or innocence based on whether they believed Mr. Davis' testimony on the witness stand:

> STATE:  But you should also consider, when you're thinking about lesser included offenses, **Toney Davis took the witness stand and he's not telling you he didn't commit first degree** murder. I committed second, or I committed manslaughter. **He's telling you he didn't do anything. He is telling you our choice, is not guilty, if you believe his testimony from the witness stand.**

(32 Tr. 967 – 968)  After a brief discussion about verdict forms, the prosecutor stated: "**And just remember, Toney Davis says, I'm not guilty.**" (32 Tr. 968) (emphasis added).

These comments impermissibly infer that jury can convict Mr. Davis solely based on the veracity of his testimony, and not whether Mr. Davis was guilty beyond a reasonable doubt.

The comments also misstated the law and shifted the burden of proof to invite the jury to convict Davis for some other reason (his untruthfulness) than the state proving its case beyond a reasonable doubt.

In two separate instances in its closing argument, prosecutor impermissibly arguments were a clearly improper argument as commenting on an opinion as to another witnesses' belief on Davis' truthfulness.

The prosecutor in Davis' case stated:

> STATE:   Captain Wade testified that when he arrived as the t
> there, he was  loud, abrupt, agitated and defensive. **He
> kept asking him questions, because the answers
> didn't make sense to** him. He asked him, after seeing
> the child laying flat down on the living room floor
> unconscious and lifeless, what happened?
>
> **Man said he gave him his version of what
> happened, he didn't make sense.** So then the fellow
> asked him some more questions. Did this child drown
> in the bathtub? **He kept asking more questions,
> because he response made no sense.**

(32 Tr. 973) (emphasis added).   The prosecutor then argued to the jury its lead Detective did not believe Mr. Davis' story.

> STATE:  Then the Detective testified; both Frank Hallum and Toney
> Hickson. They told you than they were both  dispatched to investigate
> this case, Detective Hallum as a           lead        investigator.    Tony
> Hickson, in assisting Detective  Hallum, went to the hospital, talked
> to Mr. Moore, talked to    the doctor **and then after <u>he</u> realized that
> everything  Toney Davis was saying was totally inconsistent with
> what the doctors were saying,** he took him down to the
> Police Memorial Building as a suspect in this case.

(32 Tr. 977-978)(emphasis added)     These comments constitute an improper inference that law enforcement officers believed Davis is guilty.

The *State improperly capitalized on known false testimony*

5.     At trial Janet Cotton, Gwen Cunningham's neighbor, testified that she and Celeste Wiley heard "a lot of child crying and a lot of thumping noise" and "a male voice saying "sit down" on the day in question. (29 Tr. 518-19). She stated that the "banging or thumping" sounded like "something was hitting the wall." (29 Tr. 519) She identified the male voice as that of Toney Davis. (29 Tr. 519). She also stated that the ruckus lasted for 30 minutes, between noon and 12:30, the time that Mr. Davis was allegedly alone with the child. (29 Tr519).

The state knew that Cotton's deposition testimony (5 PCR 990), Cotton's prior statements to Det. Conn (5PCR 990), and Celeste Wiley's deposition (4PCR 799) and statements to JSO officers (1 SR 88 – 92) contradicted Cotton's trial testimony, yet the state allowed the testimony to go uncorrected at trial and then use the perjured testimony of Cotton in closing argument. (32 Tr. 970). The state's actions in reiterating Cotton's known false trial testimony undermined Davis' due process rights and constitute prosecutorial misconduct. (Tr, 1013, 1019)

In Davis' case, trial counsel did not object to the statements, and no instructions to disregard were given. The whole proceeding was rendered unfair due to prosecutorial misconduct. Due to counsel's failure to object, Mr. Davis never received fair adversarial testing during his trial proceedings and the conviction and the sentence of death is the resulting prejudice. This is especially so considering Mr. Davis' case resolved around a credibility determination between his trial testimony and the testimony of the prosecutor's witnesses.

The effect of the errors at his trial individually and cumulatively created an unreliable guilt phase verdict and death sentence, resulting in a conviction(s) and death sentence were violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

(b)     Did you file a **direct appeal** on this Ground: Yes____ (See Above) No_✕_ .

   (c)     Did you file a Post-Conviction Proceedings on this ground: Yes____ (See above), No_✕_ .

   (d)     Did you receive an evidentiary hearing on this ground? Yes [ ] No [✗]

   (e)     If you did not exhaust your state remedies on this ground, explain why: Post conviction counsel failed to file in initial proceedings_____


## GROUND FOURTEENTH


**MR. DAVIS' DUE PROCESS RIGHTS WERE VIOLATED BECAUSE OF APPELLATE COUNSEL'S FAILURE ON DIRECT APPEAL TO SUPPLEMENT TWO HANDWRITTEN LETTERS FROM MR. DAVIS UNEQUIVOCALLLY REQUESTING THAT HIS ATTORNEY BE DISCHARGED BECAUSE OF INCOMPETENCE, LEAVING THE FLORIDA SUPREME COURT AN INADEQUATE RECORD ON APPEAL WHEN REVIEWING THE CLAIM THAT THE TRIAL COURT FAILED TO CONDUCT A NELSON INQUIRY IN VIOLATION OF MR. DAVIS' FIFTH, SIXTH, EIGHTH AND FOURTENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUION**


Not only did the court fail to conduct a Nelson inquiry, it failed to disclose these letters to defense counsel and also failed to determine that Mr. Davis' complaints against his counsel were unfounded, thereby advising Mr. Davis that if

his request to discharge his attorney was granted, the court was not required to appoint substitute counsel and Mr. Davis would be exercising his right to represent himself.

The two letters to the trial court *clearly alleged ineffectiveness of his counsel, and specifically referenced* defense counsel's failure to: visit him in jail for a period of over six months, failing to attend pretrial conferences; misrepresenting Mr. Davis' defense at trial; failing to cross-examine witnesses properly; failing to file motions properly; and failing to impeach witnesses who testified falsely at trial. (2 Tr. 308-309, 314-316) Additionally, Mr. Davis unequivocally requested June 5 letter before trial that his counsel be discharged because of his incompetence, asking that counsel "resign or be dismissed from the case." (2 Tr 308-309).

Additionally, because of Mr. Davis' appellate counsel's failure to supplement the record with these necessary letters, this FSC was never able to conduct a full review of this important issue on direct appeal, denying Mr. Davis' due process rights to full review on direct appeal.

Mr. Davis' letter put the trial court on notice that he and his attorney were having serious conflicts. Importantly, Mr. Davis did not remain silent about his dissatisfaction with trial counsel. Nor is there anything in the record suggesting the conflict between Mr. Davis and his attorney subsided. Quite the contrary. At trial, repeatedly informed the court as to his counsel's ineffectiveness. Mr. Davis argued that defense counsel continued to be ineffective in failing to prepare for a defense. (31 Tr 886-887). He argued that defense counsel failed to properly cross-examine state witnesses Mr. Moore, Mr. Gordon, and Ms. Williams, (32 Tr. 886-887, 889), and even changed his decision not to testify because his defense counsel did not impeach these witnesses properly. (31 Tr 887,901) Mr. Davis also unsuccessfully attempted to direct his own defense (31 Tr. 884)and deliver his own final argument,

because of his attorney's refusal to address the points Mr. Davis wanted included in closing. (31 Tr. 991, 993).

At the penalty phase, Mr. Davis' concerns about his attorney's competence continued. Presumably, this started with the fact that defense counsel shockingly did not enlist co-counsel for Davis' penalty phase, waived opening statements, argued lingering doubt in his closing argument to a jury that just convicted Mr. Davis of murder and sexual battery, and presented a mitigation case-in-chief that informed the jury that Mr. Davis was a "good" kid and lasted approximately five minutes. (32 Tr. 1087-1091, 1097-1098). Mr. Davis stated that defense counsel "neglected his whole obligation," and that the penalty phase presentation by counsel was "ridiculous." (32 Tr. 1100).

Mr. Davis specifically complained that he had four other witnesses that were willing to testify but did not due to the neglect of trial counsel. (32 Tr. 1099). Trial counsel did not know who these witnesses were and relied on a fact investigator to conduct mitigation. (32 Tr. 110) Mr. Davis also explained that his attorney would not visit or contact him, and that it was "impossible" to talk to him. (32 Tr. 1103). Again, Mr. Davis requested to conduct to do his own closing argument. (32 Tr. 11070.

When asked whether he wanted to testify, Mr. Davis was not even aware that he had an option. (32 Tr. 1105).

It is clear that in ignoring Mr. Davis' two letters concerning discharging his attorney and failing to do anything about it, the trial court created the proverbial showball effect which not only led to a failure to conduct a Nelson inquiry, but ultimately to an inadequate review of the record on direct appeal.

A.    **June 23, 1994 letter from Mr. Davis to the trial court**

After Mr. Davis' April 5, 1994, pretrial conference, Mr. Davis sent the trial court the first of his two previously undisclosed letters on June 23, 1994:

> The basis of this letter is to inform that my attorney Charley Adams still continues to neglect and avoid any communication with me concerning my case. **I haven't spoken to Mr. Adams concerning my case since Nov. Or Dec. Of 1993.** The family immediately feels along with myself that my rights are being violated.
>
> **I (sic) few months ago I requested that I be appointed new counsel, I was denied.**
>
> **Your honor you assured me during the last conversation we had in court that you'd see that Mr. Adams does his job properly.** Enough is enough and I refused to cooperate any further (sic) as Mr. Adams as my counsel. **I feel that he is ineffective assistance of counsel**, and my best interest is not held at heart. My life hangs in the balance I should at least be represented by an competent lawyer.
>
> I will file a complaint with the Florida bar **if Mr. Adams does not as I have asked, <u>which is that he resign or be dismissed from the case</u>**.
>
> Please your honor I ask you that you give this matter your full attention.
>
> Signed by Toney Davis before notary on June 23, 1994.

(2 Tr. 308-309) (emphasis added). This letter unequivocally requested new counsel be appointed, and gave specifics reason for such: **defense counsel has not done his job properly, counsel was ineffective, counsel was not competent, and counsel did not speak to Mr. Davis in over six months**.

Davis went to trial on May 9, 1995, without hearing from the trial court concerning this letter.

**B.**    <u>June 8, 1995 letter from Mr. Davis to the trial court</u>

*Prior* to Mr. Davis' penalty phase, he wrote the trial court again, explaining in even greater detail the specific acts of incompetence exhibited by his attorney:

> The Honorable Judge Davis:
>
> I don't intend occupying much of your time or "nagging" you with the situation at hand.
>
> First and foremost the court is aware, even before you took bench that I was not satisfied with Mr. Adams professional or should I say unprofessional attitude and work habits. I feel I have credible grounds for my unsatisfactory (sic) in his representation. **Mr. Adams neglected many pretrial trial appointments,** which formed by hearty (sic) belief in his unconscionable representation. **Mr. Adams clearly misrepresented the entire case from his defensive tactics to his improper cross-examination. How could he properly defend someone using a line of defense that experts testified were 9sic) in opposition? He failed to file motions properly.** The prosecution even presented false testimony of subjects they clearly knew the circumstances, **which Mr. Adams left as they were falsely testified.**
>
> Supreme Court Justice Curtis Bok once stated "I am annoyed by those who love mankind but are cruel and discourteous to people."
>
> I was represented and prosecuted cruelly and discourteously. All I want is a fair unprevaricated (sic) trial. I'm not asking for nothing more than truth, justice, and the American way. I realize that a beautiful child is dead. I feel remorse and if I could exchange places I would. But I hold fast my innocence and fight, a good fight. I don't choose to fight fire with fire. I'd rather use water. Evil with good and wrong with right.
>
> Your honor I'd also like to request that a song I wrote and recorded on a home "demo" be played at the penalty

phase. The song is called "For kids sake." Using the art of music to express and represent my inner self, this song comes from the heart. The true and correct Toney Davis lives and holds true to my belief in this song.

Thank you for your time. I truly express my utmost (sic) gratitude with respect and admiration.

Sincerely,

Toney Davis.

(2 Tr. 314-316)(emphasis added). This letter fell on deaf ears as well, and was followed by a short, disjointed, non-compelling penalty phase as described above. The jury recommended a death sentence buy a 11-1 vote.

The incomplete record on direct appeal prejudiced Mr. Davis' constitutional rights to a full and fair hearing, requiring reversal. The missing letters were essential to a full review. Without them, the FSC only relied on an April 5, 1994, pretrial to determine whether Mr. Davis unequivocally requested his counsel be discharged. At the April 5 pretrial, an inquiry was made into Mr. Davis' concern about his attorney's representation of him. Later, attorney explained some of the work he was doing to get the case ready for trial. The FSC summed up the denial of this claim, stating:

> Under Nelson, an inquiry is appropriate when an indigent defendant attempts to discharge current counsel and obtain new court-appointed counsel prior to trial **due to ineffectiveness**. Branch v. State, 685 So.2d 1250, 1252 (Fla. 1996), cert. Denied, 520 U.S. 1218, 117 S. Ct. 1709, 137 L.Ed.2d 833 (1996). As in Branch, **here we find Nelson inapplicable because it is not clear that Davis was seeking to discharge his counsel,** and "Branch's comments seemed to be a general complaint, not a formal allegation of incompetence." Branch, 685 So. 2D at 1252; see also, Windom v. State, 656 So. 2D 432, 437 (Fla. 1995) (holding no further inquiry requested where it was

not clear that defendant had moved to discharge counsel due to incompetence); Bowden v. State, 588 So.2d 225, 230 (Fla. 1991)(finding no further inquiry necessary when defendant merely expressed dissatisfaction with counsel's performance).**Davis never make an unequivocal requested to discharge his court-appointed counsel; he subsequently allowed his attorney to represent him throughout the trial.** "As a practical matter, a trial judge's inquiry into a defendant's complaints of incompetence of counsel can be only as specific and meaningful as the defendant's complaint." Lowe v. State, 650 So. 2D 969, 975 (Fla. 1994). **Davis' silence after hearing what his attorney had been doing to ready the case for trial would lead one to believe that Davis felt his concerns had been heard by the judge and his lawyer and he was content to proceed.** (emphasis added)

Davis, 703 So. 2D at 1058. Now, with a full and complete record concerning the Nelson issue, the FSC's prior finding s are shown to be uninformed. There is nothing "unclear" about Mr. Davis' unequivocal request to discharge his attorney in his June 30, 1994, letter. See Davis, 703 So.2d 1058. Likewise, there is nothing "ambiguous" about Mr. Davis' request and specific allegations of his attorney's incompetence. See Id.

Contrary to the FSC's findings, Mr. Davis also did not remain silent after the April 5, hearing, but rather sent an unequivocal request to discharged his counsel on June 30, 1994, and then on June 8, 1995, (seven days before the penalty phase) providing specific examples of his attorney's incompetent acts/omissions.

The Trial court's failure to even conduct a minimal inquiry into Mr. Davis' reason for seeking to discharge court-appointed counsel was a structural defect requiring reversal as per se error. Had the FSC possessed Mr. Davis' two letters concerning the discharge of his counsel  and specific allegations of his attorney's

incompetence, the FSC would have followed its often-cited precedent that the trial court reversibly in failing to hold a <u>Nelson</u> hearing.

Because the trial court took no action on Mr. Davis' letters, Mr. Davis was forced to proceed to trial, and eventually to a penalty phase, with an attorney he unequivocally requested be discharged and had made specific allegations about incompetence about.

Filed in State Habeas Corpus.

## GROUND FIFTEEN

**MR. DAVIS' TRIAL WAS FRAUGHT WITH PROCEDUREAL AND SUBSTANTIVE ERRORS, WHICH CANNOT BE VIEWED AS HARMLESS WHEN VIEWED AS A WHOLE. THE COMBINATION OF ERRORS DEPRIVED MR. DAVIS OF HIS U.S. CONSTITUIONAL RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

The aforementioned errors, both by Mr. Davis' trial counsel and the prosecution, cannot be considered harmless when viewed as a whole. Defendant's trial was so effected by these errors that it cannot be said a fair trial was received.

Because of the uniqueness and severity of the death penalty, the United States and Florida Supreme Courts have held that when errors viewed as a whole, even if they would not require a reversal if viewed individually, can amount to cumulative error that requires a reversal in convictions.

It is Davis' contention that the various errors in his trial are each sufficient to require reversal   of both his conviction and sentence on an individual basis; however, Defendant also avers that the combined errors in his guilt and penalty phase of the trial, when viewed as a whole, resulted in a violation of his right to a fair trial under the United States and Florida Constitutions. Therefore, Mr. Davis

requests his convictions and sentence be reversed and remanded, and a new trial granted.

11.   Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition? **Yes [ ] No [X].** *If "Yes*," provide the following information:

    (1)   Name of court: _____ **DISTRICT COURT** _____
    (2)   Docket or case number: _____
    (3)   Date Mailed:_____
    (4)   Date of filing: _____
(5)   Nature of the proceeding: _____
    _____
    _____

(6)   Grounds raised: _____
    _____
    _____

    (7)   Did you receive an evidentiary hearing where evidence was given on your petition, application, or motion? Yes [ ] No [ ]
    (8)   Result: _____
    (9)   Date of result (if you know)_____
    (10)  Date Rehearing Mailed:_____
    (11)  Date Rehearing Denied:_____

(12)  **Did you Appeal the Federal Habeas Corpus? Yes [ ] No [X]**

    (a) Name of Court:__ **11TH CIRCUIT COURT APPEAL** _____
    (b) Date Mailed Notice of Appeal"_____
    (c) Result:_____
    (d) Date of Result: _____
        (e) Date Rehearing Mailed:_____
        (f) Date Rehearing Denied:_____
    (g) Mandate Issued:_____
    (h) Case Number:_____
    (i) Citation:_____
    (j) **Certiorari to the United States Supreme Court:**
        (1) Date Mailed:_____
(2) Date Filed:_____

(3) Result:_____

(4) Date of Result: _____

(5) Rehearing Mailed:_____

(6) Rehearing Denied:_____

(7) Case Number:_____

(8) Citation:_____

12. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? **Yes** [ ] **No** [X].

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

_____

13. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: _

_____ Bill White _____
_____ Public Defender _____

(b) At arraignment and plea:

_____ Charley Adams _____

(c) At trial:

_____ Charley Adams _____

(d) At sentencing:

_____ Charley Adams _____

(e) On appeal:

_____ Bill Salmon _____

(f) In any post-conviction proceeding:

_____ Wayne Henderson _____
RICHARD SICHTA

14.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? **Yes [  ] No [X]**

(a)   If so, give name and location of court that imposed the other sentence you will serve in the future: _____

_____

(b)   Give the date the other sentence was imposed: _____

_____

(c)   Give the length of the other sentence: _____

(d)   Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? **Yes [  ] No [X]**.

15. **TIMELINESS OF PETITION**: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

16.

*The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)   The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or

claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: _To RELEASE MR. DAVIS OR, AT LEAST, REVERSE HIS CONVICTIONS AND ORDER A NEW TRIAL_

/S/ _____

_TONEY DERON DAVIS  300807_
Union Correctional Institution
7819 NW 228th Street
Raiford, FL 32026

Petitioner pro se

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on this ___30TH___ day of ___SEPTEMBER___, ___2014___. And executed on the same date.

/s/ _____

_TONEY DERON DAVIS  300807_
Union Correctional Institution
7819 NW 228th Street
Raiford, FL 32026

Petitioner pro se

# EXHIBIT   I

● Page 2                                                                                    May 17, 1999

County of Dade]
State of Florida ]

Before me Dr. Ronald K. Wright MD JD appeared, was duly sworn and said:

1.  My name is Dr. Ronald K. Wright. I am a physician and attorney duly licensed by the State of
    Florida to perform both professions. I am a board certified anatomic, clinical and forensic
    pathologist. I am and have been a full time member of the faculty of the University of Miami School
    of Medicine for 25 years. I am director of forensic pathology.
2.  Mr. Toney Davis asked me a series of questions that I answer as follows. If a child ate cereal at
    0900, head injuries occurred after 1200, should a subsequent autopsy discover the cereal? No.
    The finding of identifiable cereal suggests a time interval of less than 3 hours.
3.  Is it possible for the vagina of a pre-pubertal girl to bleed without injury to the hymen? While
    perhaps possible, it is highly unlikely if there is trauma sufficient to produce vaginal bleeding without
    hymen injury.
4.  The above answer presumes that the vaginal bleeding was produced by involuntary sexual battery.
5.  Would a vaginal/hymeneal injury sufficient to bleed, heal in 24 hours to the extent that it would not
    be discernable by physical examination or autopsy? No. While children heal fast, this would be
    impossible.
6.  Would autopsy examination reveal injury to the vagina/hymen sufficient to cause bleeding with a
    period of 24 hours between injury and death? Yes, if done by a reasonably competent pathologist
    who was looking for vaginal injury.
7.  Is it possible for the body to heal injuries after death? No.
8.  I would have testified to the above had I been asked to do so by the State or Defense in this
    matter.

                                                                        Ronald K. Wright MD JD

Signed and sealed this seventeenth day of May, nineteen hundred ninety nine by Dr. Ronald K. Wright
MD JD who is personally known to me.

                                        Estela Garcia-McDougal
                                        My Commission CC748288
                                        Expires July 22, 2002