## SUMMARY OF THE ARGUMENTS

**GROUND I** – The trial court erred in summarily denying Mr. Davis' sufficiently pleaded claim that the state committed a <u>Giglio</u> violation concerning Ms. Cotton's testimony at trial.  The record does not conclusively refute the claim.  Remand for an evidentiary hearing is necessary so the court may hear testimony from Ms. Cotton and State agents concerning the State's knowledge of Ms. Cotton's false testimony and to determine the materiality of the false testimony.

**GROUND II** – The trial court erred in summarily denying Mr. Davis' sufficiently pleaded claim that the state committed a <u>Brady</u> violation concerning Ms. Cotton at trial.  This claim is not conclusively refuted by the record.  Remand for evidentiary hearing is required so that the court may hear evidence concerning the State's suppression of evidence that Ms. Cotton's testimony was incorrect and to determine the materiality of the suppressed evidence.

## ARGUMENTS

## GROUND I.

## THE STATE VIOLATED GIGLIO BY KNOWINGLY PRESENTING THE FALSE TESTIMONY OF A CRITICAL WITNESS, JANET COTTON, AFTER PRESSURING HER TO FABRICATE A STORY THAT SUPPORTED THE STATE'S THEORY OF THE CASE

### I.      Applicable law, generally

To establish a Giglio[4] violation, "a defendant must show that: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material." Rhodes v. State, 986 So. 2d 501, 508-09 (Fla. 2008).

Whether the lower court erred in denying an evidentiary hearing on a successive rule 3.851 motion is a question of law subject to de novo review. Darling, 45 So. 3d at 447. Because the circuit court denied Mr. Davis' motion without an evidentiary hearing, this Court must accept all factual allegations in Mr. Davis' motion as true to the extent they are not conclusively refuted by the record. Id.

The circuit court's order summarily denying relief without an evidentiary hearing will be reversed unless the claim is legally insufficient or the allegations are conclusively refuted by the record. Mungin v. State, 79 So. 3d 726, 738 (Fla. 2011) ("Accordingly, for the reasons addressed above, we likewise hold that after

---

[4] Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972)

reviewing the *Giglio* claim presented and accepting all allegations in the motion as true to the extent they are not conclusively refuted by the record, we cannot agree that the record at this point conclusively shows that the evidence pertaining to Brown would not affect the jury's verdict. Accordingly, an evidentiary hearing is needed on this claim as well.")

## II.    The prosecutor presented false testimony

The lower court concedes that Mr. Davis established, through pleading *Giglio's* first prong, that Ms. Cotton's trial testimony was false. (SPCR 209.)

## III.    The prosecutor knew the testimony was false

The lower court incorrectly ruled that the claim must fail because Ms. Cotton's new statement recanting her trial testimony does not declare outright that the State knew that Cotton's trial testimony was false. (SPCR 209.)  However, the trial court's ruling was erroneous because Mr. Davis is not required to prove that he is entitled to relief on the face of his motion.  All a defendant must do to sufficiently plead a claim is set forth allegations, which, if true, would substantiate the claim. See Fla. R. Crim. P. 3.851(e)(1) (To sufficiently plead a 3.851 claim, the claim must include: "(D) a detailed allegation of the factual basis for any claim for which an evidentiary hearing is sought").  Producing evidence in support of a claim is what an evidentiary hearing is for.  See Roush v. State, 468 So. 2d 1103, 1104 (Fla. 1st DCA 1985) ("We therefore remand for an evidentiary hearing **so that appellant**

17

**may have an opportunity to prove the allegations of his motion and to prove, if he can, that the allegedly deficient conduct** on the part of counsel was so substantial that there was a reasonable probability that it affected the outcome of the trial.") (emphasis added).

Mr. Davis pleaded sufficient facts alleging that the State was aware that Ms. Cotton's trial testimony was false. Mr. Davis alleged the State knew, or worse, pressured Ms. Cotton into giving false testimony at trial as evidenced by Ms. Cotton's recent statement concerning her interactions with Ms. Corey, including Ms. Corey's willingness to make some criminal charges go away; Ms. Cotton's statement that she was under a great deal of "pressure and duress" from the State and law enforcement to provide helpful information in the case; and the previously discovered JSO notes of interviews with Cotton and Wiley. (SPCR 112.) Mr. Davis' claim is readily distinguishable from the Giglio issue in Mark Allen Davis v. State, 26 So. 3d 519, 532 (Fla. 2009), cited by the lower tribunal in denying relief (SPCR 209). In Mark Allen Davis, the defendant's successive 3.851 motion contained no statements, facts, or assertions that the State knew the testimony in question was false to support his Giglio claim. Pinellas Co. Fla. Case No. 85-8933-CFANO, February 18, 2008, Successive 3.850 Motion, pp. 6-9. Therefore, in Mark Allen Davis, the trial court was correct that the second prong of Giglio had not been pled or established. Such is not the case here.

18

Instead, the instant claim is more like <u>Rivera v. State</u>, 995 So. 2d 191 (Fla. 2008). There, the defendant set forth specific allegations within his 3.851 motion that a key State witness had extensive interactions with law enforcement and failed to disclose that he would receive a deal for his testimony. <u>Id.</u> This Court held that the trial court's summary denial of the claim was inappropriate:

> In contrast to this trial testimony, Rivera's postconviction filings assert that Zuccarello had an extensive involvement with law enforcement agencies at the time of Rivera's trial. The documents on which Rivera relies to support his postconviction claims reveal that Zuccarello was communicating with law enforcement officers about various criminal investigations before, during, and after his incarceration with Rivera at the Broward County Jail. He was in contact with law enforcement officers and prosecutors concerning investigations in Dade and Broward counties about multiple home invasion robberies and at least two other homicides. Moreover, he allegedly received a plea offer requiring him "to testify at all proceedings in which he is subpoenaed" and providing that "[a]t the time of sentencing [of Zuccarello] . . . the State will bring forward all law enforcement personnel familiar with the cases and the efforts of the defendant for the Court's consideration in sentencing." In another of the filings Zuccarello is described as a police confidential informant.
>
> We cannot agree with the trial court's conclusion that these claims are sufficiently rebutted by the record so as to make an evidentiary hearing unnecessary. Under our postconviction rules, we must accept Rivera's claims as true and direct an evidentiary hearing on their validity unless the record *conclusively* demonstrates that Rivera is not entitled to relief. *See* Fla. R. Crim. P. 3.850(d); *see also Floyd v. State,* 808 So. 2d 175, 182 (Fla. 2002) ("Under rule 3.850, a postconviction defendant is entitled to an evidentiary hearing unless the motion and record conclusively show that the defendant is entitled to no relief."). Here, the record does not conclusively refute Rivera's extensive factual allegations that the State knowingly presented false or misleading testimony in violation of *Giglio* and withheld favorable evidence in violation of *Brady.* While there may be valid explanations to refute

19

> these allegations, the State has not demonstrated that those explanations
> are apparent on the face of the record. Accordingly, we find that
> Rivera's allegations are sufficient to require an evidentiary
> hearing with regard to whether there were *Giglio* or *Brady* violations

Id. at 196-97. In Davis, as in Rivera, Mr. Davis set forth specific factual allegations

supporting its claim. Id.

Contrary to the lower court's holding, and like Rivera, Mr. Davis' allegations

that the state pressured Ms. Cotton into giving false testimony and was aware that

her trial testimony was false cannot be conclusively refuted by the current record

because the lower court has yet to hear from Ms. Cotton concerning her interactions

with the prosecution and JSO officers leading up to her trial testimony. Ms. Cotton's

affidavit indicates that she was under "pressure and *duress*" to offer evidence

consistent with the State's narrative. No court has yet heard Ms. Cotton's reasons

for testifying falsely and whether any government employee pressured, coerced, or

intimidated her into changing her statement to fit the State's theory of the case.

Further, no state employee has provided any testimony refuting Mr. Davis' 3.851

assertion that Ms. Cotton changed the dates of the events she witnessed to fit the

State's theory of the case under pressure from the government. As such, this prong

is ripe for an evidentiary hearing.

## IV.   The false testimony was material

Lastly, the lower court's finding that any false testimony from Ms. Cotton is

immaterial because Mr. Davis would have been convicted anyway impermissibly

20

minimized the importance of her trial testimony and impact of her testimony on the

jury. As explained by the Third DCA in <u>Cueto</u>, "a mere recitation that the evidence

at trial as overwhelming…is insufficient to permit a summary denial of the motion."

> The trial court summarily denied the motion without an evidentiary hearing, making a finding simply that the evidence at trial was overwhelming and that the allegations, if proven, would not meet the two-pronged test for newly-discovered evidence under *Jones* and *Taylor*. While we express no comment on the ultimate merits of Cueto's claim or the veracity of Medina's affidavit, it is evident that the trial court erred in denying this motion without conducting an evidentiary hearing. Where "the record does not conclusively refute [a defendant's] . . . factual allegations that the State knowingly presented false or misleading testimony in violation of *Giglio* . . . ," an evidentiary hearing is required. *Rivera v. State*, 995 So. 2d 191, 197 (Fla. 2008).

> The record does not conclusively refute Cueto's allegations, and the mere recitation that the evidence at trial was overwhelming (together with a summary of the evidence, without any attachments) is insufficient to permit a summary denial of the motion.

<u>Cueto v. State</u>, 37 Fla. L. Weekly D1347 (Fla. 3d DCA June 6, 2012).

The lower court ignores that the State used Ms. Cotton's testimony to establish

that she and her friend both listened as Mr. Davis flung C.C. against a wall, abusing

the girl for 30 minutes, while the child cried. The testimony was used not only to

establish that multiple people heard the abuse which resulted in C.C.'s injuries, but

that the abuser was conclusively Mr. Davis, and that the injuries occurred

immediately prior to the arrival of rescue personnel, consistent with the medical

experts' findings. Without Ms. Cotton's testimony, Mr. Davis' defense at trial—

21

that Mr. Davis left the girl with Mr. Moore while Mr. Davis went out to make a phone call, and that upon his return, Mr. Davis figured that she was suffering from an asthma attack and dropped the wet child in the bathroom while attempting to revive her—could not have been so easily ruled out.

The importance of Ms. Cotton's trial testimony is evident from the State's closing arguments. See Kyles v. Whitley, 514 U.S. 419, 444 (1995) ("The likely damage [of a witness' suppressed statements] is best understood by taking the word of the prosecutor."). Here, the State relied on Ms. Cotton's testimony heavily in closing argument to establish a timeline — to prove that Mr. Davis had no explanation for the time period between 12:00 and 12:30:

> Ms. Cotton, the next door neighbor, testified that she was familiar with Gwen Cunningham and the kids; that on the day in question she was entertaining and between 12:00 and 12:30 she heard a horrendous racket next door that included bumping and thumping, like hitting the walls, a child cry, and a man yelling, "Sit down," in a mean, stern voice. A man who she recognized the voice as being the defendant, Toney Davis.
>
> And she also told you that it went on for a half hour and stopped at 12:30. She then told you 30 minutes later rescue arrived. She told you that she told the investigators at the scene what she had heard.

(32 R 971.)

> Between 12:00 and 12:30, Janet Cotton, the next door neighbor, hears banging on the walls, child crying, defendant yelling, sit down," and it goes on for a half hour. And let me tell you something, nobody else has accounted for this half hour, not even this defendant.

22

(32 R 1019.)  As demonstrated with this argument, the testimony was absolutely necessary to refute Mr. Davis' defense at trial that Mr. Moore could have harmed the child; or to establish that the injuries did not even occur that day.

Further, the lower court failed to conduct the cumulative materiality analysis required under the law.  Even items of evidence that the court consider immaterial on their own must still be considered as part of a cumulative materiality analysis. See Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1346 (11th Cir. 2009).  Here, Ms. Cotton's false testimony must be considered along with suppressed evidence of Ms. Wiley's JSO interview notes indicating that she was not with Ms. Cotton at the time Ms. Cotton claimed and that she did not hear anything; and daycare notes indicating that, contrary to Ms. Cunningham's testimony, C.C. suffered vaginal issues prior to the time of the incident in question and that she had previously claimed C.C. suffered from asthma.  This suppressed evidence is collectively material to Mr. Davis' case, as the State relied significantly on Ms. Cotton and Ms. Cunningham to establish that Mr. Davis was the only person with the opportunity to cause the injuries in question to the child.  If the defense had been privy to evidence that the child suffered with ailments, including vaginal issues, prior to the day in question; that the noises that Ms. Cotton heard did not occur when she said they did; and that C.C. suffered an asthma attack or similar respiratory issue in the days leading up to her death, there

23

was a plausible medical defense that the child died as a result of injuries that occurred before Mr. Davis was alone with her.

Finally, the trial court's reliance on outmoded medical evidence in denying relief is hardly sufficient to refute materiality.  As set forth in Mr. Davis' successive 3.851 motion, medical experts have opined that the medical testimony in Mr. Davis' case is largely incorrect under modern medical standards and that there was little evidence that the injuries suffered by the child occurred in the short window of time that Mr. Davis was alone with the child.

## GROUND II.

**THE STATE VIOLATED BRADY BY WITHHOLDING MATERIAL INFORMATION THAT IMPEACHED A CRITICAL STATE WITNESS AND PROVIDED EXCULPATORY EVIDENCE SUPPORTING MR. DAVIS' FERVENT CLAIM OF INNOCENCE**

### I.    Applicable law, generally

To demonstrate a Brady[5] violation, the defendant has the burden to show:

> (1) that favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. To meet the materiality prong of *Brady*, the defendant must demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . . [M]ateriality under *Brady* requires a probability sufficient to undermine confidence in the outcome. [For t]he materiality inquiry . . . the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine

---

[5] Brady v. Maryland, 373 U.S. 83 (1963)

24

confidence in the verdict. It is the net effect of the evidence that must
be assessed.

Franqui v. State, 59 So. 3d 82, 101-102 (Fla. 2011). The summary denial of

a Brady claim will only be upheld if the motion is legally insufficient or its

allegations are conclusively refuted by the record. See Asay v. State, 210 So. 3d 1,

24 (Fla. 2016).

## II.   The evidence is favorable

The lower court found Ms. Cotton's admission that her trial testimony was

false to be favorable. (SPCR 213.)  As set forth in Mr. Davis' 3.851 motion, the

evidence is exculpatory in the sense that Ms. Cotton's trial testimony was used to

demonstrate that C.C.'s injuries occurred immediately before rescue personnel

arrived and to refute Mr. Davis' testimony that the child had some sort of medical

episode (he surmised choking or asthma) and that he dropped her while trying to

revive her in the bathtub.  (SPCR 116.)  The evidence was impeaching as it directly

refutes Ms. Cotton's trial testimony and indicates that state officials pressured her

into making false statements.   The prosecutor went as far as keeping tabs on her

during Mr. Davis' initial postconviction proceedings to ensure that she did not assist

the defense.  (SPCR 116.)

## III.   The state suppressed the evidence

Like the previous claim, the lower court found that because Ms. Cotton's new

statement does not explicitly say that the State was aware of and concealed Cotton's

25

true testimony, the claim must fail.  (SPCR 213.)  However, there is no requirement

that Mr. Davis establish that the State concealed the evidence prior to an evidentiary

hearing – all he must do is sufficiently plead the claim, which he has done.  (SPCR

116) See Rivera, 995 So. 2d at 196-97.  Mr. Davis' 3.851 alleged that Ms. Cotton's

trial testimony was the result of pressure and duress; he alleged that the State failed

to disclose the prosecution's contact with Ms. Cotton, including that the prosecutor

personally walked Ms. Cotton through the crime scene; he alleged that the State's

willful suppression of exculpatory and impeaching evidence concerning Ms. Cotton

was also demonstrated by the State's failure to turn over JSO notes from Ms.

Cotton's original police interview.   (SPCR 117.)   The motion alleges that the

previously litigated undisclosed notes, in conjunction with Ms. Cotton's new

statement, support Mr. Davis' claim that the State coerced impressionable, naive Ms.

Cotton into changing her original statement to suit the State's theory of the case.

(SPCR 117.)

Like the preceding claim, this prong cannot be conclusively refuted from the

current record where no court has heard testimony from Ms. Cotton concerning her

interactions with the prosecution and JSO officers leading up to her trial testimony.

No court has yet heard Ms. Cotton's reasons for testifying falsely and whether

anyone from the State pressured her into changing her statement to fit the State's

theory of the case.  Further, no State employee has provided any testimony refuting

Mr. Davis' 3.851 assertion that Ms. Cotton changed the dates of the events she witnessed to fit the State's theory under pressure from the government.

As this Court explained in <u>Mungin</u>, at this juncture, we do not know the degree to which Ms. Cotton's false testimony affected Mr. Davis' ability to prepare for trial; nor do we know what the prosecutor knew and what JSO knew at the time of trial:

> If, in fact, the trial judge upon remand determines Brown is being truthful, this would clearly mean that Kirkland was untruthful at trial, which might have been critical testimony for the jury. We are troubled by the possibility that a false police report was submitted and then relied on by defense counsel. **Without an evidentiary hearing to explore this issue, we are left with mere speculation as to what in fact occurred, what the police knew, what the prosecutor knew, and whether Kirkland, a witness with an extensive criminal history, was lying when he testified at trial. In reviewing the *Brady* claim presented, accepting all allegations in the motion as true to the extent they are not conclusively refuted by the record, we cannot agree that the record at this point conclusively shows that the evidence was not material** (i.e., that there was not "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"). *Way*, 760 So. 2d at 913 (quoting *Bagley*, 473 U.S. at 682). Accordingly, we reverse and remand this claim to the postconviction court for an evidentiary hearing pertaining to Brown and the allegation that the police report was false.

<u>Mungin</u>, 79 So. 3d at 737-38 (emphasis added).  An evidentiary hearing is required.

<u>Id.,</u> <u>see also</u> <u>Rivera</u>, 995 So. 2d at 196-97.

## IV.   The suppressed evidence is material

The trial court's finding that Mr. Davis cannot demonstrate materiality is incorrect and unreasonably discounts the impact of Ms. Cotton's recantation on the entire picture of the case.  <u>See</u> <u>Franqui</u>, 59 So. 3d at 102  (a court cannot "simply

27

discount[] the inculpatory evidence in light of the undisclosed evidence and determin[e] if the remaining evidence is sufficient."); Jones v. State, 709 So. 2d 512, 521 (Fla. 1998) ("It is the net effect of the evidence that must be assessed.")

Contrary to the trial court's apparent finding, materiality "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 434-35 (fn. omitted.)

Not only does the new revelation of Ms. Cotton's perjury provide exculpatory evidence eliminating the State's timeline of events on the day in question, a timeline necessary to establish that Mr. Davis was the only person with C.C. at the time in question, but the new statement undermines the credibility of the law enforcement and prosecution in this case, calling into question the entire evidentiary picture. This alone is sufficient to establish materiality. See Quezada v. Smith, 624 F.3d 514, 520 (2d Cir. 2010) (finding a habeas petitioner has made the prima facie showing necessary to file a successive petition based on *Brady* claim of undisclosed police

28

coercion to obtain a witness statement); United States v. O'Connor, 64 F.3d 355, 358 (8th Cir. 1995) (evidence of threats, coercion, and attempts to influence witnesses' trial testimony is impeachment evidence under Brady and must be disclosed by the defense); United States v. Sutton, 542 F.2d 1239, 1240 (4th Cir. 1976) (finding Brady violation where the government failed to disclose that the testimony of its key witness had been induced by the threats of an FBI agent).

Further, Ms. Cotton's untruthfulness, the state's failure to provide the defense with Ms. Cotton's original statement, and the state's failure to reveal that Ms. Cotton only gave her trial testimony under significant pressure from the State, undercut Mr. Davis' ability to adequately prepare for the real facts of his case. Mungin, 79 So. 3d at 737-38 ("We are troubled by the possibility that a false police report was submitted and then relied on by defense counsel.").

As with the prior claim, Ms. Cotton's new statement must be considered collectively with suppressed evidence of Ms. Wiley's JSO interview notes indicating that she was not with Mr. Cotton at the time Ms. Cotton claimed and that she didn't hear anything; and daycare notes indicating that, contrary to Ms. Cunningham's testimony, C.C. suffered vaginal issues prior to the time of the incident in question and that she did, in fact, suffer with asthma. Davis II, 136 So. 3d at 1201 ("Regarding the guilt phase, Davis did not demonstrate that he was prejudiced by the State's non-disclosure of documents that may have been used to impeach witness

29

Cunningham. Similarly, Davis demonstrated only one potential penalty phase error—trial counsel had a legal basis for objecting to the prosecutor's closing argument regarding the victim's siblings—which did not undermine confidence in Davis's sentences."); see Smith v, 572 F.3d at 1346.

The suppressed evidence is collectively material to Mr. Davis' case because the State relied heavily on Ms. Cotton and Ms. Cunningham to establish that Mr. Davis was the only person with the opportunity to cause the injuries in question to the child. However, if the defense had been privy to evidence that the child suffered with ailments, including vaginal issues prior to the day in question; and that the noises that Ms. Cotton heard did not occur when she said that they did, there was a plausible medical defense that the child died as a result of injuries that occurred before Mr. Davis was alone with her, and that she suffered an asthma attack or some other issue and that her bleeding on the day in question was caused when Mr. Davis dropped her in the tub trying to revive her, just as he explained.

As set forth in Mr. Davis' 3.850 motion, had Mr. Davis been aware at the time of trial that Cotton's testimony was false and that there was no eye-witness evidence locking in the time of injuries to 12:00 to 12:30 on the day in question, he could have built an extremely powerful defense. Further, the State's misconduct is especially consequential when considered cumulatively with other new developments in the case.

The State's medical science presented at trial and during the initial postconviction hearing was inaccurate and rebuttable. Dr. Janice Ophoven, a pediatric forensic pathologist, reviewed the State expert testimony and C.C.'s health records and opined that this trial testimony contained "many serious problems," "scientifically unsupported beliefs" "relying on criteria used to diagnose abusive injury" that "[has] been demonstrated to be unreliable." (SPCR 144.) This includes the State expert findings that "[1] retinal hemorrhages are diagnostic for abuse; [2] there is no lucid interval between injury and collapse; [3] violent shaking can and does cause subdural hematoma, retinal hemorrhages, and brain swelling that can be diagnosed on the presence of these three criteria; and [4] short falls cannot cause fatal brain injury." (SPCR 144.).

Further, Dr. Jonathan Arden, a forensic pathologist, reviewed the autopsy materials and found it "inadequate in various ways," including some of the interpretations made and testified to by the medical examiner" at trial. (SPCR 171.) The medical findings in support of the sexual assault in this case were also baseless. (SPCR 164.)

**Brain swelling**: The State's medical experts claimed at both trial and in postconviction that C.C.'s brain swelling meant she suffered from a traumatic brain injury. This claim was medically unsound. (SPCR 146.) Hypoxia, too "occurs when a part of the body does not receive enough oxygen," also causes the brain to swell,

and can be fatal. (SPCR 146.) If C.C. had an asthma attack and lost access to oxygen, "it could explain the hypoxic swelling in her brain." (SPCR 146.) While shaking used to be associated with brain swelling, it is now known that cerebral edema – swelling caused by fluid in the brain – almost always reflects a lack of oxygen. (SPCR 162.) In C.C.'s case, "the postmortem evidence shows brain damage caused by failure of circulating oxygen to the brain…" (SPCR 67.) Dr. Arden also found the brain swelling in this case to be the "more likely lethal mechanism" that can be caused by physical trauma or "in response to damage from inadequate oxygen and/or blood supply. (SPCR 172.)

**Brain hemorrhages**: The State's experts claimed that the blood pooling at the back of C.C.'s head was the result of multiple separate head impacts causing a traumatic brain injury. (30 R 615-16, 650-51; 31 R 841-42; 20 PCR 2723-24.) Medical science does not support this testimony. The autopsy photos reveal "only one significant impact point" located in the back of C.C.'s head. (SPCR 121.)

The autopsy examination which led to the cause of death was "inadequate and in places incorrect," and the size of the largest hemorrhage was not even properly measured. (SPCR 171.) Certain parts of the brain were not even examined to eliminate or confirm the doctor's hypothesis. (SPCR 147.) The trial testimony regarding the head injuries was similarly "inaccurate and frankly misleading" and "false." (SPCR 172.)

**Immediate unconsciousness following injury**: State experts claimed at trial and in postconviction that C.C.'s injuries would have rendered her unresponsive almost immediately. (31 R 840; 20 PCR 3726.) The weight of the medical evidence, however, is that a person can be lucid and "appear essentially symptom free (to laypersons) for up to 72 hours after suffering injuries that manifest as cerebral edema, subdural hematoma, and retinal hemorrhages." (SPCR 163.)  Dr. Arden describes the medical examiner testimony on this matter as "misleading." (SPCR 172.) "Some head injuries do allow for a period of consciousness, referred to as a lucid interval, before collapse and unconsciousness ensue." Dr. Arden found this "especially worthy of consideration in this instance, where no intrinsic brain trauma was identified at autopsy. (SPCR 172.)

**Retinal hemorrhaging implications**: The State experts testified that the retinal hemorrhages found in C.C.'s eyes were "evidence of direct trauma" resulting from a severe head injury. (30 R 610, 645; 20 PCR 3723-24.)  One such expert claimed that in the 15,000 to 20,000 cases he had worked on, he had never seen retinal hemorrhages from a distance shorter than a fall from a second or third story of a building. (30 R 659.) This testimony was important because Mr. Davis admitted he dropped C.C. in the shower while attempting to revive her.

This is arguably one of the most notorious debunked medical theories in recent memory. This "Shaken Baby Syndrome" has "now been largely refuted as more

33

research has been conducted in this area in recent years." (SPCR 146.)  Instead,

retinal hemorrhages are "of little diagnostic value at all, except as an indicator of

increased intracranial pressure." (SPCR 157.) They occur in traumatic and non-

traumatic events, "including cases of CPR, prolonged and forceful coughing and

vomiting." (SPCR 158.) In Mr. Davis' case, the retinal hemorrhaging is "not

consistent with a conclusion that C.C. was violently shaken." (SPCR 146.) Even at

autopsy, the methods used were error because the "eyes were not examined

internally…as they should have been." (SPCR 172.)

**Impact distance of fall on injuries**: The State experts testified at trial that

the subcranial injuries to C.C.'s forehead could have resulted from being dropped,

but the fall was not consistent with one of "less than four feet." (31 R 848.) The fall

would have to be from "a significant height, say the second or third story of a

building." (30 R 645.) These findings do not follow the established medical science.

During the postconviction hearing, Dr. Wiley explained that if a child falls at a

wrong angle, on a hard surface without protective effects, "it may be devastating

from as little as three or four feet." (18 PCR 3454.) Dr. Ophoven reaffirms this

finding: "Since Mr. Davis' 1995 trial, the science in this area has evolved so that it

has now been shown that falls of a relatively short distance [3 feet] can cause severe,

and sometimes fatal, injury in small children and toddlers." (SPCR 146.) This is

supported by other biomechanical research demonstrating falls "as short as one foot can cause fracture and intracranial bleeding. (SPCR 145.)

C.C.'s fall from Mr. Davis' arms in the bathroom is consistent with this research because "[i]mpact onto an unyielding surface such as a shower tile or porcelain floor form the height of an average height man's arms can deliver a fatal blow." (SPCR 145.) Dr. Ophoven explains it "is rare" to hear the type of testimony given by the State's experts in this case, because "[t]here is no medical or scientific support for this claim." (SPCR 163.)

**Cause of death:** State experts told the jury that the injuries were not consistent with being dropped one time; instead C.C. "died as a result of multiple blunt traumas to the head." (31 R 846.) The medical examiner testified he did not see any evidence of asthma or fibrosis of the lung, and that the lungs were red because of the blood pooling. (31 R 844.) In postconviction, State expert Dr. Alexander testified this "is a shaking death." (20 PCR 3796.)

These were theories not supported by medical science. Blunt trauma caused by Mr. Davis is doubtful because "if C.C. suffered a head trauma, her brain had already swollen to a point that she would have had to have hit her head before she was left alone with Mr. Davis." A3, Ophoven Rep. at 7. C.C.'s head injuries were not even "sufficient to cause death," because the subdural hemorrhage was merely 6-8 cc, which is a "small volume, even relative to the cranial cavity of a 2-year old

35

child." (SPCR 171.) The State's medical examiner did not even have enough information to determine the cause of C.C.'s death. "Review of the environmental and medical history is an important standard of practice in not only the care of young patients, but in the forensic analysis and certification of death. (SPCR 168.)

**Aging of bruises:** State experts opined at trial C.C. had bruises on her right temple, the edge of her right eye, her "left temporal area," and a bruise on her buttocks. (30 R 612, 638, 660.) They claimed the upper part of the bruise on the buttocks was fresh, and the bruise on the left temporal could have been caused by being dropped, not shaken. 30 R 661-66. State expert Dr. Whitworth testified one bruise had been there "less than 30 or 48 hours," (30 R. 641-42), and the other occurred "less than 24 or 40 hours" before his examination. (30 R 642.) The bruise on her buttocks was claimed to be "less than 24 or 40 hours old." (30 R 643.) He also claimed each bruise was less than 12 to 18 hours old before his examination, (30 R 656,) but conceded he gives an age range because the dating is "somewhat inexact." (30 R 668.) He then testified he decided all of the injuries he observed on C.C. were consistent with occurring within five hours prior to his examination. (30 R 668.)

The timing of these bruises were established simply by looking at them, (19 PCR 3470), and the findings are not supported by recent changes in medical science. (SPCR 173.) ("I note that the change of accepted medical knowledge cited above

36

regarding the unreliability of estimating ages of bruises by visual examination occurred subsequent to the performance of the autopsy and rendering of trial testimony in this matter.") "Recent literature confirms the absolute unreliability of attempting to date bruises with the naked eye and state unequivocally that it should not be done." (SPCR 146; 172.) ("Dr. Floro also offered opinions in testimony about the ages of the various bruises based on visual appearances, but such estimates are unreliable, as has been demonstrated in the medical literature subsequently since this autopsy and the trial.")  While "not very precise," there is an autopsy method to age bruising that is more accurate than visually estimating. (SPCR 172.) As Dr. Wiley explained during the postconviction hearing, the autopsy should have conducted a procedure known as hypostasis, where the blood drains to one side because all that would remain would be the blood from bruising, making it easier to observe them. (20 PCR 3820.) However, in this case, "no microscopic examination of the dura, subdural hemorrhage, brain or scalp bruising was performed, which would be important for the assessment of any aging of these injuries that purportedly constituted the cause of death." (SPCR 172.); see also id. (microscopic examination was only performed on one injury – the buttock bruise – which was unrelated to the cause of death).

Contrary to what this jury heard, the bruising could be much older than the State's doctors claimed. See (SPCR 172); (19 PCR 3470.) The autopsy examination

37

revealed the buttock bruise was in the healing process, but Dr. Floro testified at trial that this bruise was fresh, "contrary to his own evidence." (SPCR 172.) In fact, the bruises "could have been caused after C.C. was no longer in Mr. Davis' care by the medical equipment used to try to stabilize her." (SPCR 146.)

Ironically, the State's expert in postconviction conceded the timing of the bruises can be "overstate[d]" and that "the data they had been coming in said you are not as good as dating these bruises as you think you are," (20 PCR 3769), and that C.C.'s bruises at the time of her autopsy included both fresh and old bruises. (20 PCR 3771.) "[T]here is no way to conclusively find that all of the injuries occurred when C.C. was in Mr. Davis' care. (SPCR 146.)

**Hymen and vaginal bleeding***:* The State at trial presented evidence through Dr. Whitworth that a sexual battery occurred.  (30 R 639, 644.)  Dr. Floro's autopsy findings found no injuries to the vaginal area, but claimed, as did Dr. Whitworth, that "nature" provides humans the ability to heal those areas quickly. (31 R 835; 30 R 653.) State expert Dr. Alexander's postconviction testimony claimed this was a "flame-shaped hemorrhage," and by the time of Dr. Whitworth's evaluation this area would have healed sufficiently enough for it not to bleed. (20 PCR 3731.)

Contrary to the State's evidence, "[t]here is no medical evidence that a sexual assault occurred." (SPCR 164.) Any argument to the contrary is reckless, because the "[c]riteria for the diagnosis of sexual abuse are well recognized in the medical

literature and there are no findings in this case that would allow such a diagnosis." (SPCR 164.) The State's theory is flawed because bleeding requires something to be "either lacerated, incised, or abraded…and there are none of those injuries." (19 PCR 3479, 3482) (Dr. Wiley testimony). The medical science shows that if these injuries were indeed severe enough to cause bleeding, they would not have disappeared in one day as the State expert's claimed. See (19 PCR 3465.) "[T]he best explanation for there not being any injuries was there never were any injuries…" (19 PCR 3458.) The redness C.C. exhibited is "commonly seen with poor hygiene," and even Dr. Floro "suggested the child had poor hygiene because he attributed the various scars to impetigo which is a problem of the skin with poor hygiene." (19 PCR 3459.) What was seen could have been caused by a catheter, which was "placed without any sort of lubricant which is contrary to all the technique ever learned." (20 PCR 3822) (Dr. Wiley testimony).

**Food digestion**: EMT Captain Wade responded to the scene and testified upon arrival he inserted a nasogastric tube - which goes in the nose into C.C.'s stomach. He did not observe food in her stomach. (30 R 596-97.) He claimed that if she had eaten something than morning, it would be visible. (30 R 601.) But there were food particles in C.C.'s stomach during her autopsy, consistent with cereal but not French fries. (Dr. Floro's testimony). But Dr. Floro's conclusion about French

39

fries "ignores the fact that there had been the passage of a day of life in which the food could have been broken down and/or passed into the intestines…" (SPCR 173.)

Third, the State's medical experts were not provided with C.C.'s health and abuse history that would have affected their medical opinions at trial.

**C.C.'s life was marred by illness, injury, and neglect:** C.C.'s caregivers provide detailed information she suffered from "numerous injuries" and "chronic illnesses from months before her death up through her final days." (SPCR 167.) She had signs of "physical neglect and prior episodes of vaginal irritation with discharge and diarrhea." (SPCR 167.) She was even removed from her mother's custody after a report of suspected abuse. C.C.'s caregivers noted "ongoing bruises and sores."(SPCR 167.)

Even the daycare C.C. attended observed "vaginal discharge and odor" in November 1992, less than a month before she died. (SPCR 167.) This evidence is "critical" to Dr. Ophoven's "significant criticism" of the accusations that Mr. Davis sexually and physically abused C.C. (SPCR 167.) C.C. was also "known to have recurring breathing problems that can interfere suddenly with proper oxygenation and even death." (SPCR 167.)

The vaginal bleeding discovered on December 9, 1992, was unfortunately not usual with C.C. When she was six months old – long before Mr. Davis was present – her father noticed "her clitoris did not look normal" because "[i]t was extended

40

and hanging outside of her vagina. (SPCR 174-75.) She had "dry discharge" and bruising. (SPCR 174-75.); see also (SPCR 176-78) (during the same time, Ms. Brown saw that C.C.'s "skin around her vagina and groin was bright red and irritated" followed by a discolored discharge the next day.). In the months prior to her death, babysitter Adrienne Washington noticed C.C. had a cut around her groin and that she frequently rubbed that area. (SPCR 179-80.) Yet another sitter who babysat C.C. a week before her death noticed a skin rash on her groin. (SPCR 181-82.) A day or two before C.C.'s death, her vagina was "ripped up and the surrounding skin was swollen. (SPCR 181-82.) Employees at C.C.'s daycare reported similar issues, and noted her vagina had a discharge and odor when they changed her diaper a few days earlier. (1 SR 94.) C.C.'s mother was alerted by the aunt of one of C.C.'s babysitters, Ms. Taylor. (SPCR 181-82.) Although Ms. Cunningham said she would "look into it," Ms. Taylor did not believe she cared as much as she should. (SPCR 181-81.)

C.C. was also neglected. Her father, Mr. Love, explained that when Ms. Cunningham would drop C.C. to him, she "would be wearing dirty clothes, she smelled, and she had not been bathed in a long time. (SPCR 174.) Her hair and clothes were often "filthy." (SPCR 176-77.) C.C. would often choke on her food because she had a habit of eating too quickly. (SPCR 174-75.) C.C.'s physical injuries were sickening. "It was not unusual for [her] to have bruises and cuts on her

41

face, scalp, and body…" (SPCR 174-75.) C.C.'s grandmother "usually saw fresh

and open sores over [C.C.]'s arms, thighs, neck, and stomach." (SPCR 176-77.) "The

sores caused C.C. to scratch herself. (SPCR 176-77.) Her mother kept coming up

with excuses, like "her little cousin hit [her] with a toy truck, (SPCR 174) or they

were just bug bits, (SPCR 176) C.C.'s relatives did not believe Ms. Cunningham.

See e.g., (SPCR 174-80.)

> Ms. Washington described C.C. two months before her death:
>
> For as long as I babysat [C.C.], I saw many injuries when I bathed her
> or changed her diaper. From below [C.C.]'s belly button down to her
> thighs, she had black and blue spots as if her skin was bruised. **I saw
> cigarette burns and a cut around her groin and under her diaper**.
> She also had several black spots up and down her arms and legs that
> appeared to be sores.

(SPCR 179-80) (Emphasis added).  On one occasion when Ms. Cunningham left

C.C. with her father, C.C. had "open sores all over [her] body with bruises along her

arms, legs, and her back." (SPCR 176-77.) C.C.'s grandmother's belief was the

bruises were intentionally caused by a belt or some other object. (SPCR 176-77,)

They even took C.C. to the hospital, and the doctors believed her injuries were

"caused by physical abuse." (SPCR 176-77.) Child protective services got involved

shortly thereafter, (SPCR 176-77), and the Love family had custody for a short

while. (SPCR 176-77.) Some of these old injuries were confirmed in the autopsy

report. See, e.g. (6 PCR 1172, 1176.)

**Department of Health and Rehabilitative Services (HRS) records confirm Ms. Cunningham under investigation:** on October 11, 1992, two months prior to C.C.'s death, Ms. Cunningham dropped C.C. at her father Rickey Love's girlfriend's house. (1 SR 43.) There was a bruise on her cheek and a burn mark on her foot resembling the shape of a curling iron that had not been properly cared for. (1 SR 43.) The bruise was "from the mouth area toward the cheek bone." (7 PCR 1306.) Mr. Love's mother, C.C.'s paternal grandmother, contacted HRS. (7 PCR 1306.) The HRS intake form stated:

The referral stated that the mother, Gwendolyn Cunningham, dropped [C.C.] off at the home of her alleged biological father on the evening of Friday, October 9, 1992. The child was found to have a burn on the bottom of her foot and another infected area on her foot which was later diagnosed as a fungus growth. [C.C.] was also observed to have a bruise on her right cheek. Additionally, the mother left word that she would return the next day for the child but she failed to do so. Her whereabouts are unknown. (7 PCR 1271.) Ms. Cunningham claimed C.C. burned her foot when she stepped on a hot oven rack at her babysitter's house, but HRS noted Ms. Cunningham "could not give the Department the name or address of the baby-sitter." (7 PCR 1273.) She also had no explanation for the bruise on C.C.'s neck. (7 PCR 1273.)

43

A Child Protection Investigator (CPI) was assigned to speak with Ms. Cunningham. (1 SR 43.) On one instance, Ms. Cunningham refused to let the CPI in, and the police had to get involved. (1 SR 43.) The CPI noticed bruises on one of Ms. Cunningham's other children, who claimed to have fallen against the wall. *Id.* Ms. Cunningham avoided answering some of HRS's questions, (1 SR 45), but when asked about C.C.'s bruises, she responded: That's old stuff." (1 SR 45.) The HRS records also reveal "Carmen," an employee of Family Builders which was another agency within DFS, received material from C.C.'s daycare that on December 9, 1992, she missed daycare "due to her asthma." (1 SR 45.) Ms. Cunningham told Family Builders "the only reason [C.C.] was not in daycare that day and needed Tony [sic] to watch her was because the child's asthma was acting up, and Gwen did not want her to go to daycare." (1 SR 48.) After C.C.'s autopsy, HRS noted: "It is unknown at this time if there were signs of any old bruising, which would indicate ongoing abuse." (1 SR 48.) HRS also received information from Ms. Cunningham that C.C. had a "messy bowel movement" on December 8, 1992. (1 SR 47.) These notes further reveal Ms. Cunningham's admission "that she tends to lie about things." (1 SR 47.)

While the lower tribunal found that all of the above factors, which could have been presented at trial, had counsel been aware of Ms. Cotton's false testimony, and been able to adequately prepare, are procedurally barred, the court is not allowed to

turn a blind eye to critical facts of a case, simply to maintain a conviction. This is especially true in a death case, where the states are exponentially higher. If the court does not consider all available evidence in ascertaining the materiality of the Cotton Brady and Giglio recantation, a manifest injustice will occur, and the proceedings will be fundamentally unfair. See Mosley v. State, 209 So. 3d 1248 (Fla. 2016)("the interests of finality must yield to fundamental fairness."); see also James v. State, 615 So. 2d 668 (Fla. 1993); Walls v. State, 213 So. 3d 340, 347 (Fla. 2016) (a court "has the power to reconsider and correct erroneous rulings in exceptional circumstances, where reliance on the previous decision would result in manifest injustice, notwithstanding that such rulings have become the law of the case.") (J. Pariente, concurring); Plasencia v. State, 170 So. 3d 865, 870 (Fla. 2d DCA 2015).

Accordingly, confidence in the outcome is undermined, Kyles, 115 S. Ct. at 1566, materiality is established, and a new trial is required. See Wearry v. Cain, 136 S. Ct. 1002, 1006 (2016) ("Beyond doubt, the newly revealed evidence suffices to undermine confidence in Wearry's conviction. The State's trial evidence resembles a house of cards, built on the jury crediting Scott's account rather than Wearry's alibi."); Smith v. Cain, 565 U.S. 73, 76 (2012) ("the State's argument offers a reason that the jury *could* have disbelieved Boatner's undisclosed statements, but gives us no confidence that it *would* have done so.") At the very least, an evidentiary hearing, to evaluate Ms. Cotton's credibility, the state's role in her false testimony,

45

and the impact of the suppressed evidence on defense counsel's preparation, must be held.

## CONCLUSION

**WHEREFORE**, based on the arguments set forth in his 3.851 motion, and above, Mr. Davis respectfully requests this Honorable Court reverse and remand the trial court's denial of his 3.851 Motion for Postconviction relief for an evidentiary hearing on the summarily denied claims and, following an evidentiary hearing, reverse for a new trial.

Respectfully submitted,

THE SICHTA FIRM, LLC.,

/s/ Rick Sichta
RICK SICHTA, ESQUIRE
Fla. Bar No.: 0669903
301 W. Bay St. Suite 14124
Jacksonville, FL 32202
Phone: 904-329-7246
Email: rick@sichtalaw.com
Attorney for Appellant

46

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a copy of the foregoing has been delivered via email to the Office of the Attorney General at capapp@myfloridalegal.com on this 6th day of September, 2019.

/s/ Rick Sichta
ATTORNEY

## CERTIFICATE OF COMPLIANCE AND AS TO FONT

I **HEREBY CERTIFY** that this brief is submitted by Appellant, using Times New Roman, 14-point font, pursuant to Florida Rules of Appellate Procedure, Rule 9.210. Further, Appellant, pursuant to Florida Rules of Appellate Procedure Rule 9.210(a)(2), gives Notice and files this Certificate of Compliance as to the font in this immediate brief.

/s/ Rick Sichta
ATTORNEY

88

Filing # 96226745 E-Filed 09/24/2019 04:26:40 PM

# IN THE SUPREME COURT OF FLORIDA

## CASE NO. SC19-1207
Lower Court Case No.:  1992-CF-13193

---

### TONEY DERON DAVIS,

**Appellant,**

v.

### STATE OF FLORIDA,

**Appellee.**

---

## ON APPEAL FROM THE CIRCUIT COURT
## OF THE FOURTH JUDICIAL CIRCUIT,
## IN AND FOR DUVAL COUNTY, FLORIDA

## ANSWER BRIEF OF THE APPELLEE

ASHLEY MOODY
ATTORNEY GENERAL

JANINE D. ROBINSON
Assistant Attorney General
Florida Bar No. 865966
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
Telephone: (850) 414-3606
Facsimile:   (850) 487-0997
capapp@myfloridalegal.com
Janine.Robinson@myfloridalegal.com
COUNSEL FOR APPELLEE

Table of Contents

PAGE(S)

Table of Contents ............................................................................................. i

Table of Authorities ..................................................................................... ii

Preliminary Statement.................................................................................1

Statement of the Case, Facts and Procedural History ................................1

Standard of Review.....................................................................................19

Summary of Argument ...............................................................................20

Argument.....................................................................................................22

ISSUE I: APPELLANT'S CLAIM THAT THE STATE VIOLATED *GIGLIO* BY PRESENTING JANET COTTON'S FALSE TRIAL TESTIMONY IS UNTIMELY, PROCEDURALLY BARRED AND MERITLESS...................................................................................22

ISSUE II: APPELLANT'S CLAIM THAT THE STATE VIOLATED *BRADY* BY PRESENTING JANET COTTON'S FALSE TRIAL TESTIMONY IS UNTIMELY, PROCEDURALLY BARRED AND MERITLESS...................................................................................34

Conclusion ..................................................................................................39

Certificate of Service .................................................................................40

Certificate of Font Compliance..................................................................40

i

## Table of Citations and Authorities

## Cases

*Anderson v. State*, 220 So. 3d 1133 (Fla. 2017) ......................................................20

*Asay v. State*, 210 So. 3d 1 (Fla. 2016)..................................................................14

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................ passim

*Byrd v. State*, 118 So. 3d 807 (Fla. 2013) ..............................................................28

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ...........................................................9

*Carroll v. State*, 114 So. 3d 883 (Fla. 2013).........................................................28

*Conahan v. State*, 2017 WL 656306 (Fla. Feb. 17, 2017)................................ 29, 35

*Davis v. Florida*, 524 U.S. 930 (1998) ..................................................................4

*Davis v. Jones*, 235 So. 3d 301 (Fla. 2018) ...........................................................15

*Davis v. State*, 136 So. 3d 1169 (Fla. 2014) ...................................................... passim

*Davis v. State*, 2017 WL 656307 (Fla. Feb. 17, 2017) ..................................... 14, 15

*Davis v. State*, 26 So. 3d 519 (Fla. 2009) ......................................................... 27, 28

*Davis v. State*, 703 So. 2d 1055 (Fla. 1997) ..................................................... passim

*Downs v. State*, 740 So. 2d 506 (Fla. 1999)...........................................................25

*Faretta v. California*, 422 U.S. 806 (1975) ...........................................................4

*Florida v. Davis*, 2011 WL 12375669 (Fla. 4th Cir. 2011)....................................11

*Geralds v. State*, 111 So. 3d 778 (Fla. 2010)........................................................24

*Giglio v. United States*, 405 U.S. 150 (1972) ................................................... passim

*Guzman v. State*, 868 So. 2d 498 (Fla. 2003) .........................................................29

*Hannon v. State*, 941 So. 2d 1109 (Fla. 2006).......................................................32

*Hitchcock v. State*, 226 So. 3d 216 (Fla. 2017) .....................................................15

*Hunter v. State*, 29 So. 3d 256 (Fla. 2008) ................................................. 23, 24, 25

*Hurst v. Florida*, 136 S. Ct. 616 (2016)................................................................14

ii

*Hurst v. State*, 202 So. 3d 40 (Fla. 2016) ................................................................14

*Jimenez v. State*, 265 So. 3d 462 (Fla. 2018)................................................... passim

*Jones v. State*, 709 So. 2d 512 (Fla. 1998)................................................. 24, 35, 37

*Kelley v. Sec'y, Dept. of Corr.*, 377 F.3d 1317 (11th Cir. 2004)...........................36

*LeCroy v. Dugger*, 727 So. 2d 236 (Fla. 1998) ....................................................20

*Marek v. State*, 8 So. 3d 1123 (Fla. 2009) ............................................................19

*Merck v. State*, 260 So. 3d 184 (Fla. 2018) ..........................................................37

*Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973)...................................... 4, 9, 12

*Perry v. State*, 210 So. 3d 630 (Fla. 2016)............................................................14

*Rhodes v. State*, 986 So. 2d 501 (Fla. 2008)..........................................................30

*Ring v. Arizona*, 536 U.S. 584 (2002)......................................................................9

*Robinson v. State*, 707 So. 2d 688 (Fla. 1998)......................................................25

*Thomas v. State*, 260 So. 3d 226 (Fla. 2018) ........................................................27

*Tompkins v. State*, 994 So. 2d 1072 (Fla. 2008) ............................................. 19, 36

*United States v. Meros*, 866 F.2d 1304 (11th Cir. 1989).......................................36

*United States v. Schembari*, 484 F.2d 931 (4th Cir. 1973)....................................36

## Other Authorities

Fla. R. Crim. P. 3.850 ..............................................................................................5

Fla. R. Crim. P. 3.851 ..................................................................................... passim

Fla. R. Crim. P. 3.852 ..............................................................................................5

## PRELIMINARY STATEMENT

Appellant Toney Deron Davis is referred to as "Appellant" or "Davis." The State of Florida is referred to as "State." Citations to the record on appeal for this case, *Davis v. State of Florida*, Florida Supreme Court Case No. SC19-1207, are designated as "R" and page number. Appellant's initial brief is designated as "IB" and page number.

Citations to the record on appeal in *Toney Deron Davis v. State of Florida*, Florida Supreme Court Case No. SC12-115, are designated as "SC12-115 ROA," followed by volume and page number(s). Citations to the supplemental record on appeal in *Toney Deron Davis v. State of Florida*, Florida Supreme Court Case No. SC12-115, are designated as "SC12-115 SROA," followed by volume and page number(s).

Appellee also asks this Court to take judicial notice of records duly filed with and docketed by the Clerk of the Florida Supreme Court in *Toney Deron Davis v. State of Florida*, Florida Supreme Court Case No. SC12-115, but which are not included in a record on appeal.

## STATEMENT OF THE CASE, FACTS AND PROCEDURAL HISTORY

### Case and Facts

Appellant was convicted of first-degree felony murder, aggravated child abuse and sexual battery in 1995 for the December 9, 1992, murder of two-year-old,

1

C.C. and was sentenced to death.  The facts presented at trial are set forth in *Davis v. State*, 703 So. 2d 1055 (Fla. 1997):

> Davis first met the victim's mother, Gwen Cunningham, in 1992 and lived with her from September 1992 until he was arrested on December 9, 1992.  On the day of the murder, the mother left her child—then in good health and without injuries—in Davis's care while she ran an errand.
>
> Thomas Moore, an acquaintance of Davis's, testified that he arrived at the apartment at around 12:45 p.m. and that Davis answered the door with the victim draped over his arm.  Moore said Davis told him [C.C.] had choked on a french fry.  Moore said that after he called 911 and returned to the apartment, Davis was giving the victim mouth-to-mouth resuscitation.  Moore went to the hospital with Gwen Cunningham when she returned.
>
> Davis testified that he had left [C.C.] and his friend Moore alone in the apartment at about 12:30 p.m. and went to make some phone calls.  He said that when he returned, Moore was gone and [C.C.] was having a seizure.  He says he administered CPR, put her in the shower to revive her, and accidentally dropped her in the shower.  Davis said that when Moore returned, he had him call 911.  Davis said that Moore asked him not to mention that he had been with [C.C.] because Moore had marijuana in his possession.  Sergeant Phillips testified that Davis told him he was alone with the child.
>
> A neighbor, Janet Cotton, testified that she heard a child crying in Cunningham's apartment and a lot of thumping noises coming from the apartment at approximately noon.  She heard Davis say in a loud, angry voice, "Sit down."  She said that thirty minutes after the "ruckus" ended, rescue personnel arrived.
>
> The victim was wet, unconscious, and had blood in her mouth when she was examined in the apartment.  She was naked from the waist down, although she had been fully clothed when left with Davis.  Davis said that the victim was choking on a french fry and he had been trying to revive [C.C.]

2

The emergency-room doctor who treated the victim, Doctor DeNicola, testified that the victim was brought in at around 1:40 p.m. with bruising, swelling of the brain, and pools of blood in the skull. Doctor Whitworth, who examined the child at the request of state child welfare authorities, testified that the injuries indicated vaginal penetration by a penis, a finger, or an object. The medical examiner, Doctor Floro, testified that there was no injury to the vaginal area, but that it could have healed quickly. He said the victim had suffered four separate blows to the head, causing cerebral hemorrhage. This was the cause of death.

There was additional bruising, and there was a large collection of blood at the back of the head which was not consistent with being accidentally dropped. The child was revived but died shortly afterward on December 10, 1992.

In the bed shared by Davis and Gwen Cunningham, police found a hair bow which had been placed in the victim's hair before she was left with Davis. There was blood on the toilet seat and tank, on a sheet in the bedroom, and on the floor where the victim had been lying. There was also blood on the sink counter, on a grocery bag, on a washcloth, and on a blanket and pillowcase. There was blood which was found to be the victim's on the crotch region of the shorts Davis was wearing and on his underwear.

Gwen Cunningham testified that there were no blood stains anywhere when she left, that [C.C.] did not sleep in bed with her, and that there were no hair ribbons in the bed when she left. She said [C.C.] was clothed when she left.

*Id.* at 1056-57.

The jury recommended the death penalty by a vote of eleven to one. *Davis,* 703 So. 2d at 1057. The trial judge considered the presentence investigation report and the parties' sentencing memoranda and found two aggravating circumstances: the murder was committed in the course of a sexual battery and that it was especially

3

heinous, atrocious and cruel ("HAC"). *Id.* The court followed the jury's recommendation and sentenced Davis to death. *Id.*

Davis appealed his conviction and death sentence, raising raised eight claims.[1] *Davis*, 703 So. 2d at 1057-58. After its independent review of the record, competent and substantial evidence supported the conviction and sentence and the issues on appeal were denied on the merits. *Id.* at 1062. Appellant's conviction and death sentence became final on June 15, 1998, when the United States Supreme Court denied his petition for certiorari. *Davis v. Florida*, 524 U.S. 930 (1998).

## Postconviction Procedural History and Pertinent Facts

The postconviction procedural history in this case directly relates to Appellant's current *Brady*[2] and *Giglio*[3] claims summarily denied below and subject to this appeal. The genesis of these claims are the sealed confidential and exempt public records submitted to the State Archives of Florida ("Repository") in 1999 by

---

[1] (1) It was error not to follow *Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973), and *Faretta v. California*, 422 U.S. 806 (1975), when Davis moved to discharge court-appointed counsel; (2) the trial court should have granted Davis' motion for judgment of acquittal; (3) the sexual battery conviction should be reversed because the evidence failed to prove the victim was alive when vaginal penetration occurred; (4) it was error to admit victim impact evidence which did not satisfy the statute; (5) the court erred in considering and finding HAC where there was no evidence on or jury consideration of the aggravator; (6) it was error to find HAC proven; (7) it was error to find the "committed during the course of sexual battery" aggravator; and (8) the death penalty is disproportionate. *Davis*, 703 So. 2d at 1057-58.

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

[3] *Giglio v. United States*, 405 U.S. 150 (1972).

4

the State Attorney's Office ("SAO") and Jacksonville Sheriff's Office ("JSO"), following the affirmance of Davis' conviction and sentence, in accordance with Florida Rule Criminal Procedure 3.852(e)(2).   These public records consisted primarily of handwritten detective and SAO notes, which purportedly reflect inconsistent accounts by State witnesses Janet Cotton (Dassie)[4] and Celeste Wiley. Appellant's postconviction filings, public records litigation and his possession of the records more than 10 years ago support the State's arguments in this appeal. Therefore, a comprehensive postconviction procedural history is necessary and set forth below.

Davis filed his original motion for postconviction relief on May 3, 1999, under Fla. R. Crim. P. 3.850 and 3.851.[5]   SC12-115 ROA, Vol. 1, 0001-08.   This shell motion did not raise a rule 3.850 or 3.851 claim, but primarily requested leave to amend and raised a public records issue noting "that the records [those submitted to the Repository] include sealed boxes from the [SAO and JSO]. . . . These records need to be unsealed for review by counsel."[6]   *Id.* at 0003.

---

[4] Ms. Cotton changed her name to "Janet Dassie."   For purposes of this answer brief, she will be referred to as "Janet Cotton" or "Ms. Cotton."

[5] Through postconviction counsel, Appellant amended his initial postconviction motion several times between May 1999 and 2006, as well as independently filing pro se postconviction motions.

[6] The SAO and JSO filed respective Notices of Delivery of Exempt Public Records to Repository in January 1999.

5

On July 10, 2000, Davis moved to unseal the confidential and exempt capital collateral postconviction public records submitted to the Repository by the SAO and JSO, as mentioned in his May 1999 shell postconviction motion. SC12-115 ROA, Vol. 1, 0046-47. Davis argued that the sealed records "contain investigative and evidentiary data which should be properly disclosed to the defendant for review in this appeal." *Id.*

The trial court conducted an in-camera review to determine whether the SAO and JSO confidential and/or exempt records may be released. SC12-115 ROA, Vol. 1, 0055-56. Following its in-camera review, the trial court found: (1) the SAO exempt records included, but were not limited to, handwritten notes of witness interviews, "questions of witnesses at trial" and memoranda that are "exempt from public records disclosure. Section 119.07(3)(l)," et seq.; and (2) 55 pages of the case detective's handwritten notes, which are also exempt from disclosure. SC12-115 ROA, Vol. 1, 0143-45. This Court later described the records as detective notes which appear to be "questions and answers from an interview with [Celeste] Wiley" and her visit with Cotton. *Davis v. State*, 136 So. 3d 1169, 1189 (Fla. 2014). *See also* SC12-115 SROA, Vol I, 88-92.

Davis amended his original postconviction motion on May 6, 2004, and renewed the request to unseal the SAO and JSO exempt public records. SC12-115

6

ROA, Vol. 2, 0208-0316. This postconviction motion focused in part on State

witness Janet Cotton and the exempt records stating,

> Counsel is particularly interested in any interview or deposition notes relating to Janet Cotton's statements to the law enforcement (Det. Hallam and Det. Conn) or at deposition.
>
> ….
>
> Since it is clear from the continuing homicide report by Detective Hallam and State's discovery that law enforcement did in fact interview Cotton, Leslie, and Wiley, trial counsel was, and current post-conviction counsel continues to be rendered ineffective by the State's failure to produce all (indeed any) records of these interviews.
>
> Upon previous motion, this court has completed an *in camera* inspection of the sealed documents on file with the registry by the [SAO and JSO]. The court denied disclosure of all sealed documents submitted to the [Repository]. The court reported that the prosecutor's sealed documents included witness interviews, witness statements, evidence testing notes, and deposition notes. The sheriff's sealed documents included 55 pages of handwritten notes of the case detective. . . . Counsel cannot comprehend how the disclosure of notes pertaining to witness statements and to the processing of evidence should require special protection and non-disclosure in a death penalty case.

*Id.* at 0213-14 (emphasis in original). The 2004 amended postconviction motion

also claimed ineffective assistance of trial counsel for failing to impeach Janet

Cotton regarding inconsistencies between her trial testimony and Ms. Wiley's

account arguing,

> Wiley's deposition is the only record we have that shows that Wiley was not with Cotton on December 9, 1992 and details her visit with Janet Cotton on December 8, 1992. Neither the [JSO] nor the [SAO] produced any record of Detective Conn's interview with Janet Cotton.

7

At deposition, Conn said that she asked Cotton if she had seen or heard anything from the apartment next door on December 9, 1992. Cotton was not specific on the time and said that she was entertaining a friend (Wiley) when they heard a male voice say "sit down" and then heard a child crying. She didn't think much of it, just some one [sic] in a loud voice say "sit down." Nothing was reported about Cotton claiming to hearing "thumping" or "banging." At trial Cotton's story grew. "We heard a lot of child crying and thumping noises, because the walls are thin." (T-518) Cotton claimed a loud male voice said "Sit down." The prosecutor injected the word "banging" by asking "How long did the banging — excuse me. What did the banging or thumping sound like?" COTTON: "Like something hitting the wall." PROSECUTOR: "And do you recall how long that went on?" COTTON: "For about 30 minutes."

At deposition, Wiley said that she visited Cotton on December 8, 1992 and they heard a lot of "beating, crying, and whining" and that it went on for a while. Wiley and Cotton could not determine its source. "It sounded like a lot of bumping around and banging." "We talked about it." Wiley and Cotton talked about the couple upstairs but did not know where the noise came from. Although the noise was loud, Wiley could not determine the source.

Detective Conn's report impeaches Cotton and supports Wiley's account.

*Id.* at 0246-48.

On December 16, 2005, Davis renewed his request for disclosure of sealed materials and witness notes. SC12-115 ROA, Vol. 3, 0453-55. The trial court amended its order on the public records and permitted Davis to "obtain and review" the SAO's confidential and/or exempt records based upon the State's withdrawal of its previous objection to disclosure of sealed records. SC12-115 ROA, Vol. 3, 0457. On May 8, 2006, and based upon the JSO's consent to disclosure of its confidential

8

and/or exempt records, the trial court authorized Davis to obtain and review the same. *Id.* at 0466.

After several years of public records litigation, Appellant's review of the released SAO and JSO records, Davis filed his final original postconviction motion on July 27, 2006, raising 14 claims.[7]  *See*, SC12-115 ROA, Vol. 3, 0474-547, Appellant's Third Motion, As Amended, To Vacate Judgments of Conviction and Sentences With Special Request for Leave to Amend or Supplement ("2006 Third Amended Successive Postconviction Motion"); *Davis*, 136 So. 3d at 1183.  Directly related to this current appeal, Appellant alleged *Brady* and *Giglio* violations regarding detective notes of State witness interviews, including Janet Cotton and Celeste Wiley, which were included in the unsealed exempt public records.  IB 6-7;

---

[7] (1) trial counsel was ineffective for failing to ensure that Davis received a *Nelson* hearing, and appellate counsel was ineffective for failing to raise this issue and ensure a complete record on appeal; (2) the State violated *Brady* and *Giglio*; (3) trial counsel was ineffective for failing to investigate whether Gwen Cunningham could have been the source of the blood found on Davis and at the scene; (4) it was fundamental error to conduct voir dire prior to administering an oath to the jury; (5) it was fundamental error to conduct a pretrial conference without Davis being present; (6) trial counsel was ineffective for failing to sufficiently investigate and present evidence at the penalty phase; (7) trial counsel was ineffective for failing to conduct an adequate voir dire and exercise strikes; (8) trial counsel was ineffective for failing to object to improper evidence and argument, failing to present evidence and arguing the wrong theory of defense; (9) Davis was denied a fair trial due to unobjected-to comments made by the prosecutor about Davis' defense; (10) Davis was denied a fair trial due to unobjected-to comments made by the prosecutor that attempted to evoke sympathy from the jurors; (11) a previously raised claim that was abandoned in Davis' third motion; (12) Davis was denied a reliable sentencing when the jury's role was diminished in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985); (13) Davis was denied a reliable sentencing when the jury's role was diminished in violation of *Ring v. Arizona*, 536 U.S. 584 (2002); and (14) cumulative error denied Davis a fair trial.

9

*see also* 2006 Third Amended Successive Postconviction Motion, SC12-115 ROA, Vol. 3 at 474, 478, 493-95.

A status conference was held on April 15, 2008, in advance of the evidentiary hearing on Appellant's 2006 Third Amended Successive Postconviction Motion and the trial court directed to defense counsel, ". . . you need to check on the availability of the witnesses. And there is a question about Celeste Wiley and Janet Cotton." SC12-115 SROA, Vol. 17 at 3141. Defense counsel replied, "[d]o we have Janet Cotton located?" *Id.* The State responded, "I don't have any notes regarding Janet Cotton. . . . [T]he State wasn't necessarily going to call her. We did subpoena [Ms. Wiley]." *Id.* at 3143.

The evidentiary hearing on Appellant's 2006 Third Amended Successive Postconviction Motion began in 2008, but after three days of testimony, was continued to August 18, 2010. *See* SC12-115 SROA, Vols. 17, 18, 19 and 20. During the hearing, postconviction counsel asked Davis' trial counsel whether Ms. Cotton should have been impeached regarding inconsistencies between her trial testimony and JSO detective notes or Ms. Wiley's deposition regarding what was heard on which day. *See* SC12-115 SROA, Vol. 18, 3266-67, 3291-99. At the hearing, JSO Det. Hallam testified to his investigative notes of interviews with Ms. Cotton and Ms. Wiley. *See* SC12-115 SROA, Vol. 19, 3534-36.

Postconviction counsel also advised the trial court of Davis' personal

10

concerns about "documentary evidence, to support his claim, whether it be on the *Brady* issue or the *Giglio* issue [and] the discrepancies that we found in the sealed box from the [SAO] and the sealed box at [JSO]." *See* SC12-115 SROA, Vol. 20, 3667-68, 3670, 3861. Postconviction counsel further stated, "[Davis] was worried about whether or not we need witnesses to come forward such as Janet Cotton or Ms. Wiley." *Id.* at 3668. In his written closing argument submitted to the trial court on March 9, 2011, Appellant remarked, "[a]t trial, Cotton's story grew" and discussed discrepancies regarding what was heard and the dates that Ms. Wiley visited Ms. Cotton. SC12-115 ROA, Vol. 12, 2236-37. Following the evidentiary hearing which concluded in 2010, the trial court denied the postconviction motion in 2011. SC12-115 ROA, Vol. 14, 2558-630. *See also Florida v. Davis*, 2011 WL 12375669 (Fla. 4th Cir. 2011).

Davis appealed the trial court's order denying the 2006 Third Amended Successive Postconviction Motion and filed a contemporaneous petition for writ of habeas petition, raising 10 claims, combined.[8] *Davis*, 136 So. 3d at 1184. In his

---

[8] The postconviction court erred by denying his claims that: (1) the State violated *Brady* and *Giglio*; (2) defense counsel was ineffective for failing to present Dr. Willey; (3) defense counsel was ineffective regarding his choice of defense theory; (4) defense counsel was ineffective for failing to impeach several witnesses; (5) defense counsel was ineffective for failing to object to prosecutorial misconduct; (6) defense counsel was ineffective for failing to investigate and present witnesses at the penalty phase; (7) defense counsel was ineffective for failing to object to comments that denigrated the role of the jury; and (8) cumulative error deprived Davis of a fair trial. The habeas petition included ineffective assistance of appellate counsel claims by: (1) failing to challenge the prosecution's comments; and (2) failing to argue that Davis was entitled to a

11

initial brief, Appellant alleged *Brady* violations surrounding "sealed boxes of documentsfrom [sic] the [SAO]" and handwritten detective notes from the JSO "regarding various witness interviews," which were "previously undiscovered materials . . . relevant to his 3.851 claims . . . **Janet Cotton interview notes**." Appellant's 2013 Initial Brief at 15-16, SC12-115, docketed March 18, 2013 (emphasis in original).  Appellant also moved to supplement the record on appeal with "Notes on Janet Cotton's Statements in Sealed JSO File," which this Court granted.  *See* Motion to Supplement the Record on Appeal, SC12-115, docketed January 4, 2013; and Order granting motion to supplement record on appeal, docketed on February 5, 2013.

Appellant claimed that the State committed a *Giglio* violation by permitting Ms. Cotton to testimony falsely at trial.  *See* Appellant's 2013 Initial Brief at 34, SC12-115, docketed March 18, 2013.  In his Summary of the Arguments, Davis claimed,

> . . . the state knowingly presented false testimony of Janet Cotton that she heard a child crying and Davis say "sit down," around the time of the victim's death in direct contradiction to information contained in witness depositions and undisclosed <u>Brady</u> documents.

*Id.* at 18-19.  Substantively, Davis argued in part,

### *1. The State presented or failed to correct false testimony*

---

*Nelson* hearing based on two letters written by him to the trial court.

At trial the state presented eyewitness testimony of Janet Cotton that on the day of the alleged crimes, she **and** Celeste Wiley listened from Cotton's apartment while thumping and banging, as if someone was being slammed against a wall, continued for thirty minutes, while a child cried and they heard **Davis** yell to sit down. (29 R 518).

However, much of Cotton's trial testimony was known to the State to be embellished. Contrary to Cotton's trial testimony, Wiley was not at Cotton's apartment on the day of the alleged crimes. Sealed notes, revealed in postconviction, indicate that Wiley informed [the detective] she did not arrive at Cotton's until "**after** rescue and police had arrived." (1 SR 92) (emphasis added). According to thesesealed [sic] notes, Cotton stated that Wiley was "present on **Monday**" for "horrible" "crying." (1 SR 111) (emphasis added).

….

### 2. The State knew the testimony was false

. . . The State, with full knowledge of the limited credible evidence that Cotton could provide, called her to the stand and let her dramatize events and relay information that was contradicted by all other evidence. The state did not reveal Cotton's inconsistencies and misrepresentations to the jury despite its knowledge that Cotton was embellishing and misstating fact to the jury. The state improperly capitalized on the false testimony during closing arguments. (32 R 970).

### 3. The false testimony was material

Without Cotton's testimony, the jury would not have know [sic] anything about what happened to the child during the window between Cunningham leaving that morning and the time when law enforcement arrived. . . . [R]easonable doubt within the minds of the jurors was diminished when Cotton was permitted to testify falselyand [sic] assert that another personwho [sic] was present could corroborate every detail of her story and the state was allowed to capitalize on this improper testimony in closing arguments. (29 R 518).

13

....

> The State knew that Cotton's testimony was untrue, and the fact that the State allowed this evidence to enter the jury's minds and argue that [sic] false statements in closing undermines the confidence in the verdict returned by this jury. . . . Without Cotton's testimony, the State's case is weakened further as to the Sexual Battery and Aggravated Child Abuse claims. Had the jury acquitted Davis of these two charges, the Felony Murder charge would have necessarily failed as well, and Davis would not be facing the death sentence today. [n.7 This Court also relied, in part, on Cotton's trial testimony in denying his JOA claim on direct appeal. *Davis*, 703 So. 2d at 1059].

*Id.* at 34-37. Following oral argument, this Court affirmed the trial court's denial of Davis' claims for relief and denied his petition for writ of habeas corpus. *Davis*, 136 So. 3d at 1184.

On October 8, 2014, Davis filed his first successive postconviction motion raising three claims: (1) newly discovered evidence of shaken baby syndrome; (2) trial counsel was ineffective for failing to investigate newly discovered evidence and mitigation evidence; and (3) he was entitled to retroactive application of *Hurst v. Florida*, 136 S. Ct. 616 (2016). *Davis v. State*, 2017 WL 656307 *1 (Fla. Feb. 17, 2017). This Court affirmed the trial court's summary denial, including his *Hurst v. Florida* claim, based on *Asay v. State*, 210 So. 3d 1 (Fla. 2016). *Id.*

Davis' next successive postconviction motion was filed on January 12, 2017, which again challenged the imposition of his death sentence pursuant to *Hurst v. Florida*; *Hurst v. State*, 202 So. 3d 40 (Fla. 2016); *Perry v. State*, 210 So. 3d 630

14

(Fla. 2016); and *Mosley v. State*, 209 So. 3d 1248 (Fla. 2016).  The trial court denied

the motion and this Court affirmed on January 30, 2018.  *State v. Davis*, 2017 WL

656307 (Fla. Feb. 17, 2017).

While Davis' appeal of his 2017 successive postconviction motion was

pending, he filed a petition for writ of habeas corpus on September 22, 2017, seeking

relief pursuant to *Hurst v. Florida* and *Hurst v. State*. *Davis v. Jones*, 235 So. 3d

301 (Fla. 2018).  This Court denied Davis' petition following his response to its

order to show cause why its decision in *Hitchcock v. State*, 226 So. 3d 216 (Fla.

2017), should not be dispositive in his case.  *Id.*  The Court held that following the

jury's eleven to one vote recommending the death sentence and his sentence being

final in 1998, Davis was not entitled to retroactive application of *Hurst*.  *Id.*

### Successive Postconviction Motion Subject to This Appeal

On April 23, 2019, Appellant filed another successive postconviction motion,

which he amended on June 3, 2019, to cure deficiencies in the former.[9]  R 1-28, 104-

31, respectively.   The June 3, 2019, Amended Successive Motion to Vacate

Judgment and Sentence Under Rule 3.851 With Special Request for Leave to Amend

("2019 Amended Successive Postconviction Motion") is the subject of this appeal.

---

[9] On May 13, 2019, the trial court struck Davis' April 23, 2019, motion as insufficiently pled under
Fla. R. Crim. P. 3.851(e)(2)(C), but granted leave to amend.  R 102-03.  Coincidentally, the State
answered on the same day the trial court's order striking the motion because the Office of the
Attorney General was not served with the order and was unaware it had been filed.  R 83-101.

The 2019 Amended Successive Postconviction Motion raised substantially similar *Giglio* and *Brady* claims based on the same underlying facts and circumstances tied to the SAO and JSO's Repository records, as well as the 2006 Third Amended Successive Postconviction Motion.   Appellant claimed (1) the State knowingly presented Ms. Cotton's material, yet false trial testimony, in violation of *Giglio*; and (2) the State withheld evidence to impeach Ms. Cotton's trial testimony.  R 108, et seq., 114.

These claims and corresponding arguments are virtually the same as those raised in 2006, with one exception:  Appellant included a lengthy appendix with several "declarations" from lay persons and two forensic pathologists.  R 132-83.  Among the declarations is that of Janet Cotton, who Appellant claims was a "critical witness for the State, providing them a timeline and motive for Mr. Davis to injure C.C." and supported the HAC aggravator.  R 6-7; IB 16, 24.  Ms. Cotton's declaration dated August 13, 2018, states that she did not testify truthfully at trial and is the sole basis for the *Giglio* and *Brady* claims summarily denied by the trial court.  Ms. Cotton's declaration provides in toto:

> Declaration of Janet Dassie
> Pursuant to 28 U.S.C. § 1746 and 92.525 of Title VII, Florida Statutes
>
> I am an adult resident of Miami-Dade County in the State of Florida.  I state the following under penalty of perjury:

16

1. My name is Janet Dassie.  In December, 1992, I went by Janet Cotton.  I was living at 5342 Seaboard Avenue, Apartment 2, Jacksonville, FL 32206.  I lived alone with my children.

2. I knew Gwen Cunningham and Toney Davis as my neighbors in apartment 1.  Gwen's three children, including [C.C.], were living with them.  Their apartment and my apartment were directly next to each other on the ground floor.  Gwen's children sometimes played with mine, and I accompanied Gwen and Toney to church once or twice.

3. I was close friends with Celeste Wiley and had known her for years.  She occasionally visited my apartment, sometimes with her children.

4. At some point between one and ~~several~~ two (Jd) days before December 9, 1992, I was sitting at home.  Celeste may have been visiting that day.  I was inside my apartment when I overhead crying and screaming in a neighboring apartment.  The walls to my apartment were thin, and I could often hear neighbors talk or move around.  The loud noises on that day led me to call 911 to report it.  I did not know if police responded because I could not tell the source of the noises.  Since there were several apartments around me, I could not tell which one the noises were coming from.  The crying and screaming eventually stopped.  I did not hear them ever again.

5. On December 9, 1992, I woke up late in the morning.  My children were in school at the time.  Several hours after I woke up, I heard commotion going on outside.  I went outside.  I went outside and saw police and an ambulance on scene and the apartment building blocked off with police tape.  I also saw Toney speaking with police.  My children usually got home from school in the early-to-mid afternoon, and this all happened before they got home.  Later, when my children got home, the police allowed them to go through the tape after they pointed me out as their mother.

6. The same day, Angela Corey, a prosecutor with the [SAO] in Jacksonville, spoke with me about what I knew of my neighbors, Gwen and Toney.  As we talked, she led me through their apartment.  I saw the carpeting in the living room had missing pieces, which I believed

17

police had cut.  Angela then showed me the bathroom.  I did see blood in the bathtub and on the bathroom floor, but there was not a lot.

7. Angela warned me that I should be more careful with who I let babysit my children.  Since I let Toney watch my children before I later asked them if he had ever harmed them.  My children told me that they had never been hurt by Toney.

8. Angela also informed me that the [SAO] did not know yet if they would need me to testify at Toney's trial.  Ultimately, I was called as a witness for the State.

9. I remember Angela because she has kept in contact with me by phone through the years.  Last time I spoke with her was several years ago.  She informed me that Gwen had passed away and I was one of ~~them~~ (Jd) the few surviving witnesses from the trial.  Angela is the only one who has contacted me since the trial until now.

10. I did not hear a baby or child cry or scream on December 9, 1992.  I did not hear a banging or thumping noise hitting the floor or wall.  I did not hear Toney or a male voice yell, "Sit down."

11. When I testified at Toney's trial, I was naïve.  I only ever wanted to do the right thing.  I was put under a great deal of pressure and duress by the State of Florida during multiple meetings with law enforcement.

12. I have reviewed my testimony to the above and it was untrue.  I know in my heart that [C.C.] was not injured on December 9, 1992 as I had testified to.  This has always weighed on my mind.

~~I hereby certify that the facts set forth are true and correct to the best of my personal knowledge information and belief, subject to the penalty of perjury pursuant to 28 U.S.C. § 1746 and Sec. 92.525 of Title VII, Florida Statutes.~~

13. During my last contact with Angela Corey, I informed her of pending charges I had in Duval County pertaining to two bad checks.  Angela told me I was the last remaining witness and not to worry about the charges.  That she would take care of them.

18

> I hereby certify that the facts set forth are true and correct to the best of my personal knowledge information and belief, subject to the penalty of perjury pursuant to 28 U.S.C. § 1746 and Sec. 92.525 of Title VII, Florida Statutes.

R 133-37.

The Office of the Attorney General, on behalf of the State of Florida, answered the motion and argued that the *Giglio* and *Brady* claims were untimely under Rule 3.851, Fla. R. Crim. P. and each claim was meritless, warranting summary denial. R 186-206. The trial court summarily denied the amended successive postconviction motion on the merits, without addressing the State's untimeliness argument. Davis now appeals the trial court's summary denial.

## STANDARD OF REVIEW

A trial court may summarily deny a postconviction motion "[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief." Fla. R. Crim. P. 3.851(f)(5)(B), (h)(6); *Jimenez v. State*, 265 So. 3d 462, 480 (Fla. 2018) (affirming summary denial of postconviction *Brady* and *Giglio* clams where both were procedurally barred and without merit), quoting *Tompkins v. State*, 994 So. 2d 1072, 1081 (Fla. 2008). Because a postconviction court's decision whether to grant an evidentiary hearing on a Rule 3.851 motion is based upon the written materials before the court, its ruling is tantamount to a pure question of law and is reviewed *de novo*. *Id.*, quoting *Marek v. State*, 8 So. 3d 1123, 1127 (Fla.

19

2009).

In reviewing a trial court's summary denial of a postconviction motion, "this Court must accept the defendant's allegations as true to the extent that they are not conclusively refuted by the record." *Jimenez*, 265 So. 3d at 480 (citation omitted). However, mere conclusory and speculative allegations do not necessarily warrant an evidentiary hearing. *Id.*, citing *Anderson v. State*, 220 So. 3d 1133, 1142 (Fla. 2017); *see also LeCroy v. Dugger*, 727 So. 2d 236, 238 (Fla. 1998) ("[S]peculation and conjecture about what . . . letters and notes and opinions and cryptic references *may* suggest is not sufficient to warrant an evidentiary hearing, much less relief.") (quoting trial court's order).

## SUMMARY OF ARGUMENT

Appellant appeals summary denial of his 2019 Amended Successive Postconviction Motion which was based upon State witness Janet Cotton's 2018 declaration stating she did not testify truthfully at trial. In so doing, he comingles purported newly discovered evidence with *Giglio* and *Brady* claims.

In response to the 2019 Amended Successive Postconviction Motion, the State argued that the motion was untimely as provided by Fla. R. Crim. P. 3.851(d)(1), (d)(2), and (e)(2). The State reasserts that argument and requests relief be denied as Appellant's successive postconviction motion is untimely.

The State asserts that the *Giglio* and *Brady* claims are procedurally barred

20

where Appellant raised versions of these claims in his 2006 Third Amended Successive Postconviction Motion, relying on the same underlying records, facts and circumstances, with the exception of Ms. Cotton's declaration. The State further argues that Ms. Cotton's 2018 declaration does not qualify as newly discovered evidence. The Appellant should not be permitted to repackage and re-raise these claims where he clearly did not exercise due diligence and presents a vague declaration of Ms. Cotton's untruthful and immaterial trial testimony.

Should this Court proceed to the merits of these claims, relief should be rejected as they are meritless. Appellant is not entitled to an evidentiary hearing or other relief because (1) the materiality prongs of the *Giglio* and *Brady* claims conclusively fail, where this Court has already determined that even if Ms. Cotton's trial testimony was false, it was immaterial and harmless and would not have affected the jury's verdict. *Davis*, 136 So. 3d at 1189-90; (2) Ms. Cotton's declaration did not support or indicate that the State presented or failed to correct false testimony under *Giglio*; and (3) Appellant merely speculated and extrapolated that the State suppressed Ms. Cotton's "truthful" testimony and does not make an adequate showing of a legally sufficient claim to satisfy *Brady*.

21

## ARGUMENT

**ISSUE I:   APPELLANT'S CLAIM THAT THE STATE VIOLATED *GIGLIO* BY PRESENTING JANET COTTON'S FALSE TRIAL TESTIMONY IS UNTIMELY, PROCEDURALLY BARRED AND MERITLESS.**

Appellant claims the State violated *Giglio* when it knowingly presented and failed to correct Janet Cotton's allegedly false trial testimony. IB 3, et seq. He argues that the State's case was fabricated by using a "critical" witness who testified falsely and provided the prosecution with what it needed to convict Davis of first-degree murder. IB 4. Appellant supports his claim with Ms. Cotton's 2018 declaration stating that she did not testify truthfully and did not hear a baby cry, thumping noises or a male yell "sit down" on December 9, 1992. IB 5-7. This claim fails on multiple fronts: (1) it is procedurally barred because Ms. Cotton's declaration is not newly discovered evidence as the record shows that Davis did not exercise due diligence when the underlying substantive facts were discovered in the course of his 2006 Third Amended Postconviction Motion; (2) it is untimely under Rule 3.851; and (3) it fails on the merits primarily because this Court has already determined that Ms. Cotton's testimony, even if false, was not material.

## A. Appellant's *Giglio* Claim is Untimely and Procedurally Barred.[10]

Appellant's *Giglio* and *Brady* claims are based upon purported newly discovered evidence in the form of Ms. Cotton's 2018 declaration recanting her trial testimony. The State maintains (1) Ms. Cotton's recantation of her trial testimony does not constitute legally sufficient newly discovered evidence because it would not likely produce a different result at trial and (2) even if her declaration did rise to newly discovered evidence, his 2019 Amended Successive Postconviction Motion is untimely.

Claims raised in prior postconviction proceedings cannot be relitigated unless Appellant can demonstrate that his grounds for relief were not known and could not have been known at the time of the earlier proceedings. *Hunter v. State*, 29 So. 3d 256, 267 (Fla. 2008) (holding defendant was not entitled to an evidentiary hearing on *Giglio* and *Brady* claims where factual allegations were insufficient to satisfy timeliness and diligence requirements). Appellant's 2019 Amended Successive Postconviction Motion was filed over two decades after his conviction and death sentence became final on June 15, 1998. It is untimely unless the claim(s) fall into one of the following three narrow exceptions:

---

[10] Because the Appellant's *Giglio* and *Brady* claims are based upon the same facts and circumstances, the State's timeliness and procedural bar arguments apply equally to both issues.

23

(A) the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence, or

(B) the fundamental constitutional right asserted was not established within the period provided for in subdivision (d)(1) and has been held to apply retroactively, or

(C) postconviction counsel, through neglect, failed to file the motion.

Fla. R. Crim. P. 3.851(d)(2).[11] *See also Hunter*, 29 So. 3d at 267. The record shows that Ms. Cotton's declaration is not newly discovered evidence and warrants a procedural bar.

A legally sufficient newly discovered evidence claim must establish two elements: (1) must not have been known by the trial court, the party or by counsel at the time of trial, which *could not have been discovered by the defendant or counsel through the use of due diligence*; and (2) the evidence must be of such nature that it would probably produce an acquittal or a less severe sentence. *See Geralds v. State*, 111 So. 3d 778, 799-800 (Fla. 2010) (holding summary denial of *Brady* claim proper where defendant did not establish a "prima facie case based upon a legally valid claim") (citations omitted); *see Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998);

---

[11] The second and third timeliness exceptions under the Rule are inapplicable to Davis' motion. He has not pled facts regarding the creation of a fundamental constitutional right or that the claims would have been filed but for the neglect of postconviction counsel. Therefore, the State only addresses the newly discovered evidence exception in detail.

24

*Downs v. State*, 740 So. 2d 506, 514 (Fla. 1999), citing *Robinson v. State*, 707 So. 2d 688, 691 (Fla. 1998). Davis satisfies neither.

Rule 3.851 requires that successive postconviction motions articulate the reasons why a claim was not raised previously and why the evidence supporting the claim was not available. *Hunter*, 29 So. 3d at 267. Contrary to Appellant's argument, he fails to allege any facts that justified filing this claim. The record in this case clearly refutes Appellant's claims to the extent that he was aware of the detective notes and Ms. Wiley's account of the events, upon which he made the original *Giglio* and *Brady* claims related to Ms. Cotton's testimony. This is the same information, the same alleged false testimony and the same arguments now being made to this Court. The singular exception between the argument made then and that made now, is Ms. Cotton's declaration, which in turn supports the State's untimeliness argument.

It is an essential fact that years ago, Appellant raised *Brady* and *Giglio* claims based on the detective notes and allegations of Ms. Cotton's false trial testimony. The only difference between the 2006 postconviction efforts, the current claims and "new evidence" at issue, is Ms. Cotton's declaration. The claims, however are essentially the same. In his 2013 initial brief, Appellant titled Argument II. D. as "The state committed a *Giglio* violation in allowing Janet Cotton's [sic] to testify falsely regarding the noises she supposedly heard on the day of the incident,

25

including an assertion that another witness was present." *See* Appellant's 2013 Initial Brief at 34, SC12-115, docketed March 18, 2013. The State points out that Appellant's postconviction counsel on appeal for the 2006 Third Amended Successive Postconviction Motion is the same postconviction counsel pursuing the claims now before this Court.

Because the 2006 and 2019 motions are so closely related, save Ms. Cotton's declaration, the importance of Appellant's advanced knowledge of the purported false trial testimony cannot be overstated. Moreover, Appellant's lack of due diligence to show when Ms. Cotton's declaration *could have been obtained* is critical. Appellant admits his advance knowledge, yet failed to plead or even suggest that he engaged in a modicum of due diligence to follow-up or act upon the information surrounding Ms. Cotton at the time.

On the face of the record, no action was taken and Appellant conducted no due diligence, despite the alleged critical nature of Ms. Cotton's trial testimony and the arguments made in his 2006 Third Amended Successive Postconviction Motion. The record is devoid of any background, timeframe or context for how or when the declaration was initiated or secured in order for the declaration to be considered newly discovered evidence. The record is wanting for any level of due diligence employed to locate or speak with Ms. Cotton in the past 13 years since the Appellant obtained the records prompting the initial *Giglio* and *Brady* claims.

26

There is no suggestion, much less record evidence, that Ms. Cotton stood by her trial testimony at an earlier time, communicated that in some way to Davis and that she changed her mind and truly decided to "come forward." *See Thomas v. State*, 260 So. 3d 226, 227 (Fla. 2018) (holding summary denial of *Giglio* and *Brady* claims was proper and claims were procedurally barred where the record established that information in defendant's claims that witness testified falsely could have been discovered at an earlier date through due diligence).

Instead, the record conclusively establishes that Appellant and his postconviction counsel were fully aware of the "discrepancies" between Ms. Cotton and Ms. Wiley's versions of the events in 2006 and the detective notes. Had Appellant pursued the issue or employed any level of due diligence to contact Ms. Cotton, it could have given rise to an earlier recantation. However, Appellant provides no evidence that such efforts were ever made. Nor does the Appellant state that efforts were made, but were unsuccessful until 2018.

This Court has held that recanted testimony alleged to constitute newly discovered evidence will mandate a new trial if the trial court is satisfied that the recantation is true and that the recanted testimony would probably render a different outcome. *See Davis v. State*, 26 So. 3d 519, 526 (Fla. 2009). This Court already determined that taking Ms. Cotton's trial testimony as false, it would not weaken the

27

case against Davis nor would it give rise to reasonable doubt as to his culpability. *See Davis*, 136 So. 3d at 1189-90; *see also Davis*, 26 So. 3d at 526.

Should Ms. Cotton's declaration qualify as newly discovered evidence, Appellant's claims are still untimely. Before this Court may reach the merits of Appellant's *Giglio* and *Brady* claims, which have been resurrected from his 2006 Third Amended Successive Postconviction Motion, he must have established that his 2019 Amended Successive Postconviction Motion was timely. *Jimenez*, 265 So. 3d at 477. To be considered a timely filed newly discovered evidence claim, even though Davis commingles a *Brady* and *Giglio* claim, his successive postconviction motion must have been filed within one year from the date the claim became *discoverable through due diligence*. *Id*.

The Florida Supreme Court has repeatedly upheld the summary denial of postconviction motions that did not comply with the time limitations of Rule 3.851. *Byrd v. State*, 118 So. 3d 807 (Table) (Fla. 2013) (prisoner's successive 3.851 motion procedurally barred where it raised a constitutional right that was not retroactive); *Carroll v. State*, 114 So. 3d 883, 886-87 (Fla. 2013) (prisoner's claim that his mental illness was a categorical bar to execution was seeking the recognition of a new fundamental right, and was thus untimely raised per Rule 3.851(d)(2)).

The State incorporates its due diligence arguments made above to show that Appellant's 2019 Amended Successive Postconviction Motion was untimely.

28

Conspicuously, Davis did not plead timeliness, which is rendered highly suspect by the record as a whole.  Hence, Appellant should not be granted relief where there is no support that he first became aware of Ms. Cotton's declaration in 2018.

### B. Appellant's *Giglio* Claim is Meritless and Does Not Warrant an Evidentiary Hearing.

Appellant claims the State violated *Giglio* by "pressuring a critical witness to fabricate her trial testimony" and then knowingly presented her false testimony at trial.  IB 16.  He argues that Ms. Cotton's testimony was material and her 2018 declaration provides a sufficient factual basis to warrant an evidentiary hearing on this claim.  Appellant's claim is meritless because he fails to meet *Giglio*'s materiality prong, which has already been determined by this Court.

In contrast to Appellant's *Brady* claim discussed *infra*, *Giglio* is based upon the prosecutor's knowing presentation of false testimony at trial.  *Jimenez*, 265 So. 3d at 479.  To prevail on *Giglio*, Appellant must be show that: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false testimony was material.  *Id.*, *see also Guzman v. State*, 868 So. 2d 498, 505 (Fla. 2003).  The evidence is material under *Giglio* "if there is any reasonable possibility that it could have affected the [jury's] verdict, and the State bears the burden of proving the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt."  *Conahan v. State*, 2017

29

WL 656306 *1 (Fla. Feb. 17, 2017) (holding summary denial of successive postconviction claims of *Giglio* and *Brady* based upon newly discovered evidence was proper where the evidence was not material) (citation omitted); *see also Jimenez*, 265 So. 3d 479 (quoting *Rhodes v. State*, 986 So. 2d 501, 509 (Fla. 2008)). Appellant fails to satisfy two of the three prongs.

First and most important, this Court's 2014 opinion affirming denial of Appellant's original postconviction motion is unequivocally dispositive of the materiality prong of his *Giglio* (and *Brady)* claim. In its opinion affirming denial of Davis' 2006 Third Amended Successive Postconviction Motion, this Court determined and held, even if false, Ms. Cotton's trial testimony was not material and any failure to correct it was harmless. *Davis*, 136 So. 3d at 1189.

On appeal in SC12-115, Davis argued the State committed a *Giglio* violation and that "law enforcement officer's field notes demonstrate that witness Janet Cotton's trial testimony was false." *Davis*, 136 So. 3d at 1189. The court fully addressed her trial testimony, the content of the detective notes and Ms. Wiley's version of the events. *Id.* In fairness, the State acknowledges that the court relied upon the record at the time to hold that there was no evidence to show that Ms. Cotton's trial testimony was false. *Id.* However, this Court specifically held that her testimony was not material stating,

> **And even if Cotton's testimony that Wiley was in her apartment on**

30

> *December 9, 1992, was false, the State's failure to correct the testimony was harmless*.  As set out above, the State presented ample evidence that the victim was severely beaten on December 9, 1992—regardless of whether she was also beaten earlier in the week.  In light of this evidence, *there is no reasonable possibility that the portion of Cotton's testimony about Wiley hearing noises affected the jury's guilty verdict or the trial court's finding of HAC*.

*Id.* at 1189-90  (emphasis added).  In denying the claim, the trial court relied upon this Court's finding above.  R 210.  The trial court's deliberation did not stop there, where it "again reviewed the record" and found "that the Defendant has failed to establish materiality."  *Id.*

Appellant abjectly dismisses this Court's prior materiality determination and instead, exclusively focuses on the postconviction court's actions.  *See* IB 20-24. Davis argues in part, ". . . the lower court's finding that any false testimony from Ms. Cotton is immaterial because Mr. Davis would have been convicted anyway impermissibly minimized the importance of her trial testimony and impact of her testimony on the jury."  *Id.* at 20-21.  Davis goes on to re-plead her trial testimony and its alleged importance and impact.  *Id.* at 21-23.

Ms. Cotton's declaration and recantation of her trial testimony, when viewed as newly discovered evidence to support Appellant's *Giglio* (and *Brady*) claim, does not overcome this Court's determination and does not establish materiality.  The record in this case unequivocally establishes that (1) Davis was alone with C.C. on December 9, 1992; (2) C.C.'s catastrophic injuries and sexual battery occurred on

31

that day; (3) "fresh" blood was coming from C.C.'s vaginal canal; (4) "fresh" blood was found on the bathtub, toilet seat and in other areas of the apartment; (5) C.C.'s blood was found on Davis' shorts; (6) C.C. was naked from the waist down; and (7) responding paramedics found C.C. lifeless on December 9, 1992. *See Davis*, 703 So. 2d 1055, and *Davis*, 136 So. 3d 1169. Appellant has not provided any new evidence, including Ms. Cotton's declaration, that this Court's prior findings were wrong, her trial testimony should be elevated in importance or call his guilt and death sentence into question.

As to *Giglio*'s second prong, Appellant fails to show that the State knew Ms. Cotton's trial testimony was false, despite Appellant's contention that his motion was sufficiently pled. *See* IB 17. As correctly stated in the trial court's order denying this claim, Ms. Cotton's declaration does not contain support to show that the State knew her testimony was fabricated. *See Hannon v. State*, 941 So. 2d 1109, 1141 (Fla. 2006) (holding summary denial of *Brady* and *Giglio* claims proper where defendant did not demonstrate the State suppressed evidence or presented false testimony). Nor does she come close to stating in some form or fashion that the State knew that her testimony was false, which is required for a *Giglio* claim.

As this Court stated in *Hannon*, Davis "has not provided a factual basis that the State instructed [Ms. Cotton] to lie with regard to what occurred" on the day of C. C.'s fatal injuries. *Hannon*, 941 So. 2d at 1141. Appellant overtly alleges

32

improper actions and merely extrapolates his argument from Ms. Cotton's carefully crafted remarks regarding former State Attorney Angela Corey from one statement, "I was put under a great deal of pressure and duress by the State of Florida during multiple meetings with law enforcement."   R 136.   Nowhere in Ms. Cotton's declaration does she come close to stating, much less alleging, that the State induced or otherwise prompted her to lie at trial.

If Ms. Cotton was genuinely intent on being "truthful," it begs the questions, why did she not say what she was pressured to do; why did she not describe the nature of the duress she was under; or why did she not clearly state that the State pressured her to lie?   Instead, Appellant ostensibly relies on the declaration's vagueness to engineer an evidentiary hearing on matters which could have and should have been addressed years ago.   This essentially functions as an attempt to backdoor evidence that should have been presented 20 years ago, at the very least in his 2006 Third Amended Successive Postconviction Motion.

Even if Appellant's allegations are accepted as true, there is no reasonable probability that the outcome of the case would have been different, that Davis would not have been convicted of his crimes or that he would not have been sentenced to death.   Appellant's argument supported by Ms. Cotton's declaration, is replete with conjecture and unsupported extrapolations of the State's alleged conduct, which is insufficient to reverse the trial court's findings and warrant an evidentiary hearing.

33

**ISSUE II: APPELLANT'S CLAIM THAT THE STATE VIOLATED *BRADY* BY PRESENTING JANET COTTON'S TRIAL TESTIMONY IS UNTIMELY, PROCEDURALLY BARRED AND MERITLESS.**

Appellant claims that the State committed a *Brady* violation by allegedly suppressing and withholding exculpatory and impeaching evidence in the form of Ms. Cotton's declaration. IB 24, et seq. Davis argues that Ms. Cotton's "admission" that her trial testimony was false supports his actual innocence and the State withheld it. *Id.* Like the *Giglio* claim, should this Court reach the merits, his *Brady* claim fails on multiple fronts as well. The trial court's summary denial of this claim should be affirmed as Appellant does not demonstrate a prima facie case that the State willfully or inadvertently suppressed material evidence within its possession or control that was favorable to the defense. The evidence underlying this claim was not suppressed by the State and the evidence would have had no reasonable probability of changing the result of Davis' trial.

### A. Appellant's *Brady* Claim is Untimely.

Appellant's *Brady* claim is inextricably intertwined with his *Giglio* claim and the underlying facts, circumstances and postconviction procedural history expounded above. It is therefore untimely as well and the State incorporates and restates its untimeliness argument set forth above, as if fully set forth herein.

### B. Appellant's *Brady* Claim is Meritless and Does Not Warrant an Evidentiary Hearing.

To prevail on his *Brady* claim, Davis must show that (1) evidence exists that is favorable to the defense because it was either exculpatory or impeaching; (2) he did not possess the evidence and nor could it be obtained with any reasonable diligence; (3) the State suppressed the evidence; and (4) because the evidence was material, the defendant was prejudiced. *See Jones*, 709 So. 2d at 519, and *Jimenez*, 265 So. 3d at 478. To meet the materiality prong under *Brady*, the defendant must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Jones*, 709 So. 2d at 519 (citation omitted). In other words, "evidence is material under *Brady* only if it undermines confidence in the verdict." *Conahan*, 2017 WL 656306 at *1 (citation omitted). The State acknowledges, in making this determination, the evidence is viewed cumulatively. *Jimenez*, 265 So. 3d 478.

Again, the State first directs this Court to the materiality prong, which Appellant cannot establish, as discussed in detail *supra* at 31. In his 2019 Amended Successive Postconviction Motion and to support his *Brady* claim, Appellant inflated Ms. Cotton's role at trial, proclaiming the she was "critical," "a central piece to the prosecutions' case," and "the backbone for the prosecution's timeline." R 106, 115. In denying the *Brady* claim, the trial court specifically found that Ms.

35

Cotton's declaration did not establish that the State suppressed any evidence or that any prejudice occurred. R 213. Contrary to Appellant's assertion in his initial brief that "[t]he lower court found Ms. Cotton's admission that her trial testimony was false to be favorable. (SPCR 213)," the trial court's order states no such thing.

Once again, this Court previously determined that even if false, Ms. Cotton's trial testimony was not material. *Davis*, 136 So. 3d at 1189-90. As stated above, nothing in Ms. Cotton's declaration, Appellant's filings or the record as a whole changes this Court's determination.

There is no objective support that the State suppressed any evidence, much less the truthful testimony of Ms. Cotton. In the case of a recantation, the State cannot suppress testimony or a recantation that it does not have at the time of trial. *See United States v. Schembari*, 484 F.2d 931, 935 (4th Cir. 1973) (stating, in the context of a *Brady* claim, that "the government cannot disclose what it does not have"); *Kelley v. Sec'y, Dept. of Corr.*, 377 F.3d 1317, 1354 (11th Cir. 2004) ("Of course, *Brady* and its progeny apply only to evidence possessed by the prosecution team" citing *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989)).

Nonetheless, although Davis characterizes Ms. Cotton's recantation has impeachment evidence withheld by the State, she was not an important witness whose testimony when considered cumulatively, is not material. *See Tompkins*, 994 So. 2d at 1078 (holding *Brady* claim based on witness's affidavit was properly

36

denied under materiality prong and diligence prong under *Jones*, 709 So. 2d at 519).

Ms. Cotton's declaration provides no evidence that the prosecution or the law enforcement officers in the case knew that her trial testimony was false. Although she states that she was under a great deal of "pressure" she makes no claim that she was pressured to lie or that anyone knew she was going to lie. As noted in the trial court's order, Ms. Cotton never avers that the State knowingly presented false testimony. She does not state that any State actor pressured her or incentivized her to present false testimony in exchange for favorable treatment. Nor does Ms. Cotton declare that the State knew that she was going to do so. R 209. Although Cotton says her trial testimony was untrue, she does not explain whether her trial testimony was the product of a factual misunderstanding, errant memory, or an intentional lie. If the State was unaware that Ms. Cotton's testimony was false, it could not have been suppressed in violation of *Brady*.

Finally, Ms. Cotton's recantation does not support prejudice to the Appellant because there is no reasonable probability that, had the evidence been disclosed to the defense, the result of Davis' trial would have been different. *See Merck v. State*, 260 So. 3d 184, 194 (Fla. 2018). Ms. Cotton was a nonessential State witness who did not witness the murder and was only able to testify to overhearing yelling and crying near the time of C.C.'s murder. *Davis*, 703 So. 2d at 1056-57. Any change to her testimony would be unimpactful because far more significant and

37

incriminating evidence was presented at trial.   C.C.'s mother and a family acquaintance placed C.C. in Davis' care at the time she suffered her fatal injuries, rescue personnel found C.C. unclothed from the waist down and the ER doctor who examined her before she died found vaginal injuries.   C.C.'s blood was found on Davis' underwear and the crotch region of the shorts he was wearing at the time rescue personnel arrived.   Davis also provided multiple conflicting explanations of the circumstances surrounding C.C.'s death.   *Id.*

Further, Davis argues consideration of plainly untimely evidence in evaluating the prejudice of Davis' *Brady* claims.  IB 30-46.   This is yet another backdoor effort to inject evidence which should have been available within the past 20 years.   Davis presents untimely evidence in the form of (1) defense-favorable expert opinions to now rebut the State's scientific evidence at trial; (2) numerous witness statements documenting C.C.'s injuries and illnesses prior to her murder; (3) state agency records from the Department of Health and Rehabilitative Services; and (4) a witness statement alleging misconduct by law enforcement officers in an unrelated case.  R 119-81.

Considering the significant evidence of Davis' guilt at trial, any change to Cotton's testimony has no reasonable probability of changing the outcome of Davis' trial.   Nor should it be a vehicle to interject untimely evidence.   As such, Davis'

38

*Brady* claim based on Ms. Cotton's recantation is meritless and the trial court's summary denial should be affirmed.

## CONCLUSION

Appellant's *Giglio* and *Brady* claims are untimely and otherwise meritless, not entitling Appellant to relief.   Therefore, the trial court's summary denial of Appellant's 2009 Amended Successive Motion was proper and should be affirmed.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

/s/ Janine D. Robinson
JANINE D. ROBINSON
ASSISTANT ATTORNEY GENERAL
Florida Bar No. 865966
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
Telephone: (850) 414-3606
Facsimile:  (850) 487-0997
capapp@myfloridalegal.com
Janine.Robinson@myfloridalegal.com
COUNSEL FOR APPELLEE

39

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to Rick A. Sichta, Esquire and Susanne K. Sichta, Esquire, The Sichta Firm, LLC, Counsel for Appellant, Toney Deron Davis, via the Florida Courts E-Filing Portal this 24th day of September, 2019.

ASHLEY MOODY
ATTORNEY GENERAL

/s/ Janine D. Robinson
JANINE D. ROBINSON
ASSISTANT ATTORNEY GENERAL
COUNSEL FOR APPELLEE

## CERTIFICATE OF FONT COMPLIANCE

I HEREBY CERTIFY that the size and style of type used in this brief is 14-point Times New Roman, in compliance with Rule 9.100, Florida Rules of Appellate Procedure.

ASHLEY MOODY
ATTORNEY GENERAL

/s/ Janine D. Robinson
JANINE D. ROBINSON
ASSISTANT ATTORNEY GENERAL
COUNSEL FOR APPELLEE

40

89

Filing # 97335750 E-Filed 10/15/2019 08:30:15 PM

# IN THE SUPREME COURT OF FLORIDA

## CASE NO. SC19-1207
LOWER TRIBUNAL NO.  92-13193-CF

---

## TONEY DERON DAVIS,

*Appellant,*

vs.

## STATE OF FLORIDA,

*Appellee.*

---

*On Appeal from the Circuit Court, Fourth
Judicial Circuit, in and for Duval County, Florida*

*Honorable Linda McCallum
Judge of the Circuit Court, Division CR-E*

## REPLY BRIEF OF APPELLANT

---

RICK A. SICHTA, ESQ.
Fla. Bar No. 0669903
6279 Dupont Station Ct.
Jacksonville, FL 32217
Phone:  904-731-3800
Fax: 904-731-3807
rick@sichtalaw.com
Attorney for Appellant

## <u>TABLE OF CONTENTS</u>

<u>PAGE(S)</u>

TABLE OF CONTENTS ........................................................................ii

TABLE OF AUTHORITIES ............................................................ iii

ARGUMENTS IN REPLY ..................................................................1

    I.    **The State violated <u>Giglio</u> by knowingly presenting the false testimony of a critical witness, Janet Cotton, after pressuring her to fabricate a story that supported the State's theory of the case.** ..............................................1

    II.    **The State violated <u>Brady</u> by withholding information that materially conflicted with its theory of prosecution, impeached a critical state witness, and provided exculpatory evidence supporting Mr. Davis' fervent claim of innocence** .......................................................... 12

CONCLUSION ........................................................................ 17

CERTIFICATE OF COMPLIANCE AS TO FONT ........................................ 17

CERTIFICATE OF SERVICE .......................................................... 17

# TABLE OF AUTHORITIES

## Cases

Archer v. State, 934 So. 2d 1187 (Fla. 2006) ........................................................... 3

Banks v. Dretke, 540 U.S. 668 (2004)...................................................................... 3

Burns v. State, 858 So. 2d 1229 (Fla. 1st DCA 2003)................................... 4, 12, 13

Cueto v. State, 37 Fla. L. Weekly D1347 (Fla. 3d DCA 2012)........................... 5, 10

Davis v. State, 136 So. 3d 1169 (Fla. 2014) ............................................. 2, 9, 10, 15

Ezem v. Fed. Nat'l Mortg., 153 So. 3d 341 (Fla. 1st DCA 2014)............................ 7

Furman v. Georgia, 408 U.S. 238 (1972) ............................................................... 16

Hannon v. State, 941 So. 2d 1109 (Fla. 2006).......................................................... 8

Jacobs v. State, 880 So. 2d 548 (Fla. 2004)........................................................... 10

Johnson v. State, 44 So. 3d 51 (Fla. 2010) .............................................................. 5

Jones v. State, 709 So. 2d 512 (Fla. 1998) ........................................................ 5, 13

Mark Allen Davis v. State, 26 So. 3d 519 (Fla. 2009) .................................... 4, 6, 13

Occhicone v. State, 768 So. 2d 1037 (Fla. 2000) ..................................................... 3

Pittman v. State, 90 So. 3d 794 (Fla. 2011).............................................................. 3

Rivera v. State, 995 So. 2d 191 (Fla. 2008).............................................................. 8

Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327 (11th Cir. 2009) ............................... 7

Thomas v. State, 260 So. 3d 226 (Fla. 2018) ........................................................... 2

## **Other Authorities**

Fla. R. Crim. P. 3.851(d)(2)(A) ................................................................. 4

Fla. R. App. P. 9.210 ............................................................................. 18

iv

## ARGUMENTS IN REPLY

## GROUND I IN REPLY

**THE STATE VIOLATED GIGLIO BY KNOWINGLY PRESENTING THE FALSE TESTIMONY OF A CRITICAL WITNESS, JANET COTTON, AFTER PRESSURING HER TO FABRICATE A STORY THAT SUPPORTED THE STATE'S THEORY OF THE CASE**

**Procedural Bar/Timeliness**:

The instant procedural reply analysis applies equally to Grounds I and II of Mr. Davis' claims.

The trial court ruled on Mr. Davis' instant claims on the merits below because the State's procedural arguments are without merit.  (Answer 27 et seq); (R 207 et seq.)

The State is incorrect in suggesting that because Mr. Davis previously raised a different Giglio claim based on the same witness,[1] the instant claims are procedurally barred.  (Answer 25-28).  As the State's Answer acknowledges, Mr. Davis' previous claim was based primarily on notes held by the State and its agents (Answer 5-9, 12, 27), not a recantation from the witness herself. In Mr. Davis' initial postconviction appeal, without having evidence from Ms. Cotton herself, this Court found that the record at that time was insufficient to establish that Ms. Cotton's trial

---

[1] The prior Giglio claim was based on law enforcement and State Attorney notes indicating that the State was aware that Ms. Cotton's trial testimony was false. (Answer 5-9.)

1

testimony was false.  Davis v. State, 136 So. 3d 1169, 1189 (Fla. 2014) ("In his second *Giglio* claim, Davis asserts that a pretrial deposition and a law enforcement officer's field notes demonstrate that witness Janet Cotton's trial testimony was false. Again, Davis did not demonstrate that the testimony was false... his record does not establish that Cotton's trial testimony was false.")

Although the present Giglio claim is similar (Ms. Cotton's trial testimony was false), the source and scope of this assertion is different than before.   Now, Ms. Cotton has come forward admitting that her trial testimony was false. Ms. Cotton now admits that she felt pressured and was under duress to provide testimony that fit the State's narrative. These matters should have been available for the jury to assess the credibility of Ms. Cotton and the prosecution and its theory of the case in general.[2] If the jury disbelieved Ms. Cotton, then the prosecution's argument that Mr. Davis shouted at C.C. and violently beat her against the wall would have been unavailable as she was the only witness to provide this testimony.

Turning to the State's due diligence argument, it is not well-settled that a due diligence inquiry even applies in the context of Brady/Giglio claims. See Thomas v. State, 260 So. 3d 226, 228 (Fla. 2018) ("While the per curiam opinion reasons that the claims are procedurally barred because the evidence is "not newly

---

[2] Ms. Cotton has also divulged that the State kept in touch with her even after Mr. Davis' trial and assisted her with criminal matters to ensure that she stayed true to their cause. However, this information could not have been presented to the jury.

2

discovered" and could have been discovered through "due diligence," **neither *Brady* nor *Giglio* contains a due diligence prong**. Per curiam op. at 2. Rather, the focus in a *Brady* analysis is whether the State failed to disclose information favorable to the defendant; with *Giglio*, the critical inquiry is whether the State presented false testimony.") (J. Pariente, dissenting) (emphasis added); Pittman v. State, 90 So. 3d 794, 821 (Fla. 2011); Archer v. State, 934 So. 2d 1187, 1203 (Fla. 2006) ("the postconviction court is in error to the extent that the court's order is read to mean that Archer had to demonstrate "due diligence" in obtaining favorable evidence possessed by the State or that the prosecutor's obligation was only to give to Archer favorable evidence which was in the prosecutor's personal possession… [W]e point out that there is no "due diligence" requirement in the *Brady* test…"); Occhicone v. State, 768 So. 2d 1037, 1042 (Fla. 2000) ("Although the 'due diligence' requirement is absent from the Supreme Court's most recent formulation of the *Brady* test, it continues to follow that a *Brady* claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant."); see also Banks v. Dretke, 540 U.S. 668 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process.")

3

To the extent that Mr. Davis must satisfy the due diligence requirement under Fla. R. Crim. P. 3.851(d)(2)(A), Mr. Davis has sufficiently pleaded diligence where his 3.851 motion states that Ms. Cotton "only disclosed that she lied within the last 12 months." (R 129.) Ms. Cotton's statement was signed on August 13, 2018.  Mr. Davis' successive 3.851 motion was filed on April 23, 2018 within approximately 8 months of the statement.  Even the amended 3.851 was filed on June 3, 2019, within approximately 10 months of the statement. As explained by the First DCA, regardless of the time span from the time of trial to the discovery of the new testimony, recanted testimony cannot be "discovered" until the witness chooses to give the recantation. See Burns v. State, 858 So. 2d 1229, 1230 (Fla. 1st DCA 2003).

The State here makes the same mistake as the trial court in Mark Allen Davis v. State, which necessitated reversal for an evidentiary hearing:

> The postconviction trial court appears to have incorrectly applied the heightened requirements to establish due diligence during an evidentiary hearing to evaluate the allegations at a pleading stage. However, permitting a newly discovered evidence claim to proceed to an evidentiary hearing does *not* establish that the recanted testimony qualifies as newly discovered evidence as a matter of law. *See Swafford*, 679 So. 2d at 739. The newly discovered evidence claim remains to be factually tested in an evidentiary hearing to determine whether the defendant has demonstrated that the successive motion has been filed within the time limit for when the statement was or could have been discovered through the exercise of due diligence. *See id*. The motion here was sufficiently pled to allow the opportunity to prove through the testimony of witnesses that the threshold requirement of due diligence was satisfied. Accordingly, the postconviction trial court erred in summarily denying this claim on the

4

basis that the pleading failed to sufficiently satisfy the due diligence requirement at that stage of the proceeding.

26 So. 3d 519, 528-29 (Fla. 2009).  As presumably recognized by the trial court below, any due diligence pleading requirement was satisfied.  Notably, the State has presented no record evidence conclusively demonstrating that Mr. Davis was not duly diligent here. If the State wishes to challenge Mr. Davis' statement of due diligence, it must do so at an evidentiary hearing.[3]

**Merits:**

As a general matter, the State's merits analysis (and the trial court's order below) fails for the same reason its due diligence analysis fails – it incorrectly imposes the "heightened requirements" necessary to establish a claim after an evidentiary hearing to this pleading stage of the proceedings.  Id.  Contrary to the State's argument, "[t]he motion here was sufficiently pled to allow the opportunity

---

[3] Mr. Davis also points out that the State has either confused the due diligence requirement of Fla. R. Crim. P. 3.851(d)(2)(A) with the first prong of the newly discovered evidence test in Jones; or the State is attempting to apply Jones' newly discovered evidence standard to Mr. Davis' instant claim to benefit from its more difficult prejudice standard. (e.g. Answer 24) (citing Jones v. State, 709 So. 2d 512, 521 (Fla. 1998). However, Mr. Davis is not presenting the instant claim as newly discovered evidence. See Cueto v. State, 37 Fla. L. Weekly D1347 (Fla. 3d DCA 2012) ("the trial court erred in treating the claim as one of newly-discovered evidence rather than a *Giglio* violation, thereby assessing the claim under an incorrect standard and burden of proof.")  Rather, these are Giglio/Brady claims based on new evidence. See Johnson v. State, 44 So. 3d 51, 73 (Fla. 2010) (reversing under Giglio, not Jones, in Giglio claim arising from new evidence).

5

to prove through the testimony of witnesses [] the threshold requirement[s]" of Giglio (and next Brady). Id.

**The testimony was false**: The trial court assumed for the purposes of its order that Ms. Cotton's trial testimony was false. (R 209.) The State does not appear to dispute this finding, and correctly characterizes Ms. Cotton's declaration as a "recantation." (e.g. Answer 27, 31.)

**The State knew or *should have known* the testimony was false**: Contrary to the State's position, Mr. Davis is not required to factually prove the claim in his 3.851 motion. See Mark Allen Davis, 26 So. 3d at 528-29. A case is factually established and tested at an evidentiary hearing:

> The newly discovered evidence claim remains to be factually tested in an evidentiary hearing... The motion here was sufficiently pled to allow the opportunity to prove through the testimony of witnesses that the threshold requirement of due diligence was satisfied.

Id. Proving this claim would require calling Ms. Cotton as a witness at the evidentiary hearing to question her about her interactions with law enforcement and the prosecutor, and to hear from the prosecutor and any law enforcement officers who interviewed Ms. Cotton. At this stage, all that Mr. Davis is required to do is plead the claim, which he has done based on the allegations within Ms. Cotton's declaration, that, "[she] was naïve. [She] only ever wanted to do the right thing. [She] was put under a great deal of pressure and duress by the State of Florida during multiple meetings with law enforcement." (R 34-36.)

6

In arguing that Ms. Cotton's declaration was insufficient to factually establish the claim, the State forgets that Ms. Cotton is a layperson who gave the August, 2018 declaration in her own words. She presumably does not know the legal requirements of <u>Giglio</u> (or <u>Brady</u>). As such, she did explain her interactions with the prosecutor or other State agents in careful, legalistic language, with the intention of establishing the prongs of <u>Giglio</u> (or <u>Brady</u>).[4] Instead, she described the nature of her statements, testimony, and interactions with various state agents in her own words.[5] Ms. Cotton's instant declaration states that "[She] was put under a great deal of pressure and duress by the State of Florida during multiple meetings with law enforcement," which factually supports that the State knew or should have known that she testified falsely at trial. (R 32-35.) When Ms. Cotton's present declaration is considered along with the previously discovered notes *in the State's file* that Ms. Wiley did not hear loud noises and that Ms. Cotton heard these noises on a different day, it is evident that the State knew or should have known that her testimony was false. See <u>Smith v. Sec'y, Dep't of Corr.</u>, 572 F.3d 1327, 1333 (11th Cir. 2009) ("*Giglio* claims, occur[] where the undisclosed evidence reveals that the prosecution knowingly made

---

[4] See e.g. <u>Ezem v. Fed. Nat'l Mortg.</u>, 153 So. 3d 341, 343 (Fla. 1st DCA 2014) (Because he is pro se, despite their lack of 'magic words,' Appellant's filings were entitled to be liberally construed to seek the proper relief.")

[5] If the reverse was true, and if Ms. Cotton's declaration seemed legalistic or rehearsed, the State would be arguing that Ms. Cotton was coached.

7

false statements or introduced or allowed trial testimony that it knew or should have known was false.")

The State relies on Hannon, but that reliance is misplaced because Hannon failed to allege any facts to support his allegations that the state witness even lied, let alone that the State knew the witness' statements were false:

> Hannon simply asserts that Richardson's testimony was fabricated *without additional facts*, *or any facts* that the State knew Richardson's testimony was false. Hannon has not provided a factual basis that the State instructed Richardson to lie with regard to what occurred on the night of the murders, *or that Richardson did lie*.

Hannon v. State, 941 So. 2d 1109, 1141 (Fla. 2006) (emphasis added). Unlike Hannon, Ms. Cotton's declaration states that she lied at trial (R 35); it further indicates that she met with law enforcement numerous times and felt pressured and under duress as a result of those encounters. (R 35.) This declaration, paired with the previously discovered notes in the State's possession that also conflicted with Cotton's trial testimony, provide a sufficient factual basis for Mr. Davis' allegations that the State knew or *should have known* that Ms. Cotton's trial testimony was false.

Because the State has not referenced any record evidence conclusively refuting Mr. Davis' allegations that the State knew or should have known that Ms. Cotton's testimony was false, its argument must fail and an evidentiary hearing is required. See Rivera v. State, 995 So. 2d 191, 197 (Fla. 2008) (where "the record does not conclusively refute [a defendant's] . . . factual allegations that the State

8

knowingly presented false or misleading testimony in violation of *Giglio*. . ."
an evidentiary hearing is required.)

**Materiality:** The State attempts to demonstrate lack of materiality, without
an evidentiary hearing, based on its interpretation (and misinterpretation) of the
evidence presented at trial and without consideration of the countervailing evidence
that was presented at trial and has since come to light.  (Answer 31-32.)  Initially,
Mr. Davis points out that blood evidence cited by the State was never conclusively
linked to C.C. See Davis, 136 So. 3d at 1185.  The State also ignored Mr. Davis'
testimony, as well as evidence discovered in postconviction: that there was little to
no evidence of a sexual battery, especially given C.C.'s history of vaginal irritation
and gynecological issues; that Mr. Moore was also with the child during the time in
question; that C.C. was bleeding and wet because Mr. Davis attempted to revive her
in the bathtub when she stopped breathing; that Mr. Davis assumed she suffered
from an asthma attack or choked (corroborated through C.C.'s documented history
of asthma); that C.C.'s mother, Gwen, concealed numerous critical facts at trial; and
that Gwen's credibility, necessary for establishing many of State's facts at trial, such
as the claim C.C. was healthy and happy prior to being left alone with Mr. Davis,
has been wholly undermined.

Assuming, in arguendo, that the State's interpretation of the evidence is
accurate, "the mere recitation that the evidence at trial was overwhelming... is

9

insufficient to permit a summary denial of the motion." <u>Cueto v. State</u>, 37 Fla. L. Weekly D1347 (Fla. 3d DCA 2012).  This Court explained in <u>Jacobs</u> that a 3.850 claim "cannot be resolved on the basis of the mere existence of conflicting evidence in the record. Rather, the record evidence must *conclusively* rebut the claim if the claim is to be resolved without a hearing." For example, in a claim of ineffective assistance of counsel for failure to present witnesses, "if the record demonstrated that these witnesses had actually testified, the claim would obviously be conclusively rebutted." <u>Jacobs v. State</u>, 880 So. 2d 548, 555 (Fla. 2004) (emphasis added). Although <u>Jacobs</u> involved a claim of ineffective assistance of counsel, the point is no less valid here – evidence of guilt cannot *conclusively* refute this claim.

Finally, the State and lower tribunal's reliance on this Court's prior materiality determination concerning Ms. Cotton is misplaced.  This Court's three-sentence determination in its prior 21-page opinion found only that "Cotton's testimony *that Ms. Wiley was in her apartment on December 9, 1992…*" was not material. <u>Davis</u>, 136 So. 3d at 1189 (emphasis added).  We are now dealing with a full recantation from a critical witness, in addition to evidence that the State tampered with, coerced, and/or intimidated this witness, walked this witness through the crime scene, checked up on her, and provided her benefits for her loyalty to the State.

Further, this Court's prior determination that there was "ample evidence" that C.C. was severely beaten on December 9, 1992, was, as conceded by the State, based

10

on the record then before the Court.  (Answer 30.) Ms. Cotton's new declaration contains significant new information, none of which was heard by Mr. Davis' jury: not only was Cotton wrong that her friend Ms. Wiley was present when she heard Davis and a child during the time the State alleged Mr. Davis beat her (the subject of this Court's prior materiality determination),  none of Ms. Cotton's testimony was true. She did not hear Mr. Davis yell "sit down," she did not hear banging or thumping, and she had no idea which apartment she heard a child crying or screaming from in the days before December 9, 1992.  Instead, Ms. Cotton now indicates that she felt perfectly comfortable with Mr. Davis; she attended church with him, let him babysit her children, and Mr. Davis never harmed her children. It was also unknown to the jury (and this Court during its prior opinion) that Cotton was led through the crime scene by the prosecutor the day of the events; she had numerous meetings with law enforcement where she felt "pressure[d]" and under "duress" to assist them; the prosecutor "kept contact with" Ms. Cotton after Mr. Davis's trial; and "[took] care of" criminal charges for her because she was one of the "few surviving witnesses from the trial."  (R 34-36.)

Ms. Cotton's admissions not only reveal that her testimony was partially inaccurate, the issue explored in this Court's prior <u>Davis</u> opinion, but that none of the things she testified about, which were critical to the State's theory, ever occurred. Had the jury been aware that Cotton's testimony was entirely false, and the result of

11

pressure from the State, the jury would have questioned not only the credibility of Cotton, but the prosecution itself.

**Conclusion**:  As set forth in the Initial Brief, and explained in greater detail here, Mr. Davis has sufficiently pleaded his claims, the record does not conclusively refute his allegations and an evidentiary hearing is required.

### GROUND II IN REPLY

**THE STATE VIOLATED BRADY BY WITHHOLDING INFORMATION THAT MATERIALLY CONFLICTED WITH ITS THEORY OF PROSECUTION, IMPEACHED A CRITICAL STATE WITNESS, AND PROVIDED EXCULPATORY EVIDENCE SUPPORTING MR. DAVIS' FERVENT CLAIM OF INNOCENCE [restated]**

**Procedural Bar/Timeliness**:

The procedural analysis from Ground I applies equally to this Claim.

Like the claim above, the instant issue is neither procedurally barred nor untimely where Mr. Smith explained in his 3.851 motion that he filed the claims within 12 months of Ms. Cotton's admission that she lied at trial, and by explaining that he could only have presented her recantation when she chose to make it.  (R 113, 129) (citing Burns, 858 So. 2d at 1230).

As set forth above, the prior claims based on law enforcement and State Attorney notes are not the same as the instant claims arising from Ms. Cotton's recantation.  Thus, the instant issue is not procedurally barred.

12

Mr. Davis was duly diligent in raising this claim, regardless of the time span from the time of trial to the discovery of the new testimony, because recanted testimony cannot be "discovered" until the witness chooses to recant. See Id. The heightened inquiry to factually establish due diligence is not required in the pleading stage of the proceedings. Mark Allen Davis, 26 So. 3d at 528-29.

Contrary to the State's analysis, the instant claim is not a newly discovered evidence claim and must be evaluated under the Brady standard, not Jones, 709 So. 2d at 521.

**Merits:**

**The evidence is favorable:**   The trial court assumed that Ms. Cotton's testimony was false for the purposes of its order. (R 209.) Evidence demonstrating that the entire trial testimony of a State witness was false, and that the witness felt pressured and under duress of the State to perpetrate a false theory of prosecution, is unquestionably favorable to the defense.[6]

Ms. Cotton's recantation is not only impeachment material, but exculpatory where her trial testimony indicated that she heard Mr. Davis say "sit down" and heard loud banging/thumping and a child crying/screaming for approximately 30

_____

[6] The State notes that the lower tribunal's order does not say that Ms. Cotton's recantation is "favorable" as stated in Mr. Davis' Initial Brief. (IB 25.) The disputed sentence in the Initial Brief was mistakenly changed during the editing process and is supposed to read, "The trial court does not dispute that Ms. Cotton's recantation is favorable."

13

minutes on December 9, 1992. Cotton now explains this never happened, ruining the State's theory that the injuries could only have occurred when Mr. Davis was present.  Cotton's declaration also provides evidence of improper, perhaps illegal, State misconduct of pressuring a witness to provide untrue testimony to comport with its tenuous theory of prosecution. This declaration further reveals the length a prosecutor would go to secure a conviction, beginning by leading a witness, Cotton, a member of the general public, through a crime scene. Cotton's declaration also dilutes the credibility of the State's theory, and bolsters Mr. Davis' position that he did not abuse C.C. and there was no screaming or thumping, instead C.C. choked or had an asthma attack, and he accidently dropped her in the shower when he panicked.

**The state suppressed the evidence:** The State's argument that Mr. Davis has not provided a sufficient factual basis for the State's suppression of Ms. Cotton's truthful testimony is incorrect.  (Answer 36.)  Similar to the "knew or should have known" prong of <u>Giglio</u> above, this prong is sufficiently pleaded when Ms. Cotton's statement that she was under a great deal of pressure and duress by the State to give favorable testimony is considered collectively with previously litigated law enforcement/SAO notes concerning Ms. Cotton.  The State concedes in its recitation of the facts that the JSO and SAO notes were in a sealed box in  possession of the State (Answer 5) and were not tendered to the defense until postconviction, so it is indisputable that the State suppressed evidence of Ms. Cotton's truthful testimony.

14

**The suppressed evidence is material**:  The State, like the trial court below, attempts to rely on this Court's prior determination to argue against materiality. (Answer 36.)  However, as explained above, this analysis fails, first, because this Court rejected materiality only in the context of Cotton's testimony that Wiley was in her apartment during the time of the racket next door.  <u>Davis</u>, 136 So. 3d at 1189. This Court never considered the impact of a full recantation – indeed, Ms. Cotton now states that she was not even sure where the noises she heard on that prior day were coming from.

Further, as conceded by the State (Answer 30), the current record is not the same as the record at the time of this Court's prior materiality determination.  This Court in 2014 found that "the record does not establish that Cotton's testimony was false." <u>Id.</u>  That is certainly not the case now.

Additionally, the State's reliance on state expert Dr. Whitworth's findings, to negate materiality (R 31-32, 38), continues to ignore evidence undermining Dr. Whitworth's outmoded methodologies which was litigated in Mr. Davis' prior successive 3.851 motion.  The State also fails to address Mr. Davis' argument concerning fundamental fairness and manifest injustice, likely because such an argument leans in favor of granting Mr. Davis a new trial – or at very least, an evidentiary hearing on the instant claims. (Answer 38-39.)  The interests of finality

and judicial efficiency simply cannot overcome the interests of a defendant who may have been wrongfully convicted and sentenced to death.

In this case, Mr. Davis has demonstrated that the State withheld evidence that would have benefitted his case, such as daycare and other medical records indicating that C.C. suffered with asthma, vaginal odor and redness, and other health issues prior to December 9, 1992, negating inculpatory medical evidence and impeaching Gwen Cunningham; and notes indicating that there were no loud noises from Cunningham's apartment on the day in question.  Mr. Davis has litigated claims concerning advancements in medicine which undercut the entire scientific basis of the State's case.  The State and the courts cannot turn a blind eye any longer to the strong possibility of a gross injustice, in favor of finality.  See Furman v. Georgia, 408 U.S. 238, 366 (1972) ("Just as Americans know little about who is executed and why, they are unaware of the potential dangers of executing an innocent man. Our 'beyond a reasonable doubt' burden of proof in criminal cases is intended to protect the innocent, but we know it is not foolproof. Various studies have shown that people whose innocence is later convincingly established are convicted and sentenced to death.")

## CONCLUSION

**WHEREFORE**, based on the arguments set forth in his 3.851 motion, the Initial Brief, and this Reply, Mr. Davis respectfully requests this Honorable Court

16

reverse and remand the trial court's denial of his 3.851 Motion for Postconviction

relief for an evidentiary hearing on each of his summarily denied claims.

> Respectfully submitted,
> THE SICHTA FIRM, LLC.,
>
> /s/ Rick Sichta
> RICK SICHTA, ESQUIRE
> Fla. Bar No.: 0669903
> 301 W. Bay St. Suite 14124
> Jacksonville, FL 32202
> Phone: 904-329-7246
> Email: rick@sichtalaw.com
> Attorney for Appellant

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a copy of the foregoing has been delivered via

email to the Office of the Attorney General at capapp@myfloridalegal.com on this

15th day of October, 2019.

> /s/ Rick Sichta
> ATTORNEY

## CERTIFICATE OF COMPLIANCE AND AS TO FONT

I **HEREBY CERTIFY** that this brief is submitted by Appellant, using Times

New Roman, 14-point font, pursuant to Florida Rules of Appellate Procedure, Rule

9.210.

> /s/ Rick Sichta
> ATTORNEY

17

90

Filing # 112475885 E-Filed 08/27/2020 11:50:19 AM

# Supreme Court of Florida

_____

No. SC19-1207

_____

**TONEY DERON DAVIS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

August 27, 2020

PER CURIAM.

Toney Deron Davis, a prisoner under sentence of death, appeals the circuit

court's order summarily denying his successive motion for postconviction relief,

which was filed under Florida Rule of Criminal Procedure 3.851. We have

jurisdiction, *see* art. V, § 3(b)(1), Fla. Const., and affirm for the reasons that

follow.

## BACKGROUND

Davis was "charged with and convicted of first-degree felony murder,

aggravated child abuse, and sexual battery," stemming from "the murder of [two-

year-old] Caleasha Cunningham on December 9, 1992." *Davis v. State* (*Davis I*),

703 So. 2d 1055, 1056 (Fla. 1997), *cert. denied*, 524 U.S. 930 (1998). The

victim's mother, Gwen Cunningham, testified that "on the day of the murder," she left the victim—then fully clothed, "in good health and without injuries"—alone with Davis in their shared apartment. *Id.* At approximately 12:45 p.m., "Thomas Moore, an acquaintance of Davis's," visited the apartment. *Id.* Moore testified that "Davis answered the door with the victim draped over his arm." *Id.* After Davis told Moore that the victim "had choked on a french fry," Moore called 911. *Id.*

When rescue personnel arrived, the victim was unconscious, wet, and naked from the waist down. *Id.* at 1057. Blood was present in the bedroom and bathroom, and "blood which was found to be the victim's" was located on Davis's underwear and on "the crotch region" of his shorts. *Id.* The victim was taken to hospital, where she was "revived but died shortly afterward on December 10, 1992." *Id.*

At trial, "Davis testified that he had left [the victim] and his friend Moore alone in the apartment at about 12:30 p.m. and went to make some phone calls." *Id.* at 1056. "When he returned," Davis claimed, "Moore was gone and [the victim] was having a seizure." *Id.* Davis stated that "he administered CPR" to the victim, "put her in the shower to revive her, and accidentally dropped her in the shower." *Id.* He explained that "Moore asked him not to mention that he had been with [the victim] because Moore had marijuana in his possession." *Id.*

The State presented testimony from "[a] neighbor, Janet Cotton," who claimed to have "heard a child crying" and "a lot of thumping noises coming from" Cunningham's "apartment at approximately noon" on December 9, 1992. *Id.* Cotton explained that the noises lasted for about thirty minutes. *Davis v. State* (*Davis II*), 136 So. 3d 1169, 1189 (Fla. 2014). She further recalled hearing a " '[v]ery loud' and 'stern' 'male voice' that she recognized as Davis's, saying '[s]it down.' " *Id.* (alterations in original).

The emergency room physician who treated the victim testified that—in addition to bruising—the victim had "swelling of the brain and pools of blood in the skull." *Davis I*, 703 So. 2d at 1057. "[T]here was [also] a large collection of blood at the back of the head which was not consistent with being accidentally dropped." *Id.* Another doctor who examined the victim "testified that the injuries indicated vaginal penetration by a penis, a finger, or an object." *Id.* While the medical examiner "testified that there was no injury to the vaginal area," he explained that "it could have healed quickly." *Id.* He "said the victim had suffered four separate blows to the head, causing [the] cerebral hemorrhage" that resulted in her death. *Id.* The medical examiner further stated that no french fries were found in the victim's stomach. *See id.* at 1059.

A law enforcement officer testified that Davis claimed to have been alone with the victim. *Id.* at 1056. Law enforcement agents additionally stated that

- 3 -

Davis could not explain why blood was found in certain areas of the bedroom and bathroom or "specify how the victim actually hit the floor when he supposedly dropped her in the shower." *Id.* at 1059.

Davis was convicted of all charges, *id.* at 1056, and sentenced to death for the first-degree felony murder, *id.* at 1057. We upheld his convictions and his death sentence on direct appeal. *Id.* at 1062. Thereafter, we denied Davis's initial motion for postconviction relief and his habeas petition. *Davis II*, 136 So. 3d at 1209. We also affirmed the denial of his successive postconviction motion, *Davis v. State (Davis III)*, 42 Fla. L. Weekly S235, S236, 2017 WL 656307, at *2 (Fla. Feb. 17, 2017), and denied his second petition for a writ of habeas corpus, *Davis v. Jones*, 235 So. 3d 301, 301 (Fla. 2018).

In 2019, Davis filed another successive postconviction motion, claiming the State committed *Giglio*[1] and *Brady*[2] violations. The circuit court summarily denied the motion. This appeal followed.

## ANALYSIS

Davis contends that the circuit court erred in summarily denying his claims that the State knowingly presented false testimony from trial witness Janet

---

1. *Giglio v. United States*, 405 U.S. 150 (1972).

2. *Brady v. Maryland*, 373 U.S. 83 (1963).

- 4 -

Cotton—in violation of *Giglio*—and suppressed Cotton's "true" testimony—in violation of *Brady*. Summary denial of a successive postconviction motion is appropriate "[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief." Fla. R. Crim. P. 3.851(f)(5)(B). Applying a de novo standard of review, we find that test satisfied here.

## *Giglio*

We first address Davis's *Giglio* claim. To establish a *Giglio* violation, Davis must show "that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." *Moore v. State*, 132 So. 3d 718, 724 (Fla. 2013). False testimony is material "if there is any reasonable possibility that it could have affected the jury's verdict." *Id.* (quoting *Tompkins v. State*, 994 So. 2d 1072, 1091 (Fla. 2008)). "The State . . . bears the burden to prove that the presentation of false testimony at trial was harmless beyond a reasonable doubt." *Id.* (quoting *Guzman v. State*, 868 So. 2d 498, 506 (Fla. 2003)).

In support of his claim, Davis relies on an affidavit from Cotton in which she states that—contrary to her trial testimony—she "did not hear a baby or child cry or scream on December 9, 1992." She further claims that she did not hear "a thumping noise" or Davis "yell, 'Sit down.'" Rather, Cotton states, she heard "crying and screaming" coming from a nearby apartment "[a]t some point" one or two days "before December 9, 1992." She claims that she "was put under a great

deal of pressure and duress by the State of Florida during multiple meetings with law enforcement." Cotton further recalls that she stayed in touch with a former state attorney, who—during their final conversation "several years ago"—offered to "take care" of criminal charges filed against her.

We conclude that the circuit court properly denied this claim. Even assuming Davis could prove that the State knowingly presented false testimony from Cotton, the use of this testimony was harmless beyond a reasonable doubt. Regardless of whether Cotton heard noises coming from Davis's apartment on December 9, 1992, the State presented ample evidence that the victim's injuries were not accidental and occurred while she was in Davis's care. This includes the testimony "that Davis was alone in the apartment with the victim," "the bloodstain evidence," the medical testimony regarding the nature of the victim's injuries, "the fact that there were no french fries found in the victim's stomach," and Davis's inability to explain how the victim fell or why blood was found in certain areas of the apartment. *Davis I*, 703 So. 2d at 1059. Accordingly, there is no reasonable possibility that Cotton's testimony affected the jury's verdict.

Davis contends, however, that Cotton's testimony was material because it was essential in refuting his defense that Thomas Moore was responsible for the victim's injuries. At trial, Davis testified that "at about 12:30 p.m.," he left the victim alone in the apartment with Moore while he made phone calls. *Davis I*, 703

- 6 -

So. 2d at 1056.  Without Cotton's testimony that she heard noises—including "thumping" sounds, a child crying, and Davis's voice saying, "[s]it down"— coming from the apartment between 12:00 p.m. and 12:30 p.m., Davis claims that it would have been more difficult for the jury to rule out the possibility that Moore had injured the victim.  *Davis II*, 136 So. 3d at 1189 (alteration in original).

This argument lacks merit for three reasons.  First, even if Cotton had not testified, "[t]he jury would still be left with the impression . . . that Davis's defense evolved after he had time to contemplate the situation."  *Id.* at 1188.  "Davis did not begin to assert that someone else harmed the victim until after his conversations with the first responders and his interview with the investigating detectives."  *Id.*  He "spoke to seven people in six separate statements about what happened to the victim without ever asserting that Moore—or anyone else—was left alone with" her.  *Id.*

Further, Davis claimed "that when he returned to the apartment after leaving the victim with Moore," there appeared to be nothing wrong with the victim.  *Id.* He recalled that "[s]he looked normal, except for she wasn't breathing."  *Id.*  Yet medical testimony "render[ed] Davis's claim that the child appeared uninjured patently implausible."  *Id.*

Finally, Davis failed to provide a credible "explanation of why he did not immediately implicate Moore."  *Id.*  At trial, Davis "testified that he promised not

to inform law enforcement about Moore's presence—and thus risked implicating himself in the murder—because Moore was afraid of being charged with drug possession." *Id.* at 1188-89.

The circuit court correctly determined that there is no reasonable possibility that Cotton's testimony affected the jury's verdict.[3] Accordingly, we affirm the summary denial of Davis's *Giglio* claim.

*Brady*

Davis next argues that the circuit court erred in summarily denying his *Brady* claim based on Cotton's testimony. To establish a *Brady* violation, the defendant has the burden to show "(1) that favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced." *Taylor v. State*, 62 So. 3d 1101, 1114 (Fla. 2011) (emphasis omitted).

Davis contends that the State violated *Brady* by suppressing Cotton's "true" testimony. But we conclude that Davis's *Brady* claim—like his *Giglio* claim— fails on the materiality prong. There is no "reasonable probability that, had" Cotton's "true" testimony "been disclosed to the defense, the result of the

---

3. Davis further asserts that Cotton's statement should be considered cumulatively with evidence presented in prior postconviction claims when evaluating the materiality prong. We conclude, however, that engaging in such a cumulative analysis would not change our determination.

proceeding would have been different." *Id.* (quoting *Guzman*, 868 So. 2d at 506).
Whether or not Cotton heard noises coming from Davis's apartment on December
9, 1992, the State presented ample evidence that Davis intentionally injured the
victim on that date.[4]  We therefore conclude that the circuit court properly
summarily denied this claim.

## CONCLUSION

For the reasons above, we affirm the circuit court's order summarily denying
Davis's successive motion for postconviction relief.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, MUÑIZ, and
COURIEL, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND,
IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
      Linda McCallum, Judge - Case No. 161992CF013193AXXXMA

Rick A. Sichta of The Sichta Firm, LLC., Jacksonville, Florida,

      for Appellant

---

4. The additional evidence Davis has presented in connection with this
claim does not change our conclusion.  This evidence is either similar to that we
previously held procedurally barred, *see Davis III*, 42 Fla. L. Weekly at S236,
2017 WL 656307, at *1, immaterial even if considered cumulatively with Cotton's
statement, or untimely or otherwise improperly presented in the instant appeal.

- 9 -

Ashley Moody, Attorney General, and Janine D. Robinson, Assistant Attorney General, Tallahassee, Florida,

for Appellee

Filing # 116765521 E-Filed 11/17/2020 08:20:35 AM

# MANDATE

# SUPREME COURT OF FLORIDA

*To the Honorable, the Judges of the:*

**Circuit Court in and for Duval County, Florida**

*WHEREAS, in that certain cause filed in this Court styled:*

**TONEY DERON DAVIS    vs.    STATE OF FLORIDA**

*Case No.:* **SC19-1207**

*Your Case No.:* **161992CF013193AXXXMA**

*The attached opinion was rendered on:* **08/27/2020**

*YOU ARE HEREBY COMMANDED that further proceedings be had in accordance with said opinion, the rule of this Court and the laws of the State of Florida.*

*WITNESS, The Honorable CHARLES T. CANADY, Chief Justice of the Supreme Court of Florida and the Seal of said Court at Tallahassee, the Capital, on this 17th day of November 2020.*



_____

*Clerk of the Supreme Court of Florida*

91

Filing # 113171980 E-Filed 09/10/2020 03:29:25 PM

# FLORIDA SUPREME COURT

500 South Duval Street

Tallahassee, Florida 32399

CASE NO.: SC19-1207

L.T. NO.: 16-1992-CF-13193-AXXX-MA

**TONEY DERON DAVIS**            v.            **STATE OF FLORIDA**

Defendant/Appellant.                                                    Appellee.

## APPELLANT'S MOTION FOR REHEARING

COMES NOW, Appellant, TONEY DERON DAVIS, by and through undersigned counsel, and respectfully requests that this Court, pursuant to Fla. R. App. Pro 9.330(a)(2)(A), Rehear and/or Reconsider its August 27, 2020 Opinion affirming the lower court's order summarily denying successive 3.851 relief, and in support thereof states as follows:

## INTRODUCTION

1. Toney Deron Davis will be referenced as "Mr. Davis," "Davis" or "Appellant."

2. Citations to this Court's August 27, 2020 Opinion will be referenced as "Opinion" followed by the page number, e.g. (Opinion 1.) Citations to the Record will be designated by "SPCR" and the page number, e.g. (SPCR 1.) Citations to the direct appeal Record will be designated by the volume number "R" and the page number, e.g. (1 R 1.)

I.    **The evidence this Court relies upon to refute *Giglio* and *Brady* materiality has been largely refuted by new evidence set forth in Mr. Davis' postconviction proceedings.**

This Court's August 17, 2020 Opinion relies primarily on five points to find that Janet Cotton's recantation of her trial testimony is immaterial to Mr. Davis' case under either *Giglio* or *Brady*: 1) testimony that Davis was alone with C.C.; 2) "the bloodstain evidence"; 3) medical testimony regarding the nature of the victim's injuries; 4) "Davis's inability to explain how the victim fell or why blood was found in certain areas of the apartment"; 5) Mr. Davis' explanation concerning C.C. evolved.  (Opinion 1) (citing *Davis I,* 703 So. 2d at 1059.)  However, the Court's Opinion overlooks that most of these points are inaccurate or were refuted in during postconviction proceedings.

Contrary to this Court's August 27 Opinion, the bloodstain evidence and "blood in certain areas of the apartment" was never conclusively linked to C.C. or to Mr. Davis.  *Davis*, 136 So. 3d at 1185. In any event, any blood of C.C. was explainable by Mr. Davis' concession that he dropped her.  Additionally, Mr. Davis *has* explained why the victim fell – because she was wet from the tub when he was attempting to revive her.

Also contrary to this Court's findings, the medical evidence is subject to different interpretations, including interpretations which would support Mr. Davis's explanation of the events, thus exculpating Mr. Davis.  Numerous experts agree that

the medical evidence does not support a sexual battery.  (SPCR 164) (19 PCR 3479, 3482.)  "[T]he best explanation for there not being any injuries was there never were any injuries…" (19 PCR 3458.) A sexual battery is especially unlikely in the face of evidence withheld from the state that C.C. suffered vaginal irritation and poor hygiene leading up to the day in question. (SPCR 167), (19 PCR 3459.)

Additionally, Dr. Ophoven has explained that C.C.'s other injuries could have been the result of an accidental drop, just as Mr. Davis explained:  "Since Mr. Davis' 1995 trial, the science in this area has evolved so that it has now been shown that falls of a relatively short distance [3 feet] can cause severe, and sometimes fatal, injury in small children and toddlers." (SPCR 146.) This is supported by other biomechanical research demonstrating falls "as short as one foot can cause fracture and intracranial bleeding. (SPCR 145.)[1] Further, the retinal hemorrhaging is "not consistent with a conclusion that C.C. was violently shaken." (SPCR 146.)

Finally, as pointed out in every stage of Mr. Davis' postconviction proceedings, his story has always been the same, and he told C.C.'s mother and Ms. Williams shortly after the incident that Moore was briefly alone with the child.  The only reason he did not tell rescue personnel that Mr. Moore may have harmed the

---

[1] If Mr. Davis accidentally dropped C.C. while trying to revive her, she would have looked normal when he returned from making his phone calls, contrary to this Court's Opinion that his claim that she appeared uninjured was "patently impossible." (Opinion 7.)

child is because Mr. Davis, himself, *did not* and *does not* know what happened to C.C. However, under a cumulative assessment of currently available evidence in this case, the most probable explanation is that C.C. suffered an asthma attack or seizure while Mr. Davis was out using the phone; Davis attempted to revive her with water in the bathtub when he returned to find her unresponsive; then, in a panic, he dropped the wet child on a hard surface, causing catastrophic injuries. Where Mr. Davis has never been granted an evidentiary hearing on numerous significant postconviction issues, including new medical testimony and a full recantation of a key state witness, no court has been able to evaluate the cumulative effect of new evidence in his case.

## II.   This Court overlooks the emphasis placed on Ms. Cotton's testimony by the state at trial.

The state's reliance on Cotton's testimony at trial is the best indicator of the materiality of her full recantation. *See Kyles v. Whitley,* 514 U.S. 419, 444, 115 S. Ct. 1555, 1571 (1995) ("The likely damage [of the suppressed evidence] is best understood by taking the word of the prosecutor"); *Hayes v. Brown*, 399 F.3d 972, 986 (9th Cir. 2005) ("The importance of James's testimony was underscored by the prosecution in its closing argument"); *Gathers v. United States*, 101 A.3d 1004, 1009 n.5 (D.C. 2014) ("A prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial.")

4

Yet, in determining that Ms. Cotton's recantation does not establish *Giglio* or *Brady* materiality, this Court overlooked the prosecution's emphasis on Ms. Cotton's testimony at trial:

> Ms. Cotton, the next door neighbor, testified that she was familiar with Gwen Cunningham and the kids; that on the day in question she was entertaining and between 12:00 and 12:30 she heard a horrendous racket next door that included bumping and thumping, like hitting the walls, a child cry, and a man yelling, "Sit down," in a mean, stern voice. A man who she recognized the voice as being the defendant, Toney Davis.
>
> And she also told you that it went on for a half hour and stopped at 12:30. She then told you 30 minutes later rescue arrived. She told you that she told the investigators at the scene what she had heard.

(32 R 971.)

> Between 12:00 and 12:30, Janet Cotton, the next door neighbor, hears banging on the walls, child crying, defendant yelling, sit down," and it goes on for a half hour. And let me tell you something, nobody else has accounted for this half hour, not even this defendant.

(32 R 1019.) As demonstrated with this argument, the testimony was necessary to refute Mr. Davis' defense at trial that Mr. Moore could have harmed the child; or to establish that the injuries did not even occur that day.

## III.   **CONCLUSION**

Based on the foregoing and the contents of his Initial and Reply briefs, Mr. Davis respectfully requests that this Honorable Court rehear and reconsider this matter pursuant to Fla. R. App. Pro. 9.330(a)(2)(A) with respect to the particular points of law and fact that Mr. Davis has set forth above, grant his 3.851 appeal and

reverse and remand his convictions and sentence of death.

Respectfully submitted,

**THE SICHTA FIRM, LLC.,**

/s/ Rick Sichta

RICK A. SICHTA, ESQ.
Fla. Bar No.: 0669903
301 W. Bay St. Suite 14124
Jacksonville, FL 32202
904-329-7246
rick@sichtalaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy hereof has been furnished to the Attorney General's Office to capapp@myfloridalegal.com this 10th day of September, 2020.

/s/ Rick Sichta

ATTORNEY

6

92

Filing # 115893920 E-Filed 10/30/2020 11:49:30 AM

# Supreme Court of Florida

FRIDAY, OCTOBER 30, 2020

CASE NO.: SC19-1207
Lower Tribunal No(s).:
161992CF013193AXXXMA

TONEY DERON DAVIS          vs.      STATE OF FLORIDA

Appellant(s)                              Appellee(s)

Appellant's Motion for Rehearing is hereby denied.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, MUÑIZ, and
COURIEL, JJ., concur.
GROSSHANS, J., did not participate.

A True Copy
Test:

John A. Tomasino
Clerk, Supreme Court

kc
Served:

JANINE D. ROBINSON
RICK A. SICHTA
HON. LINDA MCCALLUM, JUDGE
STEPHEN VINCENT BLEDSOE
HON. RONNIE FUSSELL, CLERK